UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| WE THE PEOPLE PAC, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | 1:20-cv-00489-JAW |
| ) | |
| SHENNA BELLOWS, in her official ) | |
| capacity as the Secretary of State of ) | |
| Maine, et al., ) | |
| ) | |
| Defendants. ) | |

**ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER**

A political action committee, an out-of-state professional petition circulator, a Maine State representative, and a non-profit organization filed a complaint against the state of Maine Secretary of State, seeking declaratory and injunctive relief prohibiting on First Amendment grounds the Secretary of State from enforcing provisions of the Maine Constitution and Maine statutory law that restrict the circulation of ballot initiative petitions to petition circulators who are Maine residents and who are registered to vote in Maine. Even though the plaintiffs raised serious legal issues, because the caselaw in this area is nuanced, because the plaintiffs failed to provide a sufficient uncontested factual record, and because the plaintiffs delayed bringing this lawsuit, they failed to sustain their burden to demonstrate that they are likely to succeed on the merits of this claim and to show entitlement to emergency and extraordinary injunctive relief. Thus, the Court dismisses without prejudice the motion for a temporary restraining order.

# I.     BACKGROUND

## A.     Procedural Background

On December 31, 2020, We the People PAC, State Representative Billy Bob Faulkingham, Liberty Initiative Fund, and Nicholas Kowalski (Plaintiffs) filed a complaint against Matthew Dunlap,[1] in his official capacity as the Secretary of State of Maine, and Julie Flynn, in her official capacity as the Deputy Secretary of State of Maine for the Bureau of Corporations, Elections and Commissions (Defendants), seeking declaratory and injunctive relief prohibiting the Secretary of State from enforcing certain Maine State laws that regulate the circulation of ballot initiative petitions.  *Compl. for Declaratory and Injunctive Relief* (ECF No. 1) (*Compl.*).  That same day, the Plaintiffs filed a motion for a temporary restraining order and/or preliminary injunction (TRO), prohibiting enforcement of laws that require petition circulators to be Maine residents and be registered to vote in Maine.  *Pls.' Mot. for Emergency TRO and/or Prelim. Inj.* (ECF No. 3); *id.*, Attach. 1, *Pls.' Mem. of Law in Supp. of Their Mot. for TRO and/or Prelim. Inj.* (*Pls.' Mem.*).  On January 6, 2021, the Court held a telephone conference of counsel with counsel for the Plaintiffs and the Defendants, at which the Court set deadlines for the Defendants to respond to the Plaintiffs' motion by the end of the day on January 8, 2021.  *Min. Entry* (ECF No.

---

[1]     In their opposition, the Defendants observe that Shenna Bellows succeeded Matthew Dunlap as Maine Secretary of State.  *Defs.' Opp'n to Pls.' Mot. for Emergency TRO* at 1 (ECF No. 15).  The website for the Maine Secretary of State confirms that Governor Janet Mills swore in Ms. Bellows as Maine   Secretary   of   State   on   Monday,   January   4,   2021.   *See* https://www.maine.gov/sos/news/2021/sosbellows.html.  Under Federal Rule of Civil Procedure 25(d), Secretary Bellows is "automatically substituted as a party."  *Gonzalez Torres v. Toledo*, 586 F.2d 858, 859 (1st Cir. 1978) ("[A] successor is automatically substituted under Fed. R. Civ. P. 25(d)").  The Court altered the name of the current Maine Secretary of State in accordance with the Rule.

13).  On January 8, 2021, the Defendants filed their response.  *Defs.' Opp'n to Pls.' Mot. for Emergency TRO* (ECF No. 15) (*Defs.' Opp'n*).[2]  On January 9, 2021, the Plaintiffs filed a reply.  *Pls.' Reply to Defs.' Br. in Opp'n to Pls.' Mot. for TRO* (ECF No. 17) (*Pls.' Reply*).[3]

### B.   Factual Background

The Court recites this factual background from the Complaint and declarations submitted by the Plaintiffs and the Defendants.

### 1.   The Parties

We the People PAC is a political action committee registered in Maine and is currently circulating a petition for an initiative of direct legislation prohibiting anyone who is not a citizen of the United States from voting in any election held within the state of Maine.  *Compl.* ¶ 16.  Liberty Initiative Fund is a 501(c)(4) nonprofit organization actively engaged in supporting the proposed ban on non-citizen voting in Maine.  *Id.* ¶ 18.  Liberty Initiative Fund is the original proponent of the effort to institute bans on non-citizen voting through state ballot initiatives and referenda and is supporting We the People PAC's efforts to collect signatures for the petition.  *Id.*

---

[2]   The Defendants filed an opposition brief earlier the same day but forgot to file Julie Flynn's declaration.  *Defs.' Opp'n to Pls.' Mot. for Emergency TRO* (ECF No. 14).  The Defendants later made an identical filing, including the Flynn sworn declaration.  *Defs.' Opp'n to Pls.' Mot. for Emergency TRO*, Attach. 1, *Decl. of Julie Flynn in Supp. of Defs.' Opp'n to Pls.' Mot. for TRO* (ECF No. 15) (*Flynn Decl.*).  Besides the missing declaration, the briefs are identical.

[3]   The Plaintiffs filed their reply on Saturday, January 9, 2021.  "This Court has done its level best, but the parties should appreciate 'the temporal constraints under which the district court labored' in arriving at this decision."  *Nw. Bypass Grp. v. U.S. Army Corps of Eng'r's*, 453 F. Supp. 2d 333, 337 n.5 (D.N.H. 2006) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2003)).

State Representative Billy Bob Faulkingham is a Maine resident and member of the Maine House of Representatives currently representing the 136th state house district. *Compl.* ¶ 17. He is a member of We the People PAC and a proponent of We the People PAC's proposed non-citizen voting referendum. *Id.*; *Pls.' Mot.*, Attach. 2, *First Decl. of State Representative Billy Bob Faulkingham* at ¶¶ 3-4 (*Faulkingham Decl.*).

Nicholas Kowalski is a professional petition circulator who resides in the state of Michigan and would like to help circulate We the People PAC's petition in Maine. *Compl.* ¶ 19. Mr. Kowalski has circulated petitions in multiples states, including Michigan, Massachusetts, and California, and claims to have acquired unique skills, allowing him to "quickly screen-out unqualified signers, articulately communicate the substance of the petition and efficiently direct the potential signer on the correct method to properly sign the petition so that the signature will be counted as a valid signature." *Pls.' Mot.*, Attach. 3, *First Decl. of Nicholas Kowalski* at ¶¶ 3, 5 (*Kowalski Decl.*).

The Maine Secretary of State is vested with authority to enforce the statutory provisions challenged in this action. *Compl.* ¶ 20; *Defs.' Opp'n*, Attach. 1, *Decl. of Julie Flynn in Supp. of Defs.' Opp'n to Pls.' Mot. for TRO (pursuant to 28 U.S.C. § 1746)* ¶ 4 (*Flynn Decl.*). Although Matthew Dunlap was the Secretary of State at the time the Plaintiffs filed their Complaint and motion for TRO, Shenna Bellows is now the Maine Secretary of State and is automatically substituted for Mr. Dunlap. *Compl.* ¶ 20; *see supra* n.1. Julie Flynn is the Maine Deputy Secretary of State in

4

charge of the Bureau of Corporations, Elections and Commissions—the office where Plaintiffs are required to file their petitions. *Compl.* ¶ 21; *Flynn Decl.* ¶¶ 3-4. In her official capacity, Ms. Flynn has supervisory responsibility for the review of all petitions for direct initiatives and people's veto referenda, as well as overseeing all statewide elections and administering the Maine election laws. *Flynn Decl.* ¶ 4.

## 2.    The People's Veto and Direct Initiative Process in Maine

### a.    The Maine Constitution

The Maine Constitution "establishes three separate branches of government": "the legislative, executive and judicial." *Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, ¶ 24, 237 A.3d 882, 891 (quoting ME. CONST. art. III, § 1). "Legislative power is, at its core, the 'full power to make and establish all reasonable laws and regulations for the defense and benefit of the people of this State, not repugnant to this Constitution, nor to that of the United States." *Id.* ¶ 27 (quoting ME. CONST. art. IV, pt. 3, § 1).

The Maine Constitution contains two provisions that limit the Maine Legislature's authority to legislate. *See McGee v. Sec'y of State*, 2006 ME 50, ¶ 20, 896 A.2d 933, 940; *Farris ex rel. Dorsky v. Goss*, 143 Me. 227, 231, 60 A.2d 908, 910 ("The right of the people, as provided by Article XXXI of the constitution, to enact legislation and approve or disapprove legislations enacted by the legislature is an absolute one and cannot be abridged directly or indirectly by any action of the legislature"). The first is the so-called "people's veto", ME. CONST., art. IV, pt. 3, § 17, and the second the so-called "direct initiative", ME. CONST., art. IV, pt. 3, § 18. The

"people's veto" provides Maine citizens with a means to veto laws passed upon the conclusion of a legislative session.  ME. CONST., art. IV, pt. 3, § 17.  The "direct initiative" process empowers Maine citizens with the right to directly propose legislation which, if the Maine Legislature does not adopt verbatim by the next legislative session, is placed on the general election ballot as a referendum to be considered by the voters for adoption.  ME. CONST., art. IV, pt. 3, § 18.  *See McGee*, 2006 ME 50, ¶ 25 ("[S]ection 18 cannot be said merely to *permit* the direct initiative of legislation upon certain conditions.  Rather, it reserves to the people the *right* to legislate by direct initiative if the constitutional conditions are satisfied") (emphasis in original).

To exercise the people's veto or direct initiative powers, a Maine citizen must file a valid petition with a sufficient number of signatures with the Secretary of State.  Under the Maine Constitution, the number of signatures shall not be less than 10% of the total vote for Governor cast in the last gubernatorial election.  ME. CONST., art. IV, pt. 3, §§ 17-18.  For a direct initiative, the petition must be addressed to the Legislature and filed in the office of the Secretary of State by 5:00 p.m. on or before the fiftieth day after convening of the Legislature in the first regular session, or on or before the twenty-fifth day after the date of convening of the Legislature in the second regular session.  ME. CONST., art. IV, pt. 3, § 18.  From the issuance of the approved petition form, petitioners have eighteen months to collect the requisite number of signatures.  *Id.*

The Maine Constitution defines a "circulator" as "a person who solicits signatures for written petitions." ME. CONST., art. IV, pt. 3, § 20. Not just anyone can circulate a petition in Maine. The Maine Constitution requires a circulator be "a resident of this State and whose name must appear on the voting list of the city, town or plantation of the circulator's residence as qualified to vote for Governor." *Id.*

### b.   Maine Statutory Law

In addition to these constitutional provisions, the Maine Legislature has enacted statutes regulating this petition procedure. *See* 21-A M.R.S. §§ 901 et seq. Echoing the Maine constitutional provision, 21-A M.R.S. § 903-A states "[p]etitions issued under this chapter may be circulated by any Maine resident who is a registered voter acting as a circulator of a petition." To enforce this restriction, Maine law requires the circulator to sign and file with the Secretary of State an affidavit attesting as much. 21-A M.R.S. § 903-A(4). Failing to truthfully execute and file a circulator affidavit is a Class E crime. 21-A M.R.S. § 904(6). Maine statutes also require that petition sponsors provide a list of paid circulators and that circulators publicly identify themselves on each page of the petition. 21-A M.R.S. §§ 903-A(5), 903-C(1)(D), 901-A(2).

Once a petition is submitted to the Secretary of State's office, the Secretary of State has thirty days to review and determine the validity of each citizen initiative or people's veto referendum petition. 21-A M.R.S. § 905(1). Petition filings generally include anywhere from 7,000 to 20,000 separate petition forms and contain 70,000 to 90,000 voter signatures that must be reviewed by the Secretary of State's staff. *Flynn*

7

*Decl.* ¶ 12.  A legal challenge to the validity of the petition must be filed within five business days and the Superior Court must issue a decision within forty days of the Secretary of State's validity determination.  21-A M.R.S. § 905(2).

### 3.    We the People PAC's Petition

The Plaintiffs seek to exercise their direct initiative power by sponsoring and circulating a petition to propose to the Maine Legislature for its consideration their proposed ban on all non-citizen voting in the state of Maine, and if not adopted verbatim by the Legislature, place the question on the next general election ballot as a direct initiative question to be decided by Maine voters.  *Compl.* ¶ 30. Representative Faulkingham believes that "[l]ocal jurisdictions across the country have opened up their electoral process to illegal aliens, permitting them to cast ballots in local elections" and "We The People PAC's referendum seeks to prevent that trend from making its way to the State of Maine." *Faulkingham Decl.* ¶ 5.  The Secretary of State approved the Plaintiffs' form of a citizen initiative petition entitled "An Act to Clarify the Eligibility of Voters" on August 26, 2019, in accordance with 21-A M.R.S. § 901.  *Flynn Decl.* ¶ 5; *see Defs.' Opp'n*, Attach. 2, *Petition Form*. Representative Faulkingham was the lead applicant. *Flynn Decl.* ¶ 5.

To force their initiative to be adopted by the Maine Legislature or placed on the general election ballot, the Plaintiffs must collect and file 63,067 signatures on their petition.  *Id.* ¶ 6.  They must do so by February 26, 2021.  *Id.*  To meet this deadline, the Plaintiffs hope to hire Mr. Kowalski and other out-of-state professional petition circulators.  *Compl.* ¶¶ 33-34.  The Plaintiffs also wish to hire and recruit

Maine college students who are legal residents of other states and/or who are not registered to vote in Maine. *Id.* ¶¶ 35-36. As a result of the recent spike in COVID-19 infections and the onset of winter weather in Maine, the Plaintiffs believe they need to employ skilled professional circulators to collect the required number of valid signatures and meet the February 26, 2021 deadline. *Pls.' Mem.* at 1-2; *Faulkingham Decl.* ¶ 8. However, because of Maine's laws governing petition circulators, the Plaintiffs have been unable to hire unregistered or out-of-state petition circulators. *Pls.' Mem.* at 2.

## II.   THE PARTIES' POSITIONS

### A.   The Plaintiffs' Motion for TRO

The Plaintiffs bring a motion for TRO, requesting emergency, preliminary and permanent injunctive relief prohibiting the Defendants from enforcing: (1) 21-A M.R.S. § 903-A, to the extent it requires that petitions for a direct initiative or people's veto may only be circulated by a registered voter of Maine, and (2) 21-A M.R.S. § 903-A, to the extent it requires that petitions for a direct initiative or people's veto may only be circulated by a resident of the state of Maine. *Pls.' Mem.* at 1. The Court refers to these challenged provisions as the "voter registration requirement" and "residency requirement."

#### 1.   Likelihood of Success on the Merits

The Plaintiffs split the evaluation of their likelihood of success on the merits into two sections, dealing first with the voter registration requirement and second the residency requirement. *Id.* at 8.

9

### a.    Voter Registration Requirement

The Plaintiffs contend that their challenge to the voter registration requirement is "directly controlled by the United States Supreme Court decision in *Buckley* which held voter registration requirements for petition circulators [were] unconstitutional under the First and Fourteenth Amendments to the United States Constitution." *Id.* The Plaintiffs outline two Supreme Court decisions—*Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999). The Plaintiffs state that the Supreme Court in *Meyer* reasoned that circulation of a ballot access petition is "'core political speech' meriting the highest protections under the First Amendment such that any restriction which decreased the pool of available circulators was subject to strict scrutiny analysis." *Id.* at 8-9 (citing *Meyer*, 486 U.S. at 420-24).

Turning to *Buckley*, the Plaintiffs state that the Supreme Court held unconstitutional a Colorado law requiring circulators to be registered voters because "the requirement reduced the number of persons available to carry the message advanced by the petition sponsors and reduced the number of hours that could be worked and limited the number of persons the circulators could reach without impelling cause." *Id.* at 9-10 (citing *Buckley*, 525 U.S. at 193-97). The Plaintiffs compare their case to *Buckley* and argue "[t]he instant action is a near replicant of the Colorado litigation resolved by the Tenth Circuit and the United States Supreme Court striking down the voter registration requirement for petition circulators." *Id.* at 10. They contend that in Maine, "well over 146,000 voter eligible citizens are not

registered to vote," which "remov[es] them from the pool of available circulators" for the Plaintiffs' petitions and "limit[s] Plaintiffs' total quantum of available speech, the number of hours they can collect signatures and the total number of voters that Plaintiffs[] can reach." *Id.* at 10-11. The Plaintiffs preempt any argument that voter registration is easy by arguing that "the mere status of not registering to vote is, itself, potentially laden with speech." *Id.* at 11 (citing *Buckley*, 525 U.S. at 195-96).

The Plaintiffs further argue that "Maine[] could easily require circulators provide their current address, as is required in Colorado, as a more narrow means recognized by the United States Supreme Court, to protect the state's legitimate interest in serving process for any post-filing investigation." *Id.* The Plaintiffs claim such an address attestation would "provide a more immediate 'currency' than a potentially stale voter registration record." *Id.* Therefore, the Plaintiffs contend the voter registration requirement "imposes a severe burden on the exercise of core political speech subject to strict scrutiny analysis," and because the state of Maine "can more narrowly advance its interest by requiring circulators to provide their current address to Defendants," the voter registration requirement is "facially unconstitutional." *Id.*

> **b.   Residency Requirement**

The Plaintiffs also argue that they are likely to succeed on the merits of their challenge to the residency requirement because "state residency requirements for petition circulators have been held unconstitutional by every Court of Appeals to consider the issue where out-of-state petition circulators can be required to submit to

the jurisdiction of the subject state for purposes of the state's subpoena power for any post-filing investigation and/or prosecutions." *Id.* at 12. The state residency requirements "drastically limit the pool of circulators available to carry the message of the petition proponents." *Id.* The Plaintiffs claim that a state "can more narrowly protect its interest in policing against petition fraud by requirement that out-of-state circulators submit to the state's jurisdiction." *Id.*

The Plaintiffs next review federal courts that have weighed in on the issue of residency requirements. The Plaintiffs claim they find strong support in *Libertarian Party of Virginia v. Judd*, 718 F.3d 308 (4th Cir. 2013), as well as various district court decisions in Pennsylvania and Connecticut. *Id.* at 12-15. The Plaintiffs also cite appellate decisions from the Third, Fourth, Sixth, Eighth, Ninth, and Tenth Circuits. *Id.* at 15-16.

The Plaintiffs argue that Mr. Kowalski is willing to submit to the jurisdiction of Maine to circulate petitions, which "provides a greater ability to locate the nonresident circulator over a resident circulator." *Id.* at 16-17. Furthermore, the Plaintiffs argue that "there is currently no recorded instant where a nonresident circulator, having submitted to the jurisdiction of a state, has failed to comply with a subpoena issued by a state in which the nonresident circulator filed petitions." *Id.* at 17. According to the Plaintiffs, this should not be surprising, as out-of-state professional circulators like Mr. Kowalski have incentive to maintain their reputations and, like Mr. Kowalski, their payment is contingent on attaining a certain high percentage rate of valid signatures. *Id.* The Plaintiffs say that this

scheme of submitting to state jurisdiction is "now successfully employed in every jurisdiction which used to impose out-of-state circulator bans but where nonresident circulators are now permitted to circulate ballot access petitions without the evils States predicted would befall them if the ban were struck down as unconstitutional." *Id.*

### 2.    Irreparable Harm

The Plaintiffs argue that "[t]he loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury" and "in the context of an alleged violation of First Amendment rights, a plaintiffs' claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of Plaintiffs' First Amendment claims." *Id.* at 18 (quoting *Elrod v. Burns*, 427 U.S. 347, 353 (1976); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)). The Plaintiffs claim that, absent a TRO, they will be unable to hire Mr. Kowalski, will be "deprived of the benefits of contracting for the services of other out-of-state professional circulators," and "deprived of even in-state nonresidents who are registered in other state[s], such as college students." *Id.* at 18-19. Furthermore, "the requested relief will not impact any deadlines associated with the current Referendum calendar." *Id.* at 19. In sum, the Plaintiffs argue that "absent the requested emergency relief, it is less likely that Plaintiffs will be able to collect the required number of valid signatures needed to place their agenda on the Maine ballot for wider political debate." *Id.*

### 3.      Balance of Equities

The Plaintiffs claim that they will suffer irreparable harm if the Defendants are allowed to continue enforcing the voter registration and residency requirements, but the Defendants "will suffer no harm if the requested relief is granted." *Id.* The Plaintiffs note that even if the laws are found unconstitutional, they will still need to gather the requisite number of signatures and the Defendants "will secure more information about Referendum and People's Veto petition circulators Defendants can use to execute any subpoena." *Id.* In fact, the Plaintiffs claim their requested relief will actually "strengthen Defendants' ability to enforce Maine election law while expanding the total quantum of protected speech." *Id.* at 19-20.

### 4.      Public Interest

Lastly, the Plaintiffs argue that "[t]he public interest is served by Defendants conducting the Referendum and People's Veto petition process within the boundary lines of the federal constitution." *Id.* at 20. In support, the Plaintiffs quote a district court case that states, "[t]hough the public has a strong interest in the efficient regulation and processing of referendum petitioners, the public also has a strong interest in ensuring that referendum petitioners are not confronted with unconstitutional barriers, thereby impacting their speech . . .." *Id.* (quoting *OpenPittsburgh.org v. Wolosik*, No. 2:16-cv-1075, 2016 WL 7985286, at *4 (W.D. Pa. Aug. 9, 2016)).

### B.     The Defendants' Opposition

The Defendants oppose the Plaintiffs' motion for TRO, relying on the Maine Law Court's and this Court's previous consideration of the constitutionality of Maine's voter registration and residency requirements "in the context of Maine's unique circumstances and experience." *Defs.' Opp'n* at 1.  Before undertaking their constitutional analysis, the Defendants note the Plaintiffs waited "sixteen months after launching their petition drive" with no mention "of how they have proceeded thus far or how Maine's requirements threaten their ability to obtain sufficient signatures in the time remaining." *Id.* at 1.  "Given the striking lack of evidence to support the issuance of such relief, and the tardiness of Plaintiffs' legal action, this Court should deny Plaintiffs' Motion." *Id.* at 2.

### 1.     Likelihood of Success on the Merits

### a.     Legal Framework

The Defendants first lay out the legal framework for its constitutional analysis, arguing that "[t]he regulation of core political speech . . . does not automatically trigger strict scrutiny." *Id.* at 3.  Instead, they say, the Court should "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the [P]laintiff[s] seek[] to vindicate;" "identify and evaluate the precise interest put forward by the State as justifications;" and consider "the legitimacy and strength of each of those interests" and "the extent to which those interests make it necessary to burden the [P]laintiff[s'] rights." *Id.* at 4 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

**b.     Burden on the Plaintiffs**

The Defendants look next to the burden imposed by the Maine laws, calling it a "fact-intensive" decision.  *Id.* at 5 (quoting *Jones v. Sec'y of State*, 2020 ME 113, ¶ 27, 238 A.3d 982, 991).   The Defendants claim that the Plaintiffs failed to demonstrate that the residency requirement imposes a severe burden because "the evidence here does not establish that the residency requirement has been, or will be, a significant obstacle to Plaintiffs gathering the requisite 63,067 signatures within the constitutionally prescribed 18-month timeframe, particularly given Maine's long history of successful petition drives meeting these requirements."  *Id.* at 5-6 (internal citations omitted).  The Defendants point to additional missing evidence that they maintain the Plaintiffs failed to provide.  *Id.* at 6.

Second, the Defendants argue that "the residency requirement has very little impact on speech" because "[t]he provision at issue restricts *circulation* of a petition to Maine residents who are registered."  *Id.* (emphasis in brief).  While Maine law requires circulators who perform the "critical mechanical aspects of the initiative process" to be Maine residents, "neither the Constitution nor any statute prevents a nonresident from coming to Maine and engaging in core political speech in support of an initiative drive."  *Id.* at 6-7.  The Defendants suggest other ways that out-of-staters can participate in the petition process, such as "hir[ing] and train[ing] Maine residents on how best to collect signatures; accompany[ing] circulators to help

16

persuade voters to sign the petition; manag[ing] the entire petition drive; and voic[ing] their support for the initiative in any forum." *Id.* at 7.

As to the registration requirement, the Defendants contend "it is hardly any more burdensome, as it only barely reduces the pool of potential circulators." *Id.* at 8. The Defendants argue the voter registration process is simple and, unlike the circumstances in Colorado that the Supreme Court considered in *Buckley*, "approximately 97% of eligible adults are registered to vote in Maine." *Id.* (citing *Flynn Decl.* ¶ 8). Thus, they contend "Plaintiffs have not demonstrated—beyond speculative reference to an unidentified group of college students who are allegedly here on campuses in Maine but are registered to vote in other states—that the registration requirement itself has prevented them from hiring willing circulators; that any potential circulators are unwilling or unable to register; that they have had difficulty recruiting a sufficient number of registered voter circulators; or that the registration requirement has otherwise hindered their ability to meet the initiative deadline." *Id.* Rather, the Defendants suggest that "the recent history of successful petition drives in Maine demonstrates that there are ample numbers of Maine registered voters ready, willing, and able to circulate petitions." *Id.* at 8-9.

### c.   State's Interests

Regarding the residency requirement, the Defendants argue that the state of Maine has two independent interests: "(1) ensuring the initiative process is carried out legally, and (2) preserving the initiative process as a grassroots vehicle for legislative change." *Id.* at 9. The Defendants contend the interest in legality is a

compelling governmental interest. *Id.* They acknowledge the Plaintiffs' guarantee that they will only hire circulators who submit to the personal jurisdiction of Maine, but argue that "even where personal jurisdiction exists, there remains the specter of a costly and time-consuming effort to track down circulators who may have gone home or moved on to another state to work on another petition drive." *Id.* at 9-10. Furthermore, the Secretary of State only has thirty days to review petitions after they are filed, and state residency "ensures that when time-sensitive questions arise (as they generally do), circulators are easy to both locate and contact, not least because Maine's government has the most information about—and ability to find— its own citizens." *Id.* at 10.

The Defendants also claim that the residency requirement furthers the compelling interest of "protecting the local character of the direct initiative process." *Id.* The Defendants claim the requirement "ensur[es] that those involved in the direct machinery of the initiative process are individuals with a personal stake in its outcome and who are accountable to their peers, namely those whose signatures they are collecting." *Id.*

Regarding the voter registration requirement, the Defendants argue that it is a "simple and, more importantly, *verifiable* way for the Secretary of State to determine a person's residency in Maine at the time of the circulation of a petition— a consideration that was not discussed in *Buckley*." *Id.* at 10-11 (quoting *Jones*, 2020 ME 113, ¶ 33) (emphasis in original).

18

### 2.    Irreparable Harm

The Defendants argue that the "utter lack of evidence accompanying Plaintiffs' motion illustrates why a TRO is not necessary to prevent irreparable harm."  *Id.* at 11.  Specifically, they point out that there is "no evidence concerning Plaintiffs' efforts thus far to meet the signature requirement; their attempts to recruit and use registered Maine circulators; and the degree to which their efforts would be more successful—during the five weeks that remain before the filing deadline—if circulation by nonresidents and/or unregistered Mainers were permitted."  *Id.* at 11-12.

### 3.    Balance of Equities

According to the Defendants, the balance of equities favors them because the Plaintiffs obtained approval to begin circulating their petition in August 2019 and had the opportunity to circulate their petition at the polls during multiple statewide elections, but nonetheless "waited over 16 months before filing this lawsuit, forcing this Court to consider extraordinary action to address their belated grievances . . .." *Id.* at 12.  Accordingly, the "Plaintiffs' lack of diligence should not be rewarded with emergency relief."  *Id.*

### 4.    Public Interest

Finally, the Defendants claim that the public interest would not be served by issuance of a TRO because the public has a "strong interest in the efficient regulation and processing of referendum petition[s]" and "in protecting the integrity and grassroots nature of the direct initiative and people's veto power."  *Id.* at 13.  The

19

voter registration and residency requirements "directly serve these ends, with minimal effect on the prospect of obtaining sufficient signatures to place an initiative on the ballot." *Id.*

## C.     The Plaintiffs' Reply

In their reply, the Plaintiffs clarify that the voter registration requirement is actually more restrictive than the residency requirement because not only does it exclude unregistered Maine residents, but it excludes all out-of-state individuals because residency is a prerequisite to registering to vote. *Pls.' Reply* at 1-3. The Plaintiffs put the number of United States citizens excluded by the voter registration requirement at 207,904,840. *Id.* at 2. The Plaintiffs distinguish the Maine cases cited by the Defendants by claiming those cases neglected to consider the broader reach of the voter registration requirement and were not presented with facts showing that out-of-state circulators were willing to submit to Maine's jurisdiction. *Id.* at 3. The Plaintiffs also ask the Court not to read too much into the *Buckley* Court's consideration of the estimated reduction of potential circulators in Colorado as a result of the voter registration requirement, and instead look to *Meyer*, where they say the Supreme Court struck down a law "without testimony or a record detailing the numbers of petition circulators who would not circulate unless compensated . . .." *Id.* at 4. Accordingly, the Plaintiffs argue "any reduction in the pool of available circulators which makes it ***less likely*** to secure ballot access is a severe impairment to First Amendment[] guarantees." *Id.* at 4-5 (emphasis in brief).

Regarding irreparable injury, the Plaintiffs first restate their contention that "the denial of First Amendment rights even for a moment . . . constitutes an irreparable injury for purposes of the temporary restraining order test." *Id.* at 5. Second, the Plaintiffs stress that "the real constitutional injury is not a question of being able or not able to qualify a measure for the ballot," but rather "the real severe constitutional impairment caused by any state regulation that reduces the pool of available circulators which, itself makes it less likely that an initiative will secure ballot access." *Id.* Citing *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000), the Plaintiffs assert they "need only to establish that they are deprived of using the circulators of their choice," which they have clearly done. *Id.* at 6. In addition, the Plaintiffs cite their attached affidavits and highlight all the ways they have been harmed by the restrictive laws. *Id.* at 6-9. "Regulations that make it more expensive or require more funding to make the ballot is precisely the kind of injury that support the requested TRO." *Id.* at 10.

Lastly, the Plaintiffs urge the Court to "update this district's case law to reflect the overwhelming consensus extending the analysis of *Meyer* and *Buckley* to overturn voter registration and residency requirements for out-of-state petition circulators willing to submit to the jurisdiction of the state." *Id.* They repeat their claim that "[e]very jurisdiction which now employs the requirement that out-of-state circulators submit to its jurisdiction instead of a blanket registration or residency ban have operated for up to 20 years without any problems," and "Maine does not have the right to cordon itself off from the speech of nonresident[s]." *Id.* at 11.

21

## III.   LEGAL STANDARD

"[Injunctive relief] is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).   A judge should use the authority to grant such injunctive relief "sparingly."   *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981); *see Phillips v. Willis Re Inc.*, Civil No. 20-1635 (FAB),  2020 U.S. Dist. LEXIS 217027, at *7 (D.P.R. Nov. 18, 2020) ("Temporary restraining orders 'must be used sparingly and only in cases where the need for extraordinary equitable relief is clear and plain'") (quoting *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 2d 333, 338 (D.N.H. 2006)).

To determine whether to issue a TRO, the Court applies the same four-factor analysis used to evaluate a motion for a preliminary injunction.   *See Alcom, LLC v. Temple*, No. 1:20-cv-00152-JAW, 2020 WL 2202443, at *5 (D. Me. May 6, 2020) (citing cases).   The four factors are:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (alteration in original) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)).

22

"The party seeking [an injunction] bears the burden of establishing that these four factors weigh in its favor." *Id.* at 18.  The same is true with respect to a TRO. *Animal Welfare Inst. v. Martin*, 665 F. Supp. 2d 19, 22 (D. Me. 2009).  Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

## IV.    DISCUSSION

The task before the Court on this motion for a TRO is narrow: to determine whether, at this early stage, the Plaintiffs are entitled to immediate temporary injunctive relief to prevent irreparable harm and serve the public interest.  The Court analyzes the four factors Plaintiffs must establish in turn.

### A.    Likelihood of Success on the Merits

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that this factor is the "most important part of the preliminary injunction assessment") (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2007)).  The Court analyzes the Plaintiffs' challenge to the voter registration requirement and the residency requirement in turn.

1.      **Voter Registration Requirement**

a.      **Level of Scrutiny**

To properly evaluate the constitutionality of Maine's voter registration requirement, the Court must first determine the proper standard of review.[4]  As it turns out, because this legal issue defies quick and clear resolution, its uncertainty provides one of the bases for this Court's denial of the motion for TRO.  The Court's conclusions are tentative and subject to further research, but for the moment, the Court concludes that the proper standard is a balancing approach, not the strict scrutiny standard the Plaintiffs urge.

In general, there are two possible standards to examine issues of this sort, where a state has restricted core political speech: one is strict scrutiny and the other a more flexible, balancing approach.  If strict scrutiny applies, the Plaintiffs will have a much easier time prevailing, but if a balancing approach applies, the Court must turn to the harder issue of how to draw lines and resolve contested facts, which makes the Plaintiffs' case all the more difficult to prove a TRO is warranted.

---

[4]      In their memorandum, the Plaintiffs write that "[n]one of the Challenged Provisions are required by the Constitution of Maine." *Pls.' Mem.* at 4.  The Court is not clear what the Plaintiffs are saying.  Some of the challenged provisions are found both in the Maine Constitution and in Maine statutes.  Some are in the Maine statutes, not in the Constitution, but implement the constitutional provisions.  It is true that the Maine Constitution does not mandate that the Maine Legislature enact these statutes, but it would place the law in an odd posture, if the Court struck the statutes and did not strike the companion constitutional provisions, or vice versa.

The parties have not addressed whether the Court should give the Maine constitutional provisions more deference than the Maine statutes because unlike the statutes, the Maine Constitution forms the foundational core of the state of Maine's governmental organization.  Yet, if the Court determines that the constitutional provisions violate the United States Constitution, the Maine Constitution, like the statutes, must bend under the supremacy clause.  The unanswered question is whether the standard of review is the same.

In their motion, the Plaintiffs argue that any restrictions which reduce the pool of available petition circulators impose severe restrictions on First Amendment rights and are automatically subject to strict scrutiny. *Pls.' Mem.* at 7-8 ("Furthermore, this Court should grant Plaintiffs' motion for either a temporary restraining order and/or preliminary injunction on Plaintiffs' challenge to the state residency requirement for circulators of Referendum and People's Veto petitions because the Supreme Court made clear in both *Buckley* and *Meyer v. Grant*, 486 U.S. 414 (1988) that restrictions which reduce the pool of available petition circulators severely impair[] 'core political speech' subject to strict scrutiny review").

The Court is not yet convinced.  In *Meyer*, the Supreme Court concluded that "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech'" for which First Amendment protection is "at its zenith."  486 U.S. at 421-22, 425.  The Supreme Court, however, rejected an automatic application of strict scrutiny.  *See Burdick v. Takushi*, 504 U.S. 428, 432-33 (1992) (rejecting notion that "a law that imposes any burden upon the right to vote must be subject to strict scrutiny").  Rather, the Supreme Court has held that "a more flexible standard applies."  *Id.* at 433 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983)).  "A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into

consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"   *Id.* at 434 (quoting *Anderson*, 460 U.S. at 789).   Thus, "[r]egulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest," while "[l]esser burdens . . . trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'"  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 434).

In *Buckley*, the Supreme Court squarely confronted a requirement that circulators be registered voters, but the majority opinion did not explicitly state the proper level of constitutional scrutiny.  However, the *Buckley* Court did explain that "'no litmus-paper test' will separate valid ballot-access provisions from invalid interactive speech restrictions; we have come upon 'no substitute for the hard judgments that must be made.'"  *Buckley*, 525 U.S. at 192 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974), and citing *Timmons*, 520 U.S. at 359, and *Anderson*, 460 U.S. at 789-90).

This more flexible approach is in line with First Circuit precedent, as well as cases from this Court and the Maine Law Court.  *See Pérez-Guzmán v. Gracia*, 346 F.3d 229, 239 (1st Cir. 2003) (applying the *Anderson-Burdick* analysis and explaining "[t]he rigorousness of the ensuing judicial inquiry depends upon the extent to which the challenged regulation burdens First Amendment rights"); *Bond v. Dunlap*, No. 1:20-cv-00216-NT, 2020 WL 4275035, at *7 (D. Me. July 24, 2020) (citing *Libertarian Party of N.H. v. Gardner*, 638 F.3d 6, 4 (1st Cir. 2011)) (stating that "courts review

ballot access restrictions 'under the sliding scale approach announced by the Supreme Court' in *Anderson* and *Burdick*"); *Jones*, 2020 ME 113, ¶ 21 ("To ensure fairness and order, the United States Supreme Court has . . . adopted a specific framework for cases involving the regulation of ballot access that does not always require application of the strict scrutiny standard," and "[t]his approach is in contrast to mandatory application of the strict scrutiny standard in reviewing restrictions on core political speech—or content-based restrictions on speech—that do not regulate ballot access").

### b.    Burden on the Plaintiffs

The Court turns to the burden of the voter registration requirement on the Plaintiffs' First Amendment rights.  The Plaintiffs argue that "the challenged voter registration requirement for petition circulators imposes a severe burden on the exercise of core political speech subject to strict scrutiny analysis." *Pls.' Mem.* at 11. They point to the fact that "well over 146,000 voter eligible citizens are not registered to vote," thus "removing them from the pool of available circulators for the Referendum petition and limiting Plaintiffs' total quantum of available speech, the number of hours they can collect signatures and the total number of voters that Plaintiff[s] can reach." *Id.*  They argue "Maine cannot condition the right to engage in the core political speech of circulating petition by forcing unregistered voter[s] to abandon their decision to remain unregistered voters." *Id.*

The Supreme Court considered the constitutionality of voter registration requirements for petition circulators in *Buckley*.  In *Buckley*, the plaintiffs challenged

a Colorado law that required initiative petition circulators to be registered voters. 525 U.S. at 186.  The trial record showed there were approximately 1.9 million registered voters in Colorado, and at least 400,000 persons eligible to vote but unregistered.  *Id.* at 193.  The *Buckley* Court looked to the record and compared the restriction to that in *Meyer*, reasoning that voter registration "decreases the pool of potential circulators as certainly as that pool is decreased by the prohibition of payment to circulators."  *Id.* at 194 (citing *Meyer*, 486 U.S. at 422-23).  The *Buckley* Court rejected Colorado's argument that the voter registration requirement limited speech, but not severely, because "it is exceptionally easy to register to vote."  *Id.* at 195. The Supreme Court reasoned that "[t]he ease with which qualified voters may register to vote . . . does not lift the burden on speech at petition circulation time," noting that "there are . . . individuals for whom, as the trial record shows, the choice not to register implicates political thought and expression."  *Id.*

Although the parties have not cited a First Circuit case directly on point, other federal courts have sought to apply the *Buckley* Court's determination.  *See Wilmoth v. Sec'y of N.J.*, 731 F. App'x 97, 102-03 (3d Cir. 2018) (applying *Anderson-Burdick* analysis and holding New Jersey voter registration law was a severe burden on plaintiffs' First Amendment rights); *Nader v. Blackwell*, 545 F.3d 459, 475 (6th Cir. 2008) (holding Ohio's voter registration and residency requirements for candidate-petition circulators violated plaintiff's First Amendment rights); *id.* at 478 (Nelson Moore, J., concurring) (clarifying the court's holding that "the voter-registration requirement . . . is a severe restriction on political speech which cannot survive strict

scrutiny"); *Krislov v. Rednour*, 226 F.3d 851, 860-62 (7th Cir. 2000) (holding Illinois' voter registration requirement was a severe burden on the plaintiffs' First Amendment rights); *Nader v. Brewer*, 531 F.3d 1028, 1035-36 (9th Cir. 2008) (concluding Arizona's residency requirement for petition circulators was less restrictive than *Buckley*'s voter registration requirement, but was still a severe burden on plaintiff's First Amendment rights).[5]

Contrary to these cases, however, the Maine Law Court as recently as this past September upheld Maine's voter registration requirement.  In *Jones v. Secretary of State*, 2020 ME 113, 238 A.3d 982, the Maine Secretary of State had rejected the plaintiffs' petition after determining there were an insufficient number of valid signatures because some circulators were not registered voters.  *Id.* ¶¶ 2-5.  The plaintiffs filed a petition for review, and the Maine Superior Court vacated the Secretary of State's determination, concluding that *Buckley* rendered the registration requirement a violation of the First Amendment.  *Id.* ¶ 8.  The Secretary of State appealed.  *Id.* ¶ 9.

Using the sliding scale balancing test outlined in *Burdick* and *Anderson*, the *Jones* Court analyzed the First Amendment burdens on the plaintiffs.  The Court concluded that the burdens were not severe because less than two percent of people

---

[5]    The Plaintiffs also bring to the Court's attention a Fifth Circuit case, *Pool v. City of Houston*, 978 F.3d 307 (5th Cir. 2020), where the City of Houston appeared to argue that its voter registration law was a "zombie law" in the wake of *Buckley*, comparing it to same-sex marriage laws that remain on the books after *Obergefell v. Hodges*, 576 U.S. 644 (2015), "even though everyone knows they can no longer be enforced."  *Id.* at 313.  The voter registration law in *Pool*, however, restricted petition signers and circulators to Houston residents and registered voters, and this city jurisdictional restriction is significantly more restrictive than a state voter registration or residency requirement. *Id.* at 310.

who collected signatures were determined to be unregistered and, unlike *Buckley*, none of the circulators were opposed to registering to vote. *Id.* ¶ 31. Thus, "although the *effect* of the signature collectors' failure to timely register in their new municipalities of residence may be severe in this case, we cannot say that the *burden* of the registration requirement on the exercise of petition supporters' First Amendment rights is severe either as applied in this case or more broadly in Maine." *Id.* (emphasis in original).

The First Circuit has not weighed in on the issue of voter registration requirements for petition circulators, but the Defendants cite a 1999 case from this Court, *Initiative & Referendum Institute v. Secretary of State*, No. 98-cv-104-B-C, 1999 U.S. Dist. LEXIS 22071, 1999 WL 33117172 (D. Me. Apr. 23, 1999), *aff'd* (D. Me. Sept. 27, 1999), where Magistrate Judge Cohen confronted the voter registration issue on summary judgment. Magistrate Judge Cohen distinguished the plaintiffs' case in *Initiative & Referendum* from *Buckley*, noting that in Colorado less than 65% of the voting-age population was registered to vote, while in Maine, approximately 98.8% of the voter-eligible population was registered. *Id.* at *15. Moreover, the plaintiffs failed to "identify the existence of any particular obstacle imposed by the voter-registration requirement, *e.g.*, that as a direct result they were unable to hire sufficient numbers of circulators or a particular initiative campaign was hurt." *Id.* Because the evidence demonstrated "at most the imposition of a slight burden, the less stringent standard of review applie[d]." *Id.*

Despite the different outcomes, the crucial common element in these cases was the presence, or lack, of a factual record. Before engaging in its constitutional analysis, the *Jones* Court emphasized that unlike *Buckley* and *Initiative & Reform Institute*, "there has been no trial or summary judgment motion to generate evidence for the trial court's—or our—consideration here." *Jones*, 2020 ME 113, ¶ 29. The Maine Law Court stressed that "the determination of the extent of an election regulation's burden on First Amendment rights is fact-intensive and may depend on broad statistical evidence and direct testimony from those eligible to vote." *Id.* ¶ 27. "Such a record is vital, as the briefs of the parties demonstrate, with both the Secretary of State and Jones citing information from various sources concerning voter registration statistics and patterns and speculating about voter behavior given Maine's registration procedures." *Id.* ¶ 29. The *Jones* Court also highlighted that, unlike in *Buckley*, "the individual circulators whose petitions are in dispute here were not opposed to registering to vote and indeed became registered voters in their municipalities, albeit *after* they circulated the disputed petitions." *Id.* ¶ 31. *See also Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 420 (6th Cir. 2014) (noting that the sliding scale test is "fact-intensive" and stating that "[a] determination that a challenged disclosure requirement unconstitutionally burdens speech protected by the First Amendment on one record does not compel us to conclude the same of a different disclosure requirement on another record").

The importance of a factual record is further supported by a district court case the Plaintiffs submitted to the Court in their reply, *OpenPittsburgh.org v. Wolosik*,

31

No. 2:16-cv-1075, 2016 WL 7985286 (W.D. Pa. Aug. 9, 2016). *See Pls.' Reply*, Attach. 3. In *Wolosik,* the Court granted the plaintiff's request for a preliminary injunction enjoining Pennsylvania's circulator registration and residency requirements, relying on "the stipulations of the parties, the testimony and exhibits entered into the record at the hearing . . ., and the various briefs, responses, and arguments submitted on behalf of all parties to this case." *Id.* at *1. Specifically, the Court noted the plaintiff demonstrated its efforts to gather signatures and "made a record that expanding the pool of circulators will make a real difference in meeting the signature mark." *Id.* at *2. Thus, the Court concluded the "Plaintiff has shown a strong likelihood that *as applied to this Plaintiff* (and as to *this* ballot referendum issue) the in-state residency and registration requirements of circulators may not be constitutionally enforced as they are not necessary to fulfill a compelling state interest in the face of actual constitutional harm." *Id.* (emphasis in original).

Unlike *Wolosik*, there has been no hearing and there are too many unresolved or contested facts. Unlike *Buckley*, the Plaintiffs here have put forth no evidence that individual circulators, who are unregistered voters but Maine residents, and whom they want to hire, are opposed to registering to vote. The sparse record before the Court suggests that 97% of Maine's voter-eligible population—all but about 32,000 eligible residents—is registered to vote, and the Defendants have outlined the easy voter registration process.[6] *Flynn Decl.* ¶¶ 8, 14-16. The Plaintiffs state that they

---

[6]     Citing an online article, Plaintiffs state that "[a]s of November 2, 2020, it was reported that there are 146,997 unregistered, voter eligible citizens of Maine who are not permitted to assist Plaintiffs to circulate their Referendum petition as a direct result of the Challenged Provisions." *Pls.' Mem.* at 6. However, Defendants correctly note that the article actually reports 164,997 people are

"would like to hire college students who attend Maine colleges" who are unregistered but put forth no evidence of how the inability to hire these students burdens them. *Faulkingham Decl.* ¶ 19.  This is particularly true because this is no ordinary time. The state of Maine, like the rest of the country, is experiencing a sharp spike in the number of COVID-19 cases and the Plaintiffs have not explained how they intend to contact university and college students who are at home or dorm-restricted and learning online, much less recruit them to collect signatures at a time when many people are masked and anxious to maintain a social distance.

Furthermore, the Plaintiffs claim that they "need[] to hire out-of-state professional circulators to make sure we have a larger motivated army of petition circulators on the streets collecting signatures," but like *Initiative & Referendum Institute*, they have not presented sufficient evidence of particular obstacles imposed by the requirement.  *Faulkingham Decl.* ¶ 18.  The Plaintiffs specifically identify Mr. Kowalski as someone they would like to hire, but beyond stating their desire, they have put forth no evidence of how the failure to hire him burdens them.

The evidence before the Court suggests that the burden is less than severe.  In the last five years, the Secretary of State received nine citizen initiatives and three people's veto referenda; all but one had enough valid signatures to qualify for the ballot.  *Flynn Decl.* ¶ 10.  The Plaintiffs had since August 2019 to collect the requisite

---

eligible to vote but are not registered.  *Flynn Decl.* ¶ 9.  Moreover, citing data from the Maine government, Defendants claim that as of the statewide primary election on July 14, 2020, there were 1,063,383 active registered voters in Maine.  *Flynn Decl.* ¶ 8.  In other words, "97% of all eligible voters in Maine (all but about 32,000 eligible residents) were registered to vote as of July 14, 2020."  *Id.*  At this stage, where the burden is on the Plaintiffs, the disagreement on the correct data or the way the data are interpreted must fall against the Plaintiffs.

amount of signatures, and it is unclear why now the burden of voter registration warrants extraordinary relief.

To ultimately resolve the question of burden, the parties must present the Court with an evidentiary record. *See Wilmoth*, 731 F. App'x at 105 (vacating order granting motion to dismiss and remanding "to allow the parties to develop an appropriate factual record for the purposes of determining whether the New Jersey law does in fact violate [plaintiffs'] constitutional rights"). It remains possible that on a fuller evidentiary record, the Plaintiffs can show a severe burden to their First Amendment rights. At this juncture, however, on consideration of the current record, the Court cannot conclude that the Plaintiffs are likely to succeed in showing their burdens are severe.

### c. The State's Interests

The Court next looks to see if the State has shown important interests to justify the restrictions. The State claims that "the marginal additional burden it imposes is . . . amply justified," citing *Jones. Defs.' Opp'n* at 10-11.

In *Jones*, the Maine Law Court concluded that voter registration was "a simple and, more importantly, *verifiable* way for the Secretary of State to determine a person's residency in Maine at the time of circulation of a petition—a consideration that was not discussed in *Buckley*." 2020 ME 113, ¶ 33 (emphasis in original). The *Jones* Court thus held that "[t]he requirement that a circulator be registered in the circulator's municipality of residence while circulating a petition therefore imposes only 'reasonable, nondiscriminatory restrictions' on the First Amendment rights of

34

petition supporters for the purpose of ensuring compliance with the residency requirement of the Maine Constitution." *Id.* ¶ 34 (citing *Burdick*, 504 U.S. at 434).

The Plaintiffs argue that Maine "can more narrowly advance its interest by requiring circulators to provide their current address to Defendants." *Pls.' Mem.* at 11. Indeed, in *Buckley*, the Supreme Court stated that "[t]he interest in reaching law violators" was better "served by the requirement upheld below, that each circulator submit an affidavit setting out, among several particulars, the 'address at which he or she resides, including the street name and number, the city or town, [and] the county.'" *Buckley*, 525 U.S. at 196.

The Plaintiffs, however, have again failed to produce any evidence that an affidavit requirement would adequately advance the State's interest of confirming residency. In fact, the only record evidence suggests that the Secretary of State has a narrow time period of thirty days to review and determine the validity of the petition. *Flynn Decl.* ¶ 11. The Maine Law Court has already held that "[t]his efficient method of confirming circulator residency is vital to the expedited review process that the Secretary of State must undertake after the petitions are submitted." *Jones*, 2020 ME 113, ¶ 33. Given the State's strong interest in verifying the legality of submitted petitions, and in light of the less-than-severe burden on the Plaintiffs, at this stage the Court concludes that the Plaintiffs have not carried their burden of showing a likelihood of success on the merits.

### 2.    Residency Requirement

#### a.    Level of Scrutiny

As with the analysis of the voter registration requirement, the Court applies the *Burdick* sliding scale test, weighing "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," "taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). If the burden is severe, the Court will apply strict scrutiny; lesser burdens will trigger less exacting review. *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434).

#### b.    Burden on the Plaintiffs

While the Supreme Court directly addressed voter registration requirements in *Buckley*, the Court did not reach Colorado's requirement that all petition circulators be residents of the state because the parties did not contest that provision. *Buckley*, 525 U.S. at 197. Justice Rehnquist, in dissent, specifically noted the majority's "sphinx-like silence" as to whether states may limit circulators to state residents. *Id.* at 228 (Rehnquist, J., dissenting).

In the years that have passed, however, a consensus has emerged. A majority of the federal appellate courts that have considered the question have found residency restrictions to be severe burdens and unconstitutional under a strict scrutiny review. *See Wilmoth*, 731 F. App'x at 103 (applying strict scrutiny to New Jersey's residency

requirement for circulators); *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 317 (4th Cir. 2013) (holding Virginia's "residency restrictions bearing on petition circulators and witnesses burden First Amendment rights in a sufficiently severe fashion to merit the closest examination"); *Nader*, 545 F.3d at 478 (Nelson Moore, J., concurring) (clarifying majority's holding that Ohio's residency restriction "severely limits political speech and is not justified by a sufficient state interest"); *Krislov*, 226 F.3d at 860 (finding a severe burden and concluding that "[b]y preventing the candidates from employing millions of potential advocates to carry their political message to the people of Illinois, the statute places a formidable burden on the candidates' right to disseminate their message"); *Nader*, 531 F.3d at 1036 (holding Arizona's residency requirement poses a severe burden on plaintiffs' First Amendment rights, noting that "[w]hile the district court correctly observed that there remain millions of potential Arizona circulators, the residency requirement nevertheless excludes from eligibility all persons who support the candidate but who, like Nader himself, live outside the state of Arizona"); *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1028 (10th Cir. 2008) (applying strict scrutiny, despite not using *Anderson-Burdick* test).

In fact, only the Eighth Circuit has found a residency requirement not to be a severe burden. *See Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614 (8th Cir. 2001) (holding that North Dakota's residency requirement was not a severe burden and upholding its constitutionality). *But see Citizens in Charge v. Gale*, 810 F. Supp. 2d 916, 926 (D. Neb. 2011) (reviewing Nebraska's residency requirement and

concluding that *Jaeger* did not control and was distinguishable, noting that *Jaeger* specifically stated that there was "no evidence in the record" of the alleged burden associated with the ban).

The Maine Law Court, however, approved Maine's residency requirement in *Hart v. Secretary of State*, 1998 ME 189, 715 A.3d 165. The *Hart* Court stated that "[a]lthough technically any restriction limits the 'number of voices who will convey the [proponents'] message,' it does not follow that requiring circulators to be residents will limit the size of the audience the proponents can reach or will make it less likely that proponents 'will garner the number of signatures necessary to place the matter on the ballot.'" *Id.* ¶ 11 (quoting *Meyer*, 486 U.S. at 422-23) (alteration in original). The *Hart* Court distinguished its case from *Meyer*, explaining that "[i]n *Meyer*, the petitioners had only six months to gather the necessary signatures and they demonstrated a need to pay circulators in order to obtain the necessary signatures within the allotted time," while the plaintiffs "had three years to gather the necessary signatures and failed to demonstrate any necessity for employing nonresidents in circulating the petitions." *Id.* ¶ 12. *See Maine Taxpayers Action Network v. Gwadosky*, No. Civ.A. AP-02-005, 2002 WL 747912, at *2 n.2 (Me. Super. Ct. Mar. 19, 2002) (declining to revisit *Hart* in light of *Buckley*).

Like the voter registration requirement, the First Circuit has not addressed residency requirements, but Magistrate Judge Cohen in *Initiative & Referendum Institute* briefly considered the issue. The Court made quick work of the plaintiffs' challenge, noting that they "adduce[d] no evidence that Maine's residency

requirement imposes any particular burden on the initiative process." *Initiative & Referendum Inst.*, 1999 WL 33117172, at *16. The Court also emphasized that the "plaintiffs offer[ed] no evidence in support of the basic proposition that any one of them is a non-resident who wishes to work as a circulator in Maine. For this reason alone the claim founders." *Id.*

These cases demonstrate that, like the voter registration requirement, the constitutional analysis here is fact-intensive. However, the Court has few facts before it. The Plaintiffs provided direct evidence that they have been unable to hire Mr. Kowalski because of the residency requirement but have not shown why they need to hire him. The Plaintiffs have had eighteen months to gather the requisite number of signatures and, like in *Hart*, have "failed to demonstrate any necessity for employing nonresidents in circulating the petitions." *Hart*, 1998 ME 189, ¶ 12. In recently submitted declarations, Plaintiffs claim that prohibiting out-of-state circulators increases costs and there is a dearth of in-state circulators, but the Court concludes there are too many unresolved and contested facts to issue a TRO. *See Pls.' Reply*, Attach. 1, *Decl. of Paul Jacob* ¶¶ 14-16; *id.*, Attach. 2, *Decl. of James J. Tracey, Jr.* ¶¶ 6-7.

Ultimately the Court will require an evidentiary hearing and will need to determine the burden on a full record. Like the voter registration requirement, the Court notes the consensus that has emerged from most appellate courts that have considered residency requirements and found them unconstitutional, and it may be that the Plaintiffs are ultimately able to convince the Court to follow the majority

rule.  But not in the context of a motion for TRO.  With the current sparse evidentiary record before it, the Plaintiffs have not persuaded the Court that they will likely succeed in showing a severe burden on their First Amendment rights.

### c.    The State's Interests

The Court next considers whether the State has shown sufficient interests that justify the less-than-severe burden.   The Defendants argue that the residency requirement serves the State's interests in "(1) ensuring the initiative process is carried out legally, and (2) preserving the initiative process as a grassroots vehicle for legislative change."  *Defs.' Opp'n* at 9.  The Plaintiffs, on the other hand, argue that Mr. Kowalski's willingness to submit to the jurisdiction of Maine to circulate petitions actually "provides a greater ability to locate the nonresident circulator over a resident circulator."  *Pls.' Mem.* at 16-17.  Moreover, "there is currently no recorded instant where a nonresident circulator, having submitted to the jurisdiction of a state, has failed to comply with a subpoena issued by a state in which the nonresident circulator filed petitions," which makes sense as "most (virtually all) petition circulators who travel to a state to circulate ballot access petitions are professional circulators whose reputation is contingent on their ability to produce a high number and percentage of valid signatures."  *Id.* at 17.

The Court's decision again comes down to the lack of evidence.  Despite the Plaintiffs' claims about the reliability of out-of-state circulators, they have not provided evidence to back up their claims.  The Court is persuaded by the Law Court's conclusion on the matter:

> Residence enhances the integrity of the initiative process by ensuring that citizens initiatives are brought by citizens of Maine. Because the circulators are the persons who verify that the signature and residence of petitioners are accurate, the residency requirement provides the State with jurisdiction over the circulators and makes the circulators easier to locate if there is a question as to the validity of the signatures collected. Thus, any interference with proponents' right to unfettered political expression is justified by the State's compelling interest in protecting the integrity of the initiative process, and the residency requirement set forth in the Maine Constitution is narrowly tailored to serve that interest.

*Hart*, 1998 ME 189, ¶ 13. *See also Initiative & Referendum Inst.*, 1999 WL 33117172, at *15 (recounting the important and compelling interests served by Maine's residency requirement). Thus, the Court concludes at this point, the Plaintiffs have failed to carry their burden of establishing their likelihood of success on the merits.

### B.   Irreparable Harm

Irreparable injury is "an injury that cannot adequately be compensated for either by a later-issued . . . injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that it is a possibility. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *see also Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("[P]roof of a mere possibility of injury is insufficient to justify an injunction").

The Plaintiffs claim that they will suffer irreparable harm because Mr. Kowalski, other out-of-state professional circulators, and Maine college students

will be unable to circulate petitions for We the People PAC. *Pls.' Mem.* at 18-19. These professional circulators "possess unique skills that enable them to more efficiently collect a greater number of valid signatures than resident volunteer and in-state professional circulators." *Id.* They claim that absent a TRO, "it is less likely that Plaintiffs will be able to collect the required number of valid signatures needed to place their agenda on the Maine ballot for wider political debate." *Id.* at 19. They also argue that "[t]he loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 18 (quoting *Elrod v. Burns*, 427 U.S. 347, 353 (1976)). Defendants respond by pointing to "the utter lack of evidence accompanying Plaintiffs' motion." *Defs.' Opp'n* at 11.

As the Plaintiffs note in their motion, "in the context of an alleged violation of First Amendment rights, a plaintiff['s] claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of Plaintiffs' First Amendment claims." *Pls.' Mem.* at 18. The Court has already explained that due to the lack of evidence, the Court cannot conclude the Plaintiffs are likely to succeed on the merits. While there is a possibility that the Plaintiffs' initiative will be harmed, the Plaintiffs have not demonstrated that harm is likely. The loss of First Amendment rights is irreparable harm, but the Plaintiffs have not carried their burden to show a likely violation of their First Amendment rights. Furthermore, as explained in more detail below, any harm that the Plaintiffs may suffer was exacerbated by their own unexplained delay in bringing this lawsuit.

### C.     Balance of the Equities and the Public Interest

The Court must weigh the balance of the hardships on the parties and the public interest.  On the one hand, the public has a strong interest in ensuring the freedom of speech and expanding the total quantum of protected speech.  *Pls.' Mem.* at 19-20.  On the other hand, the public has a strong interest in the regulation of referendum petitions and in protecting the integrity and grassroots nature of the direct initiative and people's veto power.  *Defs.' Opp'n* at 13.  The Court recognizes that the public has strong competing interests on both sides.

In balancing the equities, however, the scale decidedly tips in the Defendants' favor.  As this Court previously emphasized, "[t]here is no constitutional right to procrastinate." *Dobson v. Dunlap*, 576 F. Supp. 2d 181, 183 (D. Me. 2008).  The record shows that the Plaintiffs obtained the approval to begin circulating their initiative petition in August 2019.  *Flynn Decl.* ¶ 5.  While the Plaintiffs complain about the difficulty of gathering signatures in "Maine's brutal winter weather," winters in Maine are nothing new.  As a Maine resident himself, Representative Faulkingham should have known that it would be harder to collect signatures in the winter.  The Court is unpersuaded by the Plaintiffs' attempt to use ordinary seasonal weather to justify extraordinary relief.

As the Court discussed earlier, by contrast, COVID-19 was not in existence in August 2019.  The global pandemic has made the world, including Maine, a fundamentally different place than it was a year ago.  The fact remains, though, that while the pandemic continues to rage throughout the country and the state of Maine,

it is not new at this point. The first case of COVID-19 in Maine was reported ten months ago in March 2020. The Plaintiffs have provided no reason why they waited until now to request a TRO. A TRO is an equitable remedy and the Plaintiffs should not be able to obtain extraordinary relief from harm induced by their own inaction. The Court concludes that the "Plaintiffs failed to offer any reason for their delay in filing this action," and that delay "has contributed in significant part to Plaintiffs' request for a somewhat urgent" TRO. *League of Women Voters v. Diamond*, 923 F. Supp. 266, 275 (D. Me. 1996).

D.    **Summary**

In reaching its conclusion, the Court emphasizes that it is the Plaintiffs' burden to establish entitlement to extraordinary injunctive relief. Whether a ballot petition law violates the First Amendment is a fact intensive inquiry, yet the Plaintiffs have provided very few facts for the Court to conclude they are likely to succeed on the merits. Moreover, some of the critical facts they do provide are contested by the Defendants. In short, there are too many contested and unresolved facts for the Court to issue a TRO. Furthermore, the Plaintiffs' own unexplained delay in bringing suit has played a large role in the emergency nature of their motion. They cannot now claim equitable relief from their inaction.

In *Jones* and *Hart*, the highest court in Maine, interpreting its own constitution, approved both the residency and voter registration requirements, as did this Court on the one occasion it addressed them. The Court notes that Supreme Court precedent in *Buckley* suggests that on a proper evidentiary record, voter

registration requirements for petition circulators may be unconstitutional. A majority of federal appellate courts have similarly found that residency requirements may be unconstitutional. However, at this point in the case on only a sparse factual record, the Court concludes it is inappropriate to grant emergency injunctive relief.

In the Court's view, the Plaintiffs' claim for a TRO mirrors *Lux v. Rodrigues*, 561 U.S. 1306 (2010), where the United States Supreme Court addressed a litigant's request for an injunction pending appeal in a case involving a state requirement that each signature on a petition to place a candidate on a congressional ballot must be witnessed by a resident of the district. *Id.* at 1306-07. In rejecting the litigant's motion for injunctive relief, Chief Justice Roberts wrote that the appellant "may very well be correct that the Fourth Circuit precedent relied on by the District Court . . . has been undermined by our more recent decisions addressing the validity of petition circulation restrictions." *Id.* at 1307-08 (citing *Meyer*, 486 U.S. at 422, 428, and *Buckley*, 525 U.S. at 186-87). At the same time, the Chief Justice observed that in *Buckley*, the Supreme Court was "careful . . . to differentiate between registration requirements that were before the Court, and residency requirements, which were not." *Id.* at 1308. However, the Chief Justice denied the request for injunctive relief pending appeal, noting that "courts of appeals appear to be reaching divergent results in this area, at least with the respect to the validity of state residency requirements." *Id.* Accordingly, the Chief Justice concluded that even if the reasoning in *Meyer* and *Buckley* "does support Lux's claim, it cannot be said that his right to relief is 'indisputably clear.'" *Id.*

The Supreme Court's *Lux* decision not to grant an injunction on appeal cautions against this Court issuing a TRO and instead supports allowing the parties to more fully develop the factual and legal record in this case for a more considered decision.

## V.   CONCLUSION

The Court DISMISSES without prejudice We the People PAC, State Representative Billy Bob Faulkingham, Liberty Initiative Fund, and Nicholas Kowalski's Motion for Emergency Temporary Restraining Order and/or Preliminary Injunction (ECF No. 3).[7]   The Court will schedule a telephone conference of counsel to discuss the next steps.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 11th day of January, 2021

---

[7]   In the Plaintiffs' motion, they request an "emergency temporary restraining order and/or preliminary injunction." *See Pls.' Mot. for Emergency TRO and/or Prelim. Inj.*  In this order, the Court addresses only the Plaintiffs' motion for TRO, not their motion for preliminary injunction.