UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| WE THE PEOPLE PAC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:20-cv-00489-JAW |
| | ) | |
| SHENNA BELLOWS, in her official | ) | |
| capacity as the Secretary of State of | ) | |
| Maine, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

In 1988, the United States Supreme Court ruled that the circulation of an initiative petition represents core political speech where the protections of the First Amendment are at their zenith.  To control the impact of out-of-state influence on ballot initiatives, the people of Maine through their Constitution and statutes have required petition circulators to be Maine residents and registered to vote in Maine. Based on a paper evidentiary record, the Court concludes that the First Amendment's free speech protections trump the state's regulatory authority and it enjoins the operation of these constitutional and statutory restrictions on petition circulation. The exercise of federal judicial power to enjoin state regulation of its ballot initiative process should be subject to an evidentiary hearing, if the parties desire it, and to appellate review, if they wish to pursue it.  The Court framed its opinion as a prelude to a challenge to the Court of Appeals for the First Circuit for a more authoritative ruling.

I.    **PROCEDURAL HISTORY**

On December 31, 2020, We the People PAC, State Representative Billy Bob Faulkingham, Liberty Initiative Fund, and Nicholas Kowalski (Plaintiffs) filed a complaint against Shenna Bellows,[1] in her official capacity as the Secretary of State of Maine, and Julie Flynn, in her official capacity as the Deputy Secretary of State of Maine for the Bureau of Corporations, Elections and Commissions (Defendants), seeking declaratory and injunctive relief prohibiting the Secretary of State from enforcing certain Maine State laws that regulate the circulation of ballot initiative petitions. *Compl. for Declaratory and Injunctive Relief* (ECF No. 1) (*Compl.*). That same day, the Plaintiffs moved for a temporary restraining order (TRO) and/or preliminary injunction, seeking to prohibit enforcement of laws that require petition circulators to be Maine residents and be registered to vote in Maine. *Pls.' Mot. for Emergency TRO and/or Prelim. Inj.* (ECF No. 3) (*Pls.' Mot.*); *id.*, Attach. 1, *Pls.' Mem. of Law in Supp. of Their Mot. for TRO and/or Prelim. Inj.* (*Pls.' Mem.*). On January 8, 2021, the Defendants filed their response. *Defs.' Opp'n to Pls.' Mot. for Emergency TRO* (ECF No. 15) (*Defs.' Opp'n*). The next day, the Plaintiffs filed a reply. *Pls.' Reply to Defs.' Br. in Opp'n to Pls.' Mot. for TRO* (ECF No. 17) (*Pls.' Reply*).

On January 11, 2021, the Court dismissed the Plaintiffs' motion for temporary restraining order, concluding the Plaintiffs had failed to demonstrate that they were

---

[1]    The Plaintiffs initiated their Complaint against Matthew Dunlap, who was Maine Secretary of State at the time. *Compl.* ¶ 20 (ECF No. 1). As the Court pointed out in its order on the motion for temporary restraining order, on January 4, 2021, Shenna Bellows succeeded Mr. Dunlap as Maine Secretary of State. *Order on Mot. for TRO* at 2 n.1 (ECF No. 18). In its January 11, 2021 order, the Court automatically substituted Ms. Bellows for Mr. Dunlap pursuant to Federal Rule of Civil Procedure 25(d). *Id.*

likely to succeed on the merits, in large part due to the lack of a sufficient factual record. *Order on Mot. for TRO* (ECF No. 18) (*TRO Order*). Notably, the Court's order "addresse[d] only the Plaintiffs' motion for TRO, not their motion for preliminary injunction." *Id.* at 46 n.7. On January 14, 2021, the Court held a telephone conference with counsel, setting the deadlines for the parties' declarations, interrogatories, and briefing. *Min. Entry* (ECF No. 20).

On January 21, 2021, the Plaintiffs filed their declarations, as well as a supplemental document production attaching an article and a YouTube link. *See First Decl. of Christopher Arps* (ECF No. 21) (*Arps Decl.*); *First Decl. of Michael Dane Waters* (ECF No. 22) (*Waters Decl.*); *First Decl. of Alex Isada* (ECF No. 23) (*Isada Decl.*); *The Second Decl. of Paul Jacob* (ECF No. 24) (*Second Jacob Decl.*); *First Decl. of Timothy F. Mooney* (ECF No. 25) (*Mooney Decl.*); *Second Decl. of James J. Tracey, Jr.* (ECF No. 26) (*Second Tracey Decl.*); *First Decl. of Trenton Donn Pool* (ECF No. 27) (*Pool Decl.*); *Suppl. Doc. Produc.* (ECF No. 28).

On January 23, 2021, the Defendants filed their declarations. *See Decl. of Jonathan Wayne in Supp. of Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (pursuant to 28 U.S.C. § 1746)* (ECF No. 30) (*Wayne Decl.*); *Decl. of Ann Luther in Supp. of Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (pursuant to 28 U.S.C. § 1746)* (ECF No. 31) (*Luther Decl.*); *Decl. of Eric McCabe Johnson in Supp. of Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (pursuant to 28 U.S.C. § 1746)* (ECF No. 32) (*Johnson Decl.*); *Suppl. Decl. of Julie Flynn in Supp. of Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (pursuant to 28 U.S.C. § 1746)* (ECF No. 33) (*Suppl. Flynn Decl.*).

On February 2, 2021, the parties simultaneously filed their briefing regarding the Plaintiffs' motion for preliminary injunction, attaching their responses to interrogatories. *Pls.' Suppl. Brief in Supp. of Pls.' Mot. for Prelim. Inj.* (ECF No. 36) (*Pls.' Prelim. Inj. Br.*); *id.*, Attach. 2, *Pls.' Am./Corrected Answer to Defs.' First Set of Interrogs.* (*Pls.' Interrog. Resp.*); *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.* (ECF No. 35) (*Defs.' Prelim. Inj. Opp'n*); *id.*, Attach. 2, *Def. Julie Flynn's Resps. to Pls.' First Set of Interrogs.* (*Flynn's Interrog. Resp.*). Attached to their brief, the Plaintiffs filed a document titled "Plaintiffs' Statement of Undisputed Facts." *Pls.' Prelim. Inj. Br.*, Attach. 1, *Pls.' Statement of Undisputed Facts* (*PSUF*). On February 4, 2021, the Defendants filed an objection to the Plaintiffs' statement of undisputed facts. *Defs.' Obj. to Pls.' Statement of Undisputed Facts* (ECF No. 37).

On February 5, 2021, the Court held a telephonic conference of counsel regarding how the Court should consider the proffered facts. *Min. Entry* (ECF No. 39). On February 8, 2021, the Court held another conference of counsel and the parties agreed upon a process similar to the District of Maine's summary judgment process, whereby each side would submit statements of undisputed facts and then each side would have the opportunity to admit or deny each fact, with the Court resolving any disputed facts. *Min. Entry* (ECF No. 40). During the call, the Plaintiffs stated that they would proceed on their previously filed statement of undisputed facts. *See* PSUF. The Defendants filed their response to the Plaintiffs' statement of undisputed facts on February 9, 2021. *Defs.' Resp. to Pls.' Statement of Undisputed Facts* (ECF No. 41) (DRPSUF). The same day, the Defendants filed their own

statement of undisputed facts. *Defs.' Statement of Undisputed Facts* (ECF No. 42) (DSUF). On February 10, 2021, the Plaintiffs filed their response to the Defendants' statement of undisputed facts. *Pls.' Resp. to Defs.' Statement of Undisputed Facts* (ECF No. 43) (PRDSUF).

## II. FACTUAL BACKGROUND

The Court recites this factual background from the Plaintiffs' and the Defendants' statements of undisputed facts, as well as their declarations and responses to interrogatories.[2] While both parties submitted statements of undisputed facts, many facts are very much in dispute. The Court reviewed the statements of undisputed facts and responses and resolved any disputes.[3]

---

[2]     In their opposition to the Plaintiffs' motion for preliminary injunction, the Defendants make two objections to the evidence submitted by the Plaintiffs. First, the Defendants argue that "while Plaintiffs have submitted a host of declarations in support of their effort to establish a severe burden, much of their content consists of lay opinion without adequate foundation—most declarants, for example, have little to no experience in Maine—or improper expert testimony." *Defs.' Prelim. Inj. Opp'n* at 4-5. The Court has reviewed all declarations and disregards any portions that lack foundation or consist of improper opinion.

Second, the Defendants find the Plaintiffs' interrogatory responses "extremely problematic" and "ask the Court to reject or discount these improper responses, particularly where they consist of more than mere factual replies to Defendants' straightforward, factual interrogatories." *Id.* at 5. Specifically, the Defendants contend the Plaintiffs' responses are "not attributed to particular Plaintiffs," are "not sworn," are "filled with hearsay and argument," and "indeed is not even signed by all Plaintiffs." *Id.* Federal Rule of Civil Procedure 33 requires interrogatories to be answered "by the party to whom they are directed," "separately and fully in writing under oath," and "[t]he person who makes the answers must sign them, and the attorney who objects must sign any objections." FED. R. CIV. P. 33(b). The Plaintiffs' interrogatory responses are signed by Plaintiff Billy Bob Faulkingham and Paul Jacob, on behalf of Plaintiff Liberty Initiative Fund, as well as the Plaintiffs' counsel, Attorney Paul Rossi. There is no requirement that the interrogatory responses be signed by all the Plaintiffs. Furthermore, in response to the Court's February 13, 2021 order, *Order* (ECF No. 44), the Plaintiffs represented that they will file sworn interrogatory responses, curing the oath defect "no later than noon on February 20, 2021." *Pls.' Representation that Pls.' Answer to Defs.' First Set of Interrogs. are Submitted Under Oath and Penalty of Perjury* (ECF No. 45). Based on the Plaintiffs' representation, the Court considers the Plaintiffs' responses to the Defendants' interrogatories as sworn.

[3]     On February 4, 2021, the Defendants objected to the Plaintiffs' statement of undisputed facts, arguing that the Defendants did not have a chance to review and the Court did not authorize the parties to submit separate statements of undisputed facts. *Defs.' Obj. to Pls.' Statement of Undisputed Facts* (ECF No. 37). In light of the Court's recent conference of counsel, during which the Court

### A.      The Parties

We the People PAC is a political action committee registered in Maine and is currently circulating a petition for an initiative of direct legislation prohibiting anyone who is not a citizen of the United States from voting in any election held within the state of Maine.  PSUF ¶ 3; *Compl.* ¶ 16.

Liberty Initiative Fund is a 501(c)(4) nonprofit organization actively engaged in organizing and contributing funds to We the People PAC to circulate petitions to place the citizen-only voting initiative on the 2022 Maine general election ballot. PSUF ¶ 5; DRPSUF ¶ 5.  Liberty Initiative Fund is the original proponent of the effort to institute bans on non-citizen voting through state ballot initiatives and referenda and is supporting We the People PAC's efforts to collect signatures for the petition. *Compl.* ¶ 17.

State Representative Billy Bob Faulkingham is a Maine resident and member of the Maine House of Representatives currently representing the 136th state house district.  PSUF ¶ 4; DRPSUF ¶ 4.  He is a member of We the People PAC and a proponent of We the People PAC's proposed non-citizen voting referendum. *Pls.' Mot.*, Attach. 2, *First Decl. of State Representative Billy Bob Faulkingham* ¶¶ 3-4 (*Faulkingham Decl.*).

Nicholas Kowalski is a professional petition circulator who resides in the state of Michigan and would like to help circulate We the People PAC's petition in Maine. PSUF ¶ 6; DRPSUF ¶ 6.  Mr. Kowalski has circulated petitions in multiples states,

---

authorized the filing of statements of undisputed facts and gave each party the opportunity to respond, the Court overrules the Defendants' objection.

including Michigan, Massachusetts, and California, and claims to have acquired unique skills, allowing him to "quickly screen-out unqualified signers, articulately communicate the substance of the petition and efficiently direct the potential signer on the correct method to properly sign the petition so that the signature will be counted as a valid signature." *Pls.' Mot.*, Attach. 3, *First Decl. of Nicholas Kowalski* ¶¶ 3, 5 (*Kowalski Decl.*). He states that he "routinely" collects signatures at a validity rate of more than 70% and accepts compensation based on the number of signatures he collects, guaranteeing that at least 70% of the signatures he collects will be counted as valid. *Id.* ¶¶ 10-12. As a condition to being able to lawfully circulate petitions in Maine, he is willing to consent to the personal jurisdiction of Maine for the purpose of any subpoena or other judicial process. *Id.* ¶ 20. We the People PAC intends to contract with Mr. Kowalski and other out-of-state professional circulators to obtain the requisite number of signatures. *Faulkingham Decl.* ¶ 11.

The Maine Secretary of State is vested with authority to enforce the statutory provisions challenged in this action. *Defs.' Opp'n*, Attach. 1, *Decl. of Julie Flynn in Supp. of Defs.' Opp'n to Pls.' Mot. for TRO (pursuant to 28 U.S.C. § 1746)* ¶ 4 (*Flynn Decl.*). Although Matthew Dunlap was the Secretary of State at the time the Plaintiffs filed their Complaint and motion for TRO, Shenna Bellows is now the Maine Secretary of State and is automatically substituted for Mr. Dunlap. *Compl.* ¶ 20; *see supra* n.1.

Julie Flynn is the Maine Deputy Secretary of State in charge of the Bureau of Corporations, Elections and Commissions—the office where the Plaintiffs are

required to file their petitions. *Flynn Decl.* ¶¶ 3-4. In her official capacity, Ms. Flynn has supervisory responsibility for the review of all petitions for direct initiatives and people's veto referenda, as well as overseeing all statewide elections and administering the Maine election laws. *Flynn Decl.* ¶ 4; *Flynn Interrog. Resp.* No. 1. She has held the position of Deputy Secretary of State for the Bureau of Corporations, Elections and Commissions since February 1999, and served as the Director of the Bureau from March 1995 until she was appointed Deputy. *Flynn Interrog. Resp.* No. 2.

## B. The People's Veto and Direct Initiative Process in Maine

### 1. The Maine Constitution

The Maine Constitution "establishes three separate branches of government": "the legislative, executive and judicial." *Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, ¶ 24, 237 A.3d 882, 891 (quoting ME. CONST. art. III, § 1). "Legislative power is, at its core, the 'full power to make and establish all reasonable laws and regulations for the defense and benefit of the people of this State, not repugnant to this Constitution, nor to that of the United States." *Id.* ¶ 27 (quoting ME. CONST. art. IV, pt. 3, § 1).

The Maine Constitution contains two provisions that limit the Maine Legislature's authority to legislate. *See McGee v. Sec'y of State*, 2006 ME 50, ¶ 21, 896 A.2d 933, 940 ("[T]he Legislature is authorized to enact implementing legislation, but cannot do so in any way that is inconsistent with the Constitution or that abridges directly or indirectly the people's right of initiative"); *Farris ex rel. Dorsky v. Goss*,

8

143 Me. 227, 231, 60 A.2d 908, 910 ("The right of the people, as provided by Article XXXI of the constitution, to enact legislation and approve or disapprove legislations enacted by the legislature is an absolute one and cannot be abridged directly or indirectly by any action of the legislature").  The first is the so-called "people's veto," ME. CONST., art. IV, pt. 3, § 17, and the second the so-called "direct initiative," ME. CONST., art. IV, pt. 3, § 18.  The "people's veto" provides Maine citizens with a means to veto laws passed upon the conclusion of a legislative session.  ME. CONST., art. IV, pt.3, § 17.  The "direct initiative" process empowers Maine citizens with the right to directly propose legislation which, if the Maine Legislature does not adopt verbatim by the next legislative session, is placed on the general election ballot as a referendum to be considered by the voters for adoption.  ME. CONST., art. IV, pt. 3, § 18.  *See McGee*, 2006 ME 50, ¶ 25 ("[S]ection 18 cannot be said merely to *permit* the direct initiative of legislation upon certain conditions.  Rather, it reserves to the people the *right* to legislate by direct initiative if the constitutional conditions are satisfied") (emphasis in original).

To exercise the people's veto or direct initiative powers, a Maine citizen must file a valid petition with a sufficient number of signatures with the Secretary of State.  Under the Maine Constitution, the number of signatures shall not be less than 10% of the total vote for Governor cast in the last gubernatorial election.  ME. CONST., art. IV, pt. 3, §§ 17-18.  For a direct initiative, the petition must be addressed to the Legislature and filed in the office of the Secretary of State by 5:00 p.m. on or before the fiftieth day after convening of the Legislature in the first regular session, or on or

before the twenty-fifth day after the date of convening of the Legislature in the second regular session. ME. CONST., art. IV, pt. 3, § 18. The petitions must also be submitted to municipal officials for certification at least ten days prior to that date. ME. CONST., art. IV, pt. 3, § 20. From the issuance of the approved petition form, petitioners have eighteen months to collect the requisite number of signatures, but signatures are only valid if they are dated within one year from the date the petition is filed with the Secretary of State. ME. CONST., art. IV, pt. 3, § 18.

The Maine Constitution defines a "circulator" as "a person who solicits signatures for written petitions." ME. CONST., art. IV, pt. 3, § 20. Not just anyone can circulate a petition in Maine. The Maine Constitution requires a circulator be "a resident of this State and whose name must appear on the voting list of the city, town or plantation of the circulator's residence as qualified to vote for Governor." *Id.*

### 2. Maine Statutory Law

In addition to these constitutional provisions, the Maine Legislature has enacted statutes regulating petition circulation. *See* 21-A M.R.S. §§ 901 et seq. Echoing the Maine constitutional provision, 21-A M.R.S. § 903-A states "[p]etitions issued under this chapter may be circulated by any Maine resident who is a registered voter acting as a circulator of a petition." Section 903-A further defines the role of a petition circulator as someone who "solicits signatures for the petition by presenting the petition to the voter, asking the voter to sign the petition and personally witnessing the voter affixing the voter's signature to the petition." *Id.* This is in

contrast with circulators of candidate nominating petitions, who are not required to be registered voters in Maine. *See* 21-A M.R.S. §§ 331-357.

To enforce the residency and voter registration restrictions, Maine law requires the circulator to sign and file with the Secretary of State an affidavit attesting that "the circulator was a resident of the State and a registered voter in the State at the time of circulating the petition." 21-A M.R.S. § 903-A(4). Failing to truthfully execute and file a circulator affidavit is a Class E crime. 21-A M.R.S. § 904(6).

Under § 903-A, a petition circulator "must comply with the provisions of section 902," which require the circulator to "sign the petition and verify by oath or affirmation before a notary public or other person authorized by law to administer oaths or affirmations that the circulator personally witnessed all of the signatures to the petition and that to the best of the circulator's knowledge and belief each signature is the signature of the person whose name it purports to be and that each signature . . . was made by the authorized signer in the presence and at the direction of the voter." 21-A M.R.S. § 902. Furthermore, Maine statutes require that petition sponsors provide a list of paid circulators and that circulators publicly identify themselves on each page of the petition. 21-A M.R.S. §§ 903-A(5), 903-C(1)(D), 901-A(2). These requirements are included in the instructions provided by the Secretary of State to organizers for initiative petitions. *See Flynn Interrog. Resp.* at 22-26 (*Exhibit B-1, Instruction to Petition Organizers for Initiative Petitions*).

Once a petition is submitted to the Secretary of State's office, the Secretary of State has thirty days to review and determine the validity of each citizen initiative or people's veto referendum petition. 21-A M.R.S. § 905(1). Signatures may be deemed invalid when they fail to comply with the Maine Constitution, article IV, part 3, §§ 18-20 and 21-A M.R.S. §§ 901-904-B, copies of which are provided by the Secretary of State's office to the petition applicants when the Secretary of State approves the form of the petition to be circulated. DSUF ¶ 30; PRDSUF ¶ 30. Petition filings generally include anywhere from 7,000 to 20,000 separate petition forms and contain 70,000 to 90,000 voter signatures that must be reviewed by the Secretary of State's staff. DSUF ¶ 21. A legal challenge to the validity of the petition must be filed within five business days and the Superior Court must issue a decision within forty days of the Secretary of State's validity determination. 21-A M.R.S. § 905(2).

### C.    We the People PAC's Petition

The Plaintiffs seek to exercise their direct initiative power by sponsoring and circulating a petition to propose to the Maine Legislature for its consideration their proposed ban on all non-citizen voting in the state of Maine, and if not adopted verbatim by the Legislature, to place the question on the next general election ballot as a direct initiative question to be decided by Maine voters. *Compl.* ¶ 30. Specifically, the Plaintiffs seek to amend the language of 21-A M.R.S. § 111, which lists the general qualifications to vote in a municipal election, to read: "A̶ Only a person who meets the following requirements may vote in any election in a municipality, including a biennial municipal caucus held pursuant to section 311."

*Defs.' Opp'n*, Attach. 2, *Petition Form* (alterations in original).   One of the requirements is that "[t]he person must be a citizen of the United States."   *Id.* Representative Faulkingham believes that "[l]ocal jurisdictions across the country have opened up their electoral process to illegal aliens, permitting them to cast ballots in local elections" and "We The People PAC's referendum seeks to prevent that trend from making its way to the State of Maine." *Faulkingham Decl.* ¶ 5.  The Secretary of State approved the Plaintiffs' form of a citizen initiative petition entitled "An Act to Clarify the Eligibility of Voters" on August 26, 2019, in accordance with 21-A M.R.S. § 901.   DSUF ¶ 1; PRDSUF ¶ 1; *see Petition Form*.   Representative Faulkingham was the lead applicant. *Flynn Decl.* ¶ 5.

To qualify their initiative for the ballot, the Plaintiffs must collect and file a minimum of 63,067 signatures of registered voters within one year prior to filing those signatures with the Secretary of State.  DRPSUF ¶10.  They must file the petitions with the Secretary of State by 5:00 p.m. on February 26, 2021, and must submit the petitions to municipal officials for certification by 5:00 p.m. on February 16, 2021.  *Id.*

### D.   The History of Citizen Initiatives and People's Veto Referenda in Maine

During the past five years, the Secretary of State's office has received and reviewed petitions for nine citizen initiatives and three people's veto referenda. DSUF ¶ 15.  Each petition drive involved hundreds of circulators who were Maine residents and registered voters, and all but one had enough valid signatures to qualify for the ballot.  *Id.*  The recent petition drives are: initiative entitled "Resolve, to Reject

the New England Clean Energy Connect Transmission Project" filed on February 3, 2020 – 563 circulators; people's veto of "An Act to Implement Ranked-choice Voting for Presidential Primary and General Elections in Maine" filed on June 16, 2020 – 543 circulators; people's veto of "An Act to Protect Maine Children and Students from Preventable Diseases by Repealing Certain Exemptions from the Laws Governing Immunization Requirements" filed on September 18, 2019 – 734 circulators; initiative entitled "An Act to Establish Universal Home Care for Seniors and Persons with Disabilities" filed on January 29, 2018 – 262 circulators; people's veto of "An Act to Implement Ranked-choice Voting in 2021" filed on February 2, 2018 – 894 circulators; initiative entitled "An Act to Enhance Access to Affordable Health Care" filed on January 26, 2017 – 445 circulators; initiative entitled "An Act to Allow Slot Machines or a Casino in York County" filed on February 1, 2016 – 549 circulators; initiative entitled "An Act to Establish the Fund to Advance Public Kindergarten to Grade 12 Education" filed on February 1, 2016 – 548 circulators; initiative entitled "An Act to Legalize Marijuana" filed on February 1, 2016 – 549 circulators; initiative entitled "An Act to Require Background Checks for Gun Sales" filed on January 19, 2016 – 339 circulators; initiative entitled "An Act to Raise the Minimum Wage" filed on January 14, 2016 – 473 circulators; and initiative entitled "An Act to Establish Ranked-choice Voting" filed on October 19, 2015 – 392 circulators.[4]  *Id.*

---

[4]    The Plaintiffs neither admit nor deny these numbers but argue that the "Defendants have provided no documents to establish this fact."  PRDSUF ¶ 15.  The Defendants have, however, previously provided these statistics in a sworn declaration by Julie Flynn.  *See Flynn Decl.* ¶ 10.  The Plaintiffs have given the Court no reason to question the Defendants' representation and thus accepts these numbers.

        The Plaintiffs also argue that the "Defendants fail to establish how many of the circulators . . . were Maine residents who actually collected signatures or were just Maine residents who witnessed

Recently on January 21, 2021, proponents of a citizen initiative petition related to the CMP transmission line project submitted to the Secretary of State petitions circulated by 616 circulators who attested to being Maine residents and registered voters, and the petitions appeared to contain over 100,000 signatures collected since October 30, 2020.  DSUF ¶ 16.[5]  Revolution Field Strategies, Inc. of Washington, D.C.—the petition organizing company hired to run the CMP transmission line petition drive—reported to the Secretary of State, pursuant to 21-A M.R.S. §§ 903-A(5) and 903-C, that it paid 349 individuals to work on this petition drive. DSUF ¶ 17.

In the past ten years, the Secretary of State has reviewed eighteen direct initiative or people's veto petitions.  *Flynn Interrog. Resp.* at 30-63 (*Exhibit C, Determinations of the Validity of a Petition for Initiated Legislation*).  All but two of them had a sufficient number of valid signatures.  *Id.*  In total, 261,694 petitions containing 1,475,486 signatures were submitted, and the Secretary of State determined 259,688 of those signatures to be invalid.  *Id.*  Of the 259,688 invalid signatures, 134,341 were invalidated because "they were not certified by the registrar

---

the collection of signatures and, thereafter, executed the circulator affidavit/oath as the circulator." PRDSUF ¶ 15.  The Court accepts this qualification and considers these "circulators" to be people who both actually collected signatures and who witnessed and executed the circulator affidavit.

[5]     The Plaintiffs neither admit nor deny these numbers but argue that the "Defendants have provided no documents to establish this fact."  PRDSUF ¶ 16.  The Defendants have, however, previously provided these statistics in a sworn declaration by Julie Flynn.  *See Suppl. Flynn Decl.* ¶¶ 4-5.  The Plaintiffs have given the Court no reason to question the Defendants' representations and thus accepts these results.

The Plaintiffs also argue that the "Defendants fail to establish how many of the circulators . . . were Maine residents who actually collected signatures or were just Maine residents who witnessed the collection of signatures and, thereafter, executed the circulator affidavit/oath as the circulator." PRDSUF ¶ 16.  The Court accepts this qualification and considers these "circulators" to be people who both actually collected signatures and who witnessed and executed the circulator affidavit.

as belonging to a registered voter in that municipality." *Id.*; *see Flynn Interrog. Resp.* No. 11.[6]

There have been some instances of fraud.[7]  For example, of the 259,688 invalid signatures, 1,291 signatures were invalidated because "the registered voter's signature was made by another."  *Id.*; *see Flynn Interrog. Resp.* No. 17.  Instances of fraud were detected on petitions for the initiative "Resolve to Reject the New England Clean Energy Connect Transmission Project" and on nominating petitions for U.S. Senate candidate Max Patrick Linn, as reflected in the Secretary of State's decisions issued in 2018, in response to a challenge to the validity of those petitions.  DSUF ¶ 23; PRDSUF ¶ 23; *see Flynn Interrog. Resp.* at 64-72 (*Am. Determination of the Validity of a Petition for Initiated Legislation*); *id.* at 77-89 (*Exhibit D, Ruling of the Secretary of State*).  The Secretary of State's office does not track whether identified instances of potential fraud are prosecuted.  *Flynn Interrog. Resp.* No. 18.

Out-of-state petition organizations have been involved in some of the petition drives, according to registration forms filed with the Maine Secretary of State's office pursuant to 21-A M.R.S. § 903-C, as well as campaign finance reports filed with the Maine Commission on Governmental Ethics and Election Practices by political action committees and ballot question committees.  *Flynn Decl.* ¶ 11.  Petition organizations

---

[6]    The Court made these calculations by adding the numbers contained in the validity determination documents provided by the Defendants in their interrogatory responses.

[7]    The Plaintiffs argue that "[b]ased on current law, all instances of petition fraud since 1974 filed with Defendants were committed by Maine residents, not out-of-state professional circulators." PRDSUF ¶ 23.  The Court gathers that the Plaintiffs make this assertion because under Maine law only Maine residents and registered voters are allowed to circulate petitions.  However, without any evidence, the Court cannot make a blanket assumption regarding the residency of all petition fraudsters since 1974, and so the Court does not consider it.

based in Maine have also hired and supervised circulators in several recent petition drives as well.  *Id.*  These petition organizations hire, train, and oversee Maine circulators and manage the petition drive, and in some campaigns, they have brought staff from out-of-state to work alongside Maine circulators.  DSUF ¶ 20; PRDSUF ¶ 20.

### E.    The Plaintiffs' Petition Circulation Efforts

Prior to Election Day 2019, Plaintiffs began recruiting Maine resident voters to collect the required number of signatures for their initiative.  PSUF ¶ 67.  Plaintiffs hired Curtis Ayotte to mobilize, organize and manage volunteers.  PSUF ¶ 17.  Representatives of the Plaintiffs' campaign met with every Republican Party county committee in the state to publicize their issue and ask for volunteers, and through those efforts, the Plaintiffs recruited fifty volunteer circulators.  PSUF ¶ 18.  The campaign also paid a petition circulation company located in Maine, 4DC Augusta LC, to manage a Maine resident paid petition effort.  PSUF ¶¶ 19, 67; DRPSUF ¶ 19.  While 4DC Augusta LC reportedly engaged six Maine paid residents for the effort, it never produced any petition signatures for the campaign.  PSUF ¶ 68.  By October 16, 2019, the Plaintiffs had used fifty Maine resident volunteers who collected only 2,000 petition signatures.  *Id.*  Because these signatures are more than one year old, they cannot be used to qualify the Plaintiffs' initiative.  PSUF ¶ 74; DRPSUF ¶ 74.

The lack of signature production caused the Plaintiffs to suspend the petition drive on October 16, 2019, and reevaluate the best method to collect the minimum

63,067 signatures within the permitted one-year window before filing.[8]  PSUF ¶¶ 68-69; DRPSUF ¶ 68.  The campaign reevaluation resulted in the Plaintiffs' belief that they needed to hire better and more experienced professional circulators who were out-of-state residents.[9]  PSUF ¶¶ 70, 73.  The Plaintiffs secured the $300,000 funding from Liberty Initiative Fund and restarted their petition drive on October 13, 2020.[10]  PSUF ¶ 75.  As of January 9, 2021, Liberty Initiative Fund had contributed over $200,000 to support the citizen-only voting initiative petition.  *Pls.' Reply*, Attach. 1, *Decl. of Paul Jacob* ¶ 2 (*First Jacob Decl.*).  As of January 21, 2021, Liberty Initiative Fund contributed over $350,000 to support the petition drive.  *Second Jacob Decl.* ¶ 2.

Starting in October 2020, Ballot Access LLC and James Tracey began advertising for petition circulators on Craigslist and Facebook, and those advertising efforts cost the campaign about $40,000.  PSUF ¶ 20.  Mr. Tracey also printed and distributed flyers in Portland, Lewiston, and Auburn seeking paid Maine petition circulators.  *Id.*  The campaign initially lost Maine circulators to the Central Maine Power (CMP) petition effort, but Mr. Tracey contacted some of the circulators working

---

[8]     The Defendants "deny that the campaign was merely 'paused,' given at that time a large portion of contributions were returned, and most of the remainder of the campaign's funds were spent to support political candidates."  DRPSUF ¶ 69.  Regardless of whether the campaign was "merely 'paused,'" the Court finds that the Plaintiffs at least suspended their campaign on October 16, 2019.
[9]     The Defendants "deny that the campaign had to hire circulators from outside Maine in order to gather sufficient signatures."  DRPSUF ¶ 73.  Notwithstanding whether they actually needed to hire out-of-state circulators, the Court accepts that the Plaintiffs believed they had to do so.
[10]    The Defendants object, arguing that "Mr. Jacob's declaration does not indicate when the campaign restarted, though other evidence shows that Plaintiffs' first petitioning expenditure was made on October 26, 2020."  DRPSUF ¶ 75.  The Court agrees that Mr. Jacob's declarations do not say when the campaign restarted.  However, the Plaintiffs' answer to the Defendants' interrogatory number fourteen states that "[o]n October 13, Rep. Faulkingham announced that the petition drive was re-starting."  *Pls.' Interrog. Resp.* No. 14.  Absent any evidence to the contrary, the Court accepts the Plaintiffs' representation that the campaign restarted on October 13, 2020.

for the CMP petition drive after that drive ended.[11]   PSUF ¶ 21.   Other efforts included promotion by Representative Faulkingham, who called for volunteers on the We the People PAC Facebook page, which has 1,474 followers, as well as on his own Representative Faulkingham Facebook page, which has 2,450 followers.   PSUF ¶ 22. Representatives of the campaign held a second round of meetings with every Republican Party county committee in Maine requesting they help recruit volunteer help in circulating their petition.   PSUF ¶ 23.

The results of the Plaintiffs' campaign efforts are recounted below.   From the start of the campaign to the October 16, 2019 petition drive, the Plaintiffs recruited fifty volunteer Maine residents for the signature collection drive, and by November 6, 2019 they had collected 2,000 signatures.   PSUF ¶¶ 25, 68; DRPSUF ¶ 68.   For Election Day 2020, Plaintiffs recruited forty-two paid and twenty-four volunteer Maine resident circulators, and by November 4, 2020 had collected 12,000 signatures, not including the 2,000 signatures from the previous year, which fell outside the one-year window.   PSUF ¶ 25.   Between Election Day 2020 and December 31, 2020, the Plaintiffs used seven professional out-of-state circulators to work with two paid and twelve volunteer Maine resident circulators, and by December 31, 2020 had collected 25,000 signatures.   *Id.*   Since January 1, 2021, Plaintiffs recruited fifty-five professional circulators, consisting of forty-nine out-of-state and six Maine resident

---

[11]      The Plaintiffs also claim that the CMP petition effort was "reportedly paying circulators $25.00 per hour."  PSUF ¶ 21.  The Defendants object, arguing that the "Plaintiffs' representations as to payments made by the CMP petition effort are inadmissible hearsay."  DRPSUF ¶ 21.  The Court agrees with the Defendants.  The Plaintiffs have not provided any support for their statement and any claims as to what CMP reportedly paid its circulators is hearsay.

professional circulators, and twelve volunteer Maine resident circulators. *Id.* Most of the out-of-state professional circulators were recruited after January 5, 2021. PSUF ¶ 27; DRPSUF ¶ 27. As of January 25, 2021, Plaintiffs had collected 38,000 signatures. PSUF ¶ 76; DRPSUF ¶ 76.

Prior to and on Election Day 2020, the Plaintiffs paid their professional circulators $2.00 per signature. *Pls.' Interrog. Resp.* No. 4. After November 3, 2020, the Plaintiffs increased the pay rate to $2.50 per signature and in December 2020, the rate was increased to $3.00 per signature. *Id.* In addition to the $3.00 per signature compensation, the Plaintiffs reimburse out-of-state professional petition circulators for their accommodations if they collect at least three hundred signatures per week, in lieu of the $.50 per signature bonus paid to Maine resident professional circulators who do not have accommodation costs. *Id.*[12]

According to the Maine Commission on Governmental Ethics and Election Practices' campaign finance records, three committees have registered with the stated purpose of supporting Plaintiffs' citizen initiative: We the People PAC, Liberty Initiative Fund-Maine PAC, and the Maine Citizen Elections Committee PAC. *Wayne Decl.* ¶ 7.

Maine Citizen Elections Committee registered as a PAC to support this initiative petition on September 12, 2019, and terminated its existence in January

---

[12]   In their responses to the Defendants' interrogatories four and nine, the Plaintiffs state that out-of-state circulators have their expenses reimbursed if they collect at least three hundred signatures, but in answer number ten, they state the requirement is at least five hundred signatures. The Court resolves this conflict by accepting the three hundred number that the Plaintiffs represent in two of their interrogatory responses.

2020, after returning most of its contributions following the suspension of the petition drive in October 2019.  DSUF ¶ 3; PRDSUF ¶ 3.  Maine Citizen Elections Committee spent $2,408 on "petition consulting," as reported on October 21, 2019.  *Wayne Decl.* ¶ 8.

We the People PAC registered as a PAC on April 21, 2020, but did not begin spending funds for petition signature gathering until November 15, 2020, when it began paying a Maine-based organization, James Tracey Initiative Source, for this purpose.  DSUF ¶ 4; PRDSUF ¶ 4.  We the People PAC reported three expenditures for the purpose of collecting signatures on petitions: $12,000 to James Tracey Initiative Source on November 15, 2020 for "petitioning"; $10,000 to James Tracey Initiative Source on November 25, 2020 for "petitioning"; and $10,714.50 to James Tracey Initiative Source on December 27, 2020 for "signature collection."  *Wayne Decl.* ¶ 9.

Liberty Initiative Fund registered a PAC named Liberty Initiative Fund-Maine PAC, for the purpose of supporting the initiative on October 22, 2020, after receiving a contribution of $300,000 from a single donor on October 16, 2020.  DSUF ¶ 5; PRDSUF ¶ 5.  Liberty Initiative Fund-Maine PAC contributed $30,000 to James Tracey on October 13, 2020 and $6,500 to James Tracey on October 14, 2020 to assist in the initiative petition.  PRDSUF ¶ 5.  Beginning on October 26, 2020, Liberty Initiative Fund-Maine PAC also began paying Ballot Access LLC, a North Carolina company whose principal is a resident of Maine and former state representative, for signature-gathering.  DSUF ¶ 6; PRDSUF ¶ 6.  Liberty Initiative Fund-Maine PAC

has reported seven different direct expenditures to Ballot Access LLC and James Tracey for petitioning between October 26, 2020 and December 28, 2020, totaling $129,965.16. *Wayne Decl.* ¶ 10.

### F.    Opportunities to Collect Signatures

Signature gathering at the polls on election day is allowed by law and is a method commonly used by petitioners in initiative and referendum petition drives. DSUF ¶ 11; PRDSUF ¶ 11.  Four statewide elections were held in Maine during the Plaintiffs' eighteen-month window to collect signatures, with the following numbers of voters voting in-person at the polls: November 5, 2019 referendum – 158,959 voters; March 3, 2020 presidential primary – 335,891 voters; July 14, 2020 primary – 133,771 voters; and the November 3, 2020 general election – 313,876 voters.  DSUF ¶ 10.  In the Plaintiffs' experience, most volunteers limited their willingness to collect signatures at more comfortable locations such as the polls on Election Day 2020, which was itself impaired due to the prohibition on collecting signatures inside polling locations as a result of the COVID-19 pandemic.  DSUF ¶ 12; PRDSUF ¶ 12; *see Flynn Interrog. Resp.* at 92, 96 (*Exhibits E-1 and E-2, Guidance on Election Procedures*).[13]  For example, during the July 2020 primary and November 2020 general elections, signature gathering was restricted to areas outside the building for public health reasons due to the COVID-19 pandemic.  DSUF ¶ 12; PRDSUF ¶ 12.

---

[13]    The parties dispute whether there was bad weather in Maine on Election Day 2020.  The Plaintiffs argue that severe weather hampered their signature collection efforts.  PSUF ¶ 28.  The Defendants respond by denying that there was severe weather in many parts of Maine on Election Day 2020, including the Portland area.  DRPSUF ¶ 28.  Neither party has provided evidence for the Court to conclude one way or the other, but either way, the Court does not find the weather to be a material fact in this case and thus does not consider it for purposes of this motion.

### G.    The Role of Professional Petition Circulators

The Plaintiffs define a "professional petition circulator" as "an individual who earns a significant portion of their annual income from the circulation of election petitions, such as candidate nominating petitions, initiative and referendum petitions, recall petitions and legislative veto petitions."[14]  PSUF ¶ 35.  Professional petition circulators are also sometimes "hired to collect signatures on issue-based petitions used to lobby elected officials to advance a particular policy agenda."  *Id.* They are "routinely engaged in the circulation of election petitions and, as a result of their experience, have acquired the skills necessary to engage a stranger on the street or at an event and quickly communicate the purpose of the petition, ascertain if the targeted stranger is legally qualified to provide a valid signature and to instruct the stranger on how to properly execute his/her signature on the petition."  PSUF ¶ 36. The best professional petition circulators are well known and have a good reputation within the industry of petition management firms.  PSUF ¶ 39.

Matthew Dunlap, the former Maine Secretary of State, has acknowledged the difficulty of obtaining signatures using volunteers.   In an interview with the Sportsman's Alliance of Maine (SAM), which aired on January 8, 2021, Mr. Dunlap

---

[14]    The Defendants object to this definition, arguing that the Plaintiffs "offer no source for their invented definition of 'professional petition circulator,' and at least one of their declarants defined a professional circulator as simply 'an individual hired by a candidate or proponent of a proposed initiative or referendum."  DRPSUF ¶ 35 (citing *Pool Decl.* ¶ 9).  The Court qualifies the Plaintiffs' definition by stating that it is just that—the Plaintiffs' definition.  The Court does not, however, think "professional petition circulator" is a technical term that requires a source, and for the purposes of the Plaintiffs' motion it will accept the Plaintiffs' definition.   Even if one of the Plaintiffs' declarants proposed a different definition, that proposed definition is broader than the narrower definition the Plaintiffs propose and does not contradict it.  To the extent one of the Plaintiffs' declarants defined the term differently, the Court accepts the definition in the Plaintiffs' statement of undisputed facts.

stated that it is "very difficult to get volunteers to really engage with people and get them to sign petitions."  Sportsman's Alliance of Maine, *Conserving the Maine Outdoors, air date 1/8/2021*, YOUTUBE (Jan. 10, 2021), https://www.youtube.com/watch?v=LoQnPyZrXqc&feature=youtu.be, at 17:44-18:44 (*SAM Interview*).[15]  He explained that "it's not normal, socially it's not normal to walk up to perfect strangers and say, 'excuse me are you a registered voter, would you like to sign this petition,'" and so "it takes . . . a particular type of personality to be able to do this."  *Id.*  It is this difficulty that drives groups to hire out-of-state professional circulators to gather signatures.  *Id.*

For the Plaintiffs' campaign, the forty-nine out-of-state professional circulators have collected 90% of the 38,000 signatures collected within the last year of the campaign.  PSUF ¶ 76.  Only 3,800 signatures have been collected by the six Maine resident professional petition circulators, twenty-four volunteer and forty-two paid Maine resident circulators.  PSUF ¶ 29.  That means seventy-two Maine circulators collected 3,800 signatures, whereas forty-nine out-of-state professional petition circulators have collected 34,200 signatures.  *Id.*  Based on these numbers, each out-of-state professional petition circulator has, on average, collected six hundred ninety-seven signatures, versus, on average, fifty-three signatures collected by each Maine resident circulator (professional, paid and volunteer).  PSUF ¶ 26.

---

[15]     The parties stipulated to the video's authenticity. PSUF ¶ 15; DRPSUF ¶ 15.

The Plaintiffs have only identified six professional petition circulators in the state of Maine.[16]   PSUF ¶ 40.   Through conversations with Tim Mooney, Edee Baggett—CEO and president of National Ballot Access, one of the largest petition management firms in the country—and other professional petition managers, Plaintiffs were unable to identify any additional professional petition circulators in Maine.[17]  PSUF ¶ 42.

Use of professional petition circulators is not, however, required to collect a sufficient number of signatures.   The Defendants identified one successful all-volunteer initiative effort.  PSUF ¶ 34; DRPSUF ¶ 34; DSUF ¶ 19; PRDSUF ¶ 19; *see Johnson Decl.* ¶¶ 5, 8, 11.  On Election Day 1995, the initiative petition drive for the Maine Clean Elections Act collected over 65,000 valid signatures using over one thousand volunteer circulators and no paid signature collectors.  *Johnson Decl.* ¶ 8.

---

[16]    The Defendants object, arguing that the "Defendants have presented evidence that there are thousands of individuals in Maine who have experience as petition circulators, and many of them have circulated petitions for pay."  DRPSUF ¶ 40 (citing *Flynn's Interrog. Resp.* at 8-9).  They also assert that "there are likely thousands of Maine resident and registered voters who have circulated petitions for pay since October 2015."  DSUF ¶ 18.  However, the Defendants also admit that "our office does not record or consider which circulators are paid and which ones are not, nor do we know which circulators do this work regularly as their occupation."  *Flynn Interrog. Resp.* No. 14.  Without further information, the Court cannot conclude how many "professional circulators" reside in Maine, nor can it conclude how many Maine residents have been paid to circulate petitions.  However, the Court accepts the Plaintiffs' assertion that they could only identify six professional petition circulators in Maine.

[17]    The Plaintiffs further contend that "[d]iscssions with Edee Baggett, CEO and president of National Ballot Access, also one of the largest petition management firms in the United States (they managed President Trump's 2016 ballot access campaign), also confirmed that she was not aware of any other professional petition circulator who was a resident of the State of Maine other than those on the list of 6 professional petition circulators identified by James Tracey."  PSUF ¶ 42.  The Plaintiffs also claim that "[o]f the six known Maine professional petition circulators, none of them are considered by Edee Baggett or Tim Mooney as being on a list of those considered to be among the best in the industry."  PSUF ¶ 43.  The Defendants object, claiming that the Plaintiffs' "representations as to how many professional petition circulators they were told by others are in Maine are inadmissible hearsay."  DRPSUF ¶¶ 42-43.  The Court agrees the information as to what Ms. Baggett or Mr. Mooney said is hearsay and does not consider it.

The Secretary of State determined that the petition had enough valid signatures to qualify for the ballot, and the initiative was adopted by voters on Election Day 1996. *Id.* Another campaign, to amend the Maine Clean Elections Act in 2015, obtained a majority of signatures by volunteers and it turned out the number of signatures collected by volunteers was sufficient to qualify for the ballot, and was adopted by voters in November 2015. *Luther Decl.* ¶¶ 3-5.

### H.   Out-of-State Circulators Willing to Participate in the Plaintiffs' Petition Campaign

In addition to the fifty-five professional petition circulators now working on the Plaintiffs' campaign (forty-nine out-of-state and six in-state), the Plaintiffs identified one hundred thirty-five additional professional petition circulators who are available to circulate the Plaintiffs' petition in Maine under the current pay structure and are willing to do so if they do not have to work with an in-state resident witness.[18] PSUF ¶ 45. Plaintiff Nicholas Kowalski is one of these out-of-state circulators. Another is Timothy Mooney, an independent political consultant residing in Arizona, who, through his company Morning in America, is prepared to enter into a contract with Liberty Initiative Fund to collect signatures during the last week of the collection period if, and only if, the voter registration and residency requirements are enjoined by this Court. *Mooney Decl.* ¶ 17. The Plaintiffs also specifically identified Trenton Donn Pool as an experienced professional circulator who resides in Texas and would

---

[18]   The Defendants object to this statement, pointing out that the "Plaintiffs and their declarants have made conflicting representations as to how many out-of-state circulators are available to the campaign." DRPSUF ¶ 45 (citing *Pls.' Reply* at 8; *Jacob Decl.* ¶¶ 4-5; *Second Jacob Decl.* ¶ 4). Despite the conflicting declarations, the Court accepts the one hundred thirty-five number in the Plaintiffs' statement of undisputed facts as the most recent number of identified out-of-state circulators.

work on the Plaintiffs' petition drive but for Maine's voter registration and residency requirements. *Pool Decl.* ¶¶ 3-5, 42.

The Plaintiffs also identified out-of-state volunteer petition circulators willing to circulate the Plaintiffs' petition in Maine. For example, Christopher Arps is the president of Americans for Citizen Voting, which supports We the People PAC's initiative petition, and is a resident of Missouri who, if permitted to do so, would travel to Maine to volunteer for the Plaintiffs' campaign and would submit to the jurisdiction of Maine for purpose of service of any subpoena. PSUF ¶¶ 48, 51-52; DRPSUF ¶¶ 48, 51-52. Alex Isada is a resident of Ohio who attends college in Maine but is unwilling to register to vote in Maine. PSUF ¶¶ 53, 55; DRPSUF ¶¶ 53, 55. Like Mr. Arps, Mr. Isada would like to circulate the Plaintiffs' petition and is willing to submit to Maine's jurisdiction. PSUF ¶¶ 54, 56; DRPSUF ¶¶ 54, 56.[19]

## I.    Use of Maine Resident Witnesses

While under Maine law petition circulators must be registered Maine voters, out-of-state circulators can still participate by using Maine residents to witness the signature collection so that the in-state witnesses can execute the required affidavit. However, this process is more costly and increases inefficiencies. PSUF ¶¶ 58-59, 63; DRPSUF ¶¶ 58-59, 63. The Plaintiffs currently pay in-state witnesses $100 for eight

---

[19]    The Plaintiffs assert that "[t]here is not a single recorded instance of an out-of-state circulator failing to comply with a subpoena or other process of law after having submitted to the jurisdiction of a state in order to be able to freely circulate election petition in the jurisdiction." PSUF ¶ 2 (citing *Waters Decl.* ¶¶ 52-53). The Defendants object, arguing that the Plaintiffs have not provided a foundation for their declarant Dane Waters to "conclusively opine on subpoena compliance." DRPSUF ¶ 2. The Court agrees with the Defendants. Not only does the Waters Declaration not provide support for the Plaintiffs' assertion, but the Plaintiffs have not provided any foundation for Mr. Waters to make such a strong assertion. Thus, the Court cannot accept the Plaintiffs' assertion.

hours of work, plus $50 if they provide transportation.  PSUF ¶ 60.  From December 29, 2020 to January 4, 2021, We the People PAC spent $5,373.25 for 1,791 signatures—about $3.00 per signature—collected by out-of-state professional circulators while spending $5,790.00 on in-state resident Maine registered voters— an additional $3.23 per signature—to witness the collection of signatures by out-of-state circulators.  PSUF ¶ 61; DRPSUF ¶ 61.  Therefore, there is a cost increase of 107% for using in-state witnesses.  *Id.*  In the professional petition circulation industry, resident witnesses are referred to as "anchors" because they only slow down the most efficient techniques to collect signatures in as short a time period as possible.  *First Jacob Decl.* ¶ 11; *Pool Decl.* ¶¶ 38-39.

The legality of using in-state witnesses is unclear.  In their interrogatory answers, the Defendants have taken the position that only Maine voters are allowed to handle the petitions, so it is unclear to what extent out-of-state circulators can participate in petition circulation.  *See Flynn Interrog. Resp.* No. 21 ("21-A M.R.S. § 903-A provides that a circulator 'present[s] the petition to the voter, ask[s] the voter to sign the petition and personally witness[es] the voter affixing the voter's signature to the petition.'  Thus, only a Maine voter is authorized to engage in the listed conduct") (alterations in original).[20]  Furthermore, it appears the explicit purpose of

---

[20]     The Plaintiffs argue that the Defendants "refused to guarantee that the use of out-of-state petition circulators working with a Maine resident as a witness who can execute the affidavit is lawful and/or free from private challenge."  *Second Jacob Decl.* ¶ 6.  The Defendants dispute this.  *Suppl. Flynn Decl.* ¶ 9.  The Defendants claim they do not recall being asked to provide a "guarantee" and state that the Secretary of State "certainly cannot guarantee what any private party will or will not do with respect to challenging the validity of an initiative petition."  *Id.*  The Defendants continue, "However, the Secretary would not invalidate a petition (and has not invalidated any previous petition) on the grounds that a person from out-of-state worked alongside a Maine resident and registered voter who was circulating the petitions."  *Id.*  The Court concludes that it is immaterial whether the

a 2015 amendment to 21-A M.R.S. § 903-A was to prohibit out-of-state circulators from coming to Maine and participating in the petition circulation process. *See* L.D. 176, Summary (127th Legis. 2015) ("This bill prohibits persons who are not residents of the State from collecting signatures on a petition for the direct initiative of legislation or a people's veto referendum and from handling such a petition in any manner"); *see also An Act To Amend the Law Governing the Gathering of Signatures for Direct Initiatives and People's Veto Referenda: Hearing on L.D. 176 Before the J. Standing Comm. on Veterans and Legal Affairs*, 127th Legis. (2015) (testimony of Julie L. Flynn, Deputy Secretary of State) ("The bill also prohibits persons who are not residents of the State from collecting signatures on a petition and from handling a petition in any manner"). Some out-of-state circulators are refusing to work in Maine as a result of the 2015 amendment. PSUF ¶ 44; DRPSUF ¶ 44. However, in their statement of undisputed facts, the Defendants claim that "Maine law does not forbid Maine registered voters from witnessing signature collection and executing the circulator oath as it is currently written." DRPSUF ¶ 62.

In a January 8, 2021 SAM interview, former Maine Secretary of State Matthew Dunlap stated that the 2015 amendment to 21-A M.R.S. § 903-A was meant to help "bring some accountability" to the "end around" where out-of-state circulators would use in-state witnesses. *SAM Interview* at 18:35-44. In that same interview, David Trahan, the Executive Director of SAM, claimed to have drafted the text of the 2015

Defendants refused to provide a guarantee, and thus does not consider the Plaintiffs' assertion. However, the Court finds that it is at the very least unclear precisely what role out-of-state residents can legally play in the circulation process.

amendment and lamented that "states like Maine . . . are targeted by certain groups, animal rights groups, gun control groups can't get their bills through Congress or through their legislatures come to Maine and think they can get on the ballot and jam it through in a state like ours, and so we were really trying to get that under control too," to which Mr. Dunlap responded, "well in terms of political advertising Maine's a cheap date, right, you know it's one of the reasons why they come here, and that was a great change."[21]  *Id.* at 16:41-17:12.  Mr. Dunlap added that "once they get a critical mass of states it seems to at least philosophically be less of a jump to get Congress to take further action or . . . some of the states that don't have initiatives to keep things uniform, and that's how they make these national changes in sort of an incremental way."  *Id.* at 20:39-55.  Mr. Trahan explained that after the 2015 amendment, "the person circulating had to be the one holding the petition, make the ask and witness the signature" because "some of these out-of-state petition groups, they were bringing up non-residents anyway."  *Id.* at 14:57-15:30.

The Defendants maintain, however, that other options exist for out-of-state residents to participate in the petition circulation process.   For example, the Secretary of State's office has never interpreted § 903-A to prohibit out-of-staters "from working alongside a Maine circulator, engaging with voters to persuade them

---

[21]      The Defendants deny that Mr. Trahan wrote the text of the statute.  DRPSUF ¶ 12.  The Court is unable to resolve this factual conflict on this record.  It is not uncommon in Maine for an outside group, such as a law firm or lobbying group, to write legislation, for a supporting legislator to propose it in the form the outside group drafted it, and for the Maine Legislature to enact the legislation substantially in the form the outside group wrote it.  It is also true that the legislators and legislative staff sometimes write legislation.  The Court cannot know on this record what happened here, so the Court included Mr. Trahan's statement as a claim.  At the same time, it is unclear how the Secretary of State knows that Mr. Trahan did not do as he claimed to supply the language of the legislation that was ultimately enacted.

to sign the petition, or otherwise assisting the circulation process." *Suppl. Flynn Decl.*
¶ 7. The Secretary of State suggests out-of-staters can engage in "recruiting, hiring,
training and supervising Maine circulators; hiring notaries to administer the oaths
to circulators; collecting the signed petitions from the circulators or notaries and
distributing them to the town offices for certifications; and organizing and filing all
of the petitions with our office by the deadline." *Id.* ¶ 8.

### J.     Registered Voters

Registering to vote in Maine requires an individual to complete and submit to
their city or town office a two-sided card, listing their legal name, physical address,
mailing address (if different), date of birth, driver's license number (or, in the absence
of a driver's license, a state identification number or the last four digits of a social
security number), signature, municipality and state where previously registered.
DSUF ¶ 25; PRDSUF ¶ 25. The voter can mail or deliver this form to the municipal
office in the city or town where they live. *Id.*

Before accepting a voter's application form, the registrar must determine that
the voter is a resident of the municipality, applying the factors listed in 21-A M.R.S.
§ 112. *Flynn Decl.* ¶ 15. For voters who mail in their application without providing
documentation to prove residency, the registrar is required to send a voter
registration acknowledgment notice (VRAN) to the address on the application, and if
the VRAN is not returned undeliverable within fifteen days, the registrar will accept
the application and add the voter to the Central Voter Registration system. *Id.* A
voter may also register to vote in person at the municipal office and present proof of

identity and residency, pursuant to 21-A M.R.S. §§ 112, 112-A and 121(1-A). *Id.* The Secretary of State's Elections Division staff has access to the Central Voter Registration system to see the registration status of any petition circulator. *Id.*

Any individual who wishes to verify their voter registration status may call the town office where they live and ask the registrar to verify that information over the phone. DSUF ¶ 26; PRDSUF ¶ 26. An individual may also obtain, free of charge— either from the Secretary of State's office or from their local town office—a copy of the information contained in the individual's voter record in Maine's Central Voter Registration System. *Id.* If the record shows that the voter is still registered in a municipality where the voter no longer lives, the voter may update their registration by downloading a voter registration form from the Secretary of State's website, completing the form with the voter's new residence address, and returning the completed form to their local town office. DSUF ¶ 27; PRDSUF ¶ 27.

Approximately 1,063,383 Maine citizens—97% of all eligible voters in Maine and all but 32,000 eligible residents—were registered to vote as of July 14, 2020.[22] DSUF ¶ 13; *Flynn Decl.* ¶ 8. However, it is unknown how many people are registered

---

[22]    The Defendants calculate this number by comparing the 1,063,383 active registered voters in Maine to the estimated voting age population of Maine, as reported by the U.S. Census in July 2019, which was 1,095,370. *Flynn Decl.* ¶ 8. The Secretary of State also notes that she is "not aware of any method to determine precisely how many residents of Maine are eligible to vote but are not registered to vote." *Suppl. Flynn Decl.* ¶ 13. Plaintiffs argue that there are 146,997 eligible but unregistered Maine citizens. *Pls.' Mem.* at 6. For support, the Plaintiffs merely cite an article from WMTW, a local ABC-affiliated television station in Maine. The Court resolves this dispute in the Defendants' favor, but qualifies the number as unprecise.

to vote at their current address,[23] as required by Maine law.[24]  Under Maine law, a circulator must be a Maine resident "whose name must appear on the voting list of the city, town or plantation of the circulator's residence as qualified to vote for Governor."  ME. CONST., art. IV, pt. 3, § 20.  Therefore, the number of Maine residents who are ineligible to circulate petitions due to the voter registration is some number higher than 32,000, but the Court cannot quantify how many.  PRDSUF ¶¶ 13-14.

## K.   The Plaintiffs' Lawsuit

After Election Day 2020, the campaign realized it would not be able to collect a sufficient number of signatures relying solely on Maine circulators.  PSUF ¶ 78.  Initially, Liberty Initiative Fund lacked sufficient funds for the purpose of this litigation, but the Plaintiffs were able to secure funding after the Christmas holiday.  PSUF ¶ 81.  The Plaintiffs challenge 21-A M.R.S. § 903-A, and request preliminary injunctive relief, to the extent it requires that petitions for a direct initiative may only be circulated by registered voters of Maine and residents of Maine.[25]  PSUF ¶ 7;

---

[23]    The record is silent as to whether a crosstown move, as opposed to a move to another municipality, would trigger a reregistration requirement.  The Court assumes for purposes of this motion that it would not.

[24]    The Plaintiffs provide evidence of an audit they performed on a sample of one hundred fifty signatures of the Plaintiffs' current initiative petitions.  The audit showed that of the one hundred fifty signatures, forty-one did not match a registered voter that the address had given.  Based on this audit, the Plaintiffs conclude that "27.33% of the Maine population is not qualified to circulate initiative and people's veto petitions because they are either not registered to vote, at all, or not registered to vote at their current address."  PSUF ¶ 64-66.  The Defendants object to the consideration of this sample audit.  DRPSUF ¶ 64-66.  The Court agrees that the Plaintiffs have not shown how their sample audit is representative of the 1,063,383 active registered voters in Maine, and thus does not consider it.

The Defendants admit, however, that "there is no statistic or method of determining how many voters in Maine are registered at a different address than where they currently reside."  DRPSUF ¶ 64.  Thus, for the purposes of this motion the Court concludes it is unknown how many voters are registered at their current address.  A statistician might well properly extrapolate a realistic number from a smaller sample.  But the Plaintiffs have not provided statistical evidence and the Court is unwilling to perform its own extrapolation from a sample size of only one hundred and fifty voters.

[25]    The Plaintiffs also claim to "challenge and request preliminary injunctive relief [to] enjoin the corresponding affidavit or oath to the extent it requires circulators of initiative petitions in Maine

DRPSUF ¶ 7.  The Plaintiffs hope to gather enough signatures to meet the February 16, 2021 deadline, but understand that if they do not meet the deadline, they can immediately refile the initiative petition and still make the 2022 ballot if they file signatures from a new petition drive with signatures collected from March 2021 to January 31, 2022.  PSUF ¶ 83; DRPSUF ¶ 83; DSUF ¶ 9; PRDSUF ¶ 9.

## III.   THE PARTIES' POSITIONS

The Court previously restated the parties' positions in its order on the Plaintiffs' motion for a temporary restraining order.  *See TRO Order* at 9-21.  In this order, the Court recounts only the parties' most recent briefs concerning the motion for preliminary injunction.

### A.   The Plaintiffs' Brief in Support of Their Motion for Preliminary Injunction

The Plaintiffs begin by restating their position that the United States Supreme Court has established that "ballot access rules which reduce the pool of available circulators of initiative petitions is a severe impairment" of First Amendment rights and "must be reviewed under strict scrutiny analysis."  *Pls.' Prelim. Inj. Br.* at 1-2.  Under a strict scrutiny analysis, the Plaintiffs say that the Court should enjoin the

---

attesting that the circulator was a resident and registered voter in the State of Maine at the time the circulator circulated the petition."  PSUF ¶ 8 (citing 21-A M.R.S. § 903-a(4)(c)).  The Defendants deny this, arguing that the "Plaintiffs' motion does not seek relief from this portion of Maine law."  DRPSUF ¶ 8.  The Court agrees with the Defendants.  In their Complaint, the Plaintiffs challenge "MRS Title 21-A, Chapter 11, Section 903-A(4)(c), to the extent it requires circulators to sign an affidavit attesting that the circulator was a resident of the State and a registered voter in the State at the time of circulating the petition."  *Compl.* at 2.  In their brief in support of the preliminary injunction, the Plaintiffs also state they are requesting "injunctive relief against the voter registration, residency, and corresponding requirement of the circulator affidavit/oath for initiative petition circulators in the State of Maine."  *Pls.' Prelim. Inj. Br.* at 1.  However, the Plaintiffs do not mention this provision in their motion for temporary restraining order/preliminary injunction or their supporting memoranda.  Thus, the Court does not consider the Plaintiffs to be challenging that law in the instant motion.  This conclusion does not bar the Plaintiffs from clarifying their claim in future proceedings in this case.

challenged laws because "every court has held that requiring an out-of-state circulator to submit to the jurisdiction of the state is more narrowly tailored to protect the only recognized state interest of policing the integrity of the petition process." *Id.* at 2. The Plaintiffs argue that the Court denied their motion for TRO for lack of a factual record, and point to the "extensive affidavits, evidence in documents, YouTube video of an interview with former Secretary of State Dunlap and answers to Defendants' interrogatories" as establishing a "robust record." *Id.* at 3. The Plaintiffs then undertake a preliminary injunction analysis.

Regarding the likelihood of success on the merits, the Plaintiffs first assert that "[i]t does not matter if Plaintiffs can, or cannot, qualify their initiative using Maine volunteer or professional residents" because the relevant constitutional harm is "whether or not the challenged restrictions prevent Plaintiffs from associating with the petition circulators of their choice." *Id.* at 4. The Plaintiffs cite *On Our Terms '97 PAC v. Secretary of State of Maine*, 101 F. Supp. 2d 19 (D. Me. 1999), which considered a pay-per-signature ban, and argue "the pool of available circulators is, in fact, reduced both by the voter registration requirement and the independent residency restrictions challenged in this action in the same way, and on the same analysis, that this Court used to hold the pay-per-signature ban unconstitutional back in 1999." *Id.* at 7.

Turning to the record, the Plaintiffs assert there are only six known professional circulators in Maine, but there are at least one hundred thirty-five additional out-of-state professional petition circulators willing to travel to Maine to

35

circulate the Plaintiffs' petition. *Id.* at 7-8. The Plaintiffs also claim that most of their 38,000 signatures were collected by out-of-state circulators. *Id.* at 8. The Plaintiffs argue that the reduction in pool of available circulators makes it less likely that their initiative will qualify for the Maine ballot. *Id.* at 9. They contend that the 2015 amendments to the Maine laws may make it unlawful for out-of-state circulators from even holding the petition or asking for a signature, and even if in-state witnesses are permitted, they are an unsatisfactory option, as they greatly increase costs and slow down the signature collection process. *Id.* at 9-12. Finally, the fact that some petition drives successfully relied exclusively on volunteer efforts does not save the laws because the "Plaintiffs have an absolute constitutional right to use professional petition circulators under *Meyer*" and using volunteers is not as certain as professional circulators who have a record of past efforts. *Id.* at 12-13.

Regarding voter registration, the Plaintiffs challenge the Defendants' claim that 97% of voter-eligible Maine citizens are registered to vote. *Id.* at 14. The Plaintiffs argue that the Defendants "fail to provide any evidence as to the number of registered voters who do not reside at their current residence," which reduces the pool of available circulators below the raw data. *Id.* Pointing to their own sample audit, the Plaintiffs contend that the "Defendants['] 96% registration rate is significantly inflated and cannot be relied upon by this Court without some further evidence presented by Defendants to defend their statistic." *Id.* at 15. The Plaintiffs try to qualify the Supreme Court's findings in *Buckley* by contending that Colorado had a

36

bigger population and *Buckley* should be "considered in proportion to the Maine population." *Id.* at 15.

Next, the Plaintiffs consider the remaining preliminary injunction factors and repeat their arguments from their previous briefs. The Plaintiffs argue that "[t]he loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (citing *Elrod v. Burns*, 427 U.S. 347, 353 (1976)). They claim the balance of equities favors them because they will suffer irreparable harm, while the Defendants will suffer no harm if the Maine laws are enjoined because the "Plaintiffs must still file the requisite number of valid signatures and Defendants will secure more information about Referendum and People's Veto circulators Defendants can use to execute any subpoena." *Id.* at 16. Finally, the public interest is favored by the "Defendants conducting the Referendum and People's Veto petition process within the boundary lines of the federal constitution." *Id.* (citing *OpenPittsburgh.Org v. Wolosik*, 2:16-cv-1075, 2016 WL 7985286 (W.D. Pa. Aug. 9, 2016)).

**B.    The Defendants' Brief in Opposition to the Plaintiffs' Motion for Preliminary Injunction**

The Defendants oppose the Plaintiffs' motion for preliminary injunction, claiming that the Plaintiffs seek to "flood the state with out-of-state circulators in a belated attempt to rescue their citizen initiative campaign," but absent from the record is "(1) evidence that Maine's circulator requirements have hampered their petition-gathering efforts, or the degree to which they have done so, and (2) evidence demonstrating that the use of out-of-state circulators at this late stage will make a

37

meaningful difference to their efforts." *Defs.' Prelim. Inj. Opp'n* at 1.  The Defendants argue that the few times Maine's voter registration and residency requirements have been challenged, state and federal courts have upheld them, and this Court should as well.  *Id.* at 2.  The Defendants urge the Court to reject the Plaintiffs' "eleventh-hour attempt to enjoin Maine's longstanding circulator requirements." *Id.*[26]

Turning to the merits, the Defendants first consider the residency requirement.  The Defendants argue that a reduction in the likelihood of successfully gathering sufficient signatures is not a severe burden because it is "abundantly clear from the record that there are ample in-state circulators, be they paid or volunteer, to enable the collection of sufficient signatures within the 18-month timeframe afforded by Maine's Constitution." *Id.* at 6-7.  They state that in the past five years, "all but one of nine citizen initiative campaigns and three people's veto campaigns have gathered enough signatures to qualify for the ballot." *Id.* at 7.  They claim the Plaintiffs "have made little effort to mount a petition drive using Maine circulators" and "conspicuously absent is any discussion of the likely thousands of Mainers who do not make a living circulating petitions but would be more than willing to do so for pay." *Id.* at 8.  Thus, the Plaintiffs "have not substantiated a meaningful decrease in the pool of circulators available to their campaign." *Id.* at 9.  The Defendants further argue that the Plaintiffs have not shown they can make up the gap in signatures in a week by using out-of-state circulators.  *Id.* at 9-10.  In conclusion, the "Plaintiffs

---

[26]    The Defendants next argue that the Court should disregard the Plaintiffs' declarations and interrogatory responses.  *Defs.' Prelim. Inj. Opp'n* at 4-5.  The Court already resolved those objections, and thus does not recount them here.  *See supra* n.2

have not substantiated how Maine's residency requirement has made it any more difficult for them to succeed in gathering sufficient signatures, nor have they quantified a burden that justifies the application of strict scrutiny." *Id.* at 11.

The Defendants briefly address the radio interview given by former Secretary of State Matthew Dunlap to the Sportsman's Alliance of Maine, arguing that the video actually supports the Defendants' position because the conversation "underscore[s] the importance of citizen initiatives retaining their grassroots character" and Mr. Dunlap states that the Republican Party was able to collect about 72,000 signatures on a people's veto petition in ninety days largely during the pandemic." *Id.* at 10-11.

The Defendants next argue the added cost due to the residency restriction is not a severe burden. *Id.* at 11. The Defendants state that "a marginal increase in cost is not a severe First Amendment burden" and "[t]he State is not obligated to adopt the lowest cost election regulations absent compelling reason to do otherwise." *Id.* Moreover, the Defendants claim that "the record does not substantiate any increase in cost at all." *Id.* at 12. The Defendants argue that in-state circulators are no more expensive than out-of-staters, especially considering the transportation, lodging and food costs of out-of-state circulators. *Id.*

The Defendants conclude their residency argument by arguing the restriction has only prevented Mr. Kowalski from exercising his First Amendment rights, and even he could still support the initiative petition "in a variety of ways, from training and organizing to accompanying circulators and persuading voters to sign the

39

petition," and they say that multiple courts have ruled this alternative means of engaging in protected speech lessens the overall burden on First Amendment rights. *Id.* at 13 (citing *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614 (8th Cir. 2001); *Idaho Coal. United for Bears v. Cenarrusa*, 234 F. Supp. 2d 1159 (D. Idaho 2001)). Thus, "Mr. Kowalski's rights have . . . not been meaningfully burdened by Maine's circulator residency requirement." *Id.*

Turning to the voter registration requirement, the Defendants state the requirement "exists as a means of enforcing the state's residency requirement" and "visits hardly any additional burden beyond that imposed by the residency requirement." *Id.* The Defendants distinguish *Buckley* by noting the 97% voter registration rate in Maine and emphasizing that the Plaintiffs identified only one individual who is eligible to vote in Maine but prefers not to register. *Id.* at 14. Regarding the Plaintiffs' contention that circulators be registered in their town of residence, the Defendants argue "it is exceedingly simple to check the status of one's registration, just as it is easy to change that registration if need be," and thus, "while there is no easy way to identify just how many Maine residents are registered in locations other than their residence, it is an easily correctable issue . . .." *Id.* at 15.[27]

The Defendants next argue that no matter what the burden is, "the State's interests in its circulator residency and registration requirements are more than

---

[27]    The Defendants also discount the Plaintiffs' sample audit, claiming that "[t]here is nothing representative about this sample, which reflects less than two ten thousandths (0.0002%) of Maine's voting-age population" and any voter who wishes to circulate a petition can easily update their voter registration. *Defs.' Prelim. Inj. Opp'n* at 15.  But, as noted above, the Court has not considered the Plaintiffs' sample audit for purposes of ruling on this motion. *See supra* n.24.

adequate to justify it." *Id.* at 16. Those interests are "procedural integrity and protecting the initiative's grassroots nature." *Id.* The Defendants contend procedural integrity is compelling because the State needs to limit fraud and only has a thirty-day period to review initiative petitions, which involves checking tens of thousands of signatures. *Id.* The Defendants emphasize that the Plaintiffs will not require their out-of-state circulators to remain in Maine for any period of time, and in-state circulators "are far easier to contact" when the Secretary of State's office inevitably has questions about the petitions. *Id.* at 17. The Defendants also claim that preserving the local character of citizen initiatives is important because "[w]hile out-of-staters are free to voice their support for an initiative to their heart's content, the citizen initiative's very essence is undermined when it is entrusted to a flood of out-of-state circulators, as Plaintiffs contemplate." *Id.* The voter registration requirement similarly "ensures that each circulator has a vested interest in the initiative they hope to pass, in that each can vote on that initiative itself." *Id.* at 18.

The Defendants finally address the remaining preliminary injunction prongs. They argue the Plaintiffs "have failed to demonstrate that it is Maine's laws—rather than Plaintiffs' own lack of diligence or simply a lack of support for the campaign—that stand in the way of them gathering sufficient signatures to qualify their petition for the ballot." *Id.* The Plaintiffs have not shown that they cannot gather sufficient signatures legally and they "admit that if they fail to gather enough signatures by the deadline, they can resubmit an application to the Secretary's Office and collect

signatures between March 2021 and January 2022, thereby still qualifying for the ballot in the very same election." *Id.* at 18-19.

The Defendants next claim that the balance of equities and public interest weigh in their favor. *Id.* at 19. They argue the Plaintiffs delayed in collecting signatures and were late in filing this lawsuit, and thus cannot now claim injunctive relief. *Id.* at 19-20. The public "has a strong interest in the efficient regulation and processing of petitions, and the integrity and grassroots nature of the citizen initiative process," and the circulator requirements "directly serve these ends, with minimal effect on the prospect of obtaining sufficient signatures to place an initiative on the ballot, or First Amendment rights more generally." *Id.* at 20.

## IV.   LEGAL STANDARD

"[Injunctive relief] is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)). A judge should use the authority to grant such injunctive relief "sparingly." *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981).

To determine whether to issue a preliminary injunction a court must analyze four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (alteration in original) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)).

"The party seeking [an injunction] bears the burden of establishing that these four factors weigh in its favor."   *Id.* at 18.   Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co*., 572 F.3d 1, 14 (1st Cir. 2009).

## V.   DISCUSSION

The Court previously applied the four-factor analysis in its order denying the Plaintiffs' motion for temporary restraining order, determining that on the scant factual record the Plaintiffs had not proven their entitlement to extraordinary injunctive relief.   The Court now reviews the Plaintiffs' motion for preliminary injunction on a more substantial record including affidavits and declarations, as well as interrogatories and statements of facts.   It is on this more complete factual record that the Court analyzes the four factors Plaintiffs must establish.

### A.   Petition Circulation and the First Amendment

Before beginning its preliminary injunction analysis, the Court believes a brief discussion of the relationship between circulating an initiative petition and the First Amendment is instructive.   The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."   The Fourteenth Amendment makes that prohibition applicable to the state of Maine.   "The freedom of speech and of the press, which are secured by the

43

First Amendment against abridgment by the United States, are among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a state." *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940).   The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476 (1957).

In *Meyer v. Grant*, 486 U.S. 414 (1988), the United States Supreme Court explained how the First Amendment specifically relates to petition circulation.   The plaintiffs in *Meyer*, much like the Plaintiffs in this case, sought "by petition to achieve political change in Colorado; their right freely to engage in discussions concerning the need for that change is guarded by the First Amendment." *Meyer*, 486 U.S. at 421. The Court explained that "[t]he circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Id.*  "Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate," which "will in almost every case involve an explanation of the nature of the proposal and why its advocates support it." *Id.*  Therefore, the Supreme Court reasoned that "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Id.* at 421-22.  The Supreme Court determined that the circulation

44

of initiative petitions is "an area in which the importance of First Amendment protections is 'at its zenith.'" *Id.* at 425.

It is with that this important background in mind that the Court proceeds with its preliminary injunction analysis.

## B. Likelihood of Success on the Merits

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that this factor is the "most important part of the preliminary injunction assessment") (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2007)).   The Court analyzes the Plaintiffs' challenge to the residency requirement and voter registration requirement in turn.

### 1. Level of Scrutiny

To properly evaluate the constitutionality of Maine's voter registration requirement, the Court must first determine the applicable standard of constitutional scrutiny.[28]   In general, there are two possible standards to examine issues of this sort,

---

[28]     The challenged voter registration and residency requirements are found in both the Maine Constitution and Maine statutory law.   In its TRO Order, the Court noted that the parties had not addressed whether the standard of review is the same for state constitutional provisions as it is for state statutory provisions.   *See TRO Order* at 24 n.4.   The parties still have not addressed this question., but the Court finds guidance from the United States Supreme Court.   In *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), the Supreme Court considered a challenge to Colorado's voter registration requirement, which was included in both the Colorado Constitution as well as corresponding statutory provisions.   *See Buckley*, 525 U.S. at 192-93 ("By constitutional amendment in 1980, and corresponding statutory change the next year, Colorado added to the

where a state has restricted core political speech: one is automatic application of strict scrutiny and the other a more flexible, balancing approach.  The Court concludes that the proper standard is a balancing approach, not an automatic application of strict scrutiny.[29]

In *Meyer v. Grant*, 486 U.S. 414 (1988), the Supreme Court concluded that "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech'" for which First Amendment protection is "at its zenith."  *Id.* at 421-22, 425.  The Supreme Court, however, rejected an automatic application of strict scrutiny.  *See Burdick v. Takushi*, 504 U.S. 428, 432-33 (1992) (rejecting notion that "a law that imposes any burden upon the right to vote must be subject to strict scrutiny").  Rather, the Supreme Court has held that "a more flexible standard applies."  *Id.* at 433 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983)).  "A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"  *Id.* at

_____

requirement that petition circulators be residents, the further requirement that they be registered voters") (internal citations omitted).  The Supreme Court concluded the voter registration requirement was unconstitutional without any special deference to the Colorado Constitution or any distinction between the Colorado Constitution and Colorado statutes.  Without deciding the issue, this Court proceeds without giving any special deference to the Maine Constitution as opposed to Maine statutory law.

[29]     The Court came to the same conclusion in its order on the motion for TRO.  *TRO Order* at 24-27.

434 (quoting *Anderson*, 460 U.S. at 789).  Thus, "[r]egulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest," while "[l]esser burdens . . . trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 434).

In *Buckley*, the Supreme Court confronted a requirement that circulators be registered voters, but the majority opinion did not explicitly state the proper level of constitutional scrutiny.  However, the *Buckley* Court did explain that "'no litmus-paper test' will separate valid ballot-access provisions from invalid interactive speech restrictions; we have come upon 'no substitute for the hard judgments that must be made.'" *Buckley*, 525 U.S. at 192 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974), and citing *Timmons*, 520 U.S. at 359, and *Anderson*, 460 U.S. at 789-90).

This more flexible approach is in line with First Circuit precedent, as well as cases from this Court and the Maine Supreme Judicial Court.  *See Pérez-Guzmán v. Gracia*, 346 F.3d 229, 239 (1st Cir. 2003) (applying the *Anderson-Burdick* analysis and explaining "[t]he rigorousness of the ensuing judicial inquiry depends upon the extent to which the challenged regulation burdens First Amendment rights"); *Bond v. Dunlap*, No. 1:20-cv-00216-NT, 2020 U.S. Dist. LEXIS 131389, at *20 (D. Me. July 24, 2020) (citing *Libertarian Party of N.H. v. Gardner*, 638 F.3d 6, 4 (1st Cir. 2011)) (stating that "courts review ballot access restrictions 'under the sliding scale approach announced by the Supreme Court' in *Anderson* and *Burdick*"); *Jones v. Sec'y*

47

*of State*, 2020 ME 113, ¶ 21, 238 A.3d 982, 988-89 ("To ensure fairness and order, the United States Supreme Court has . . . adopted a specific framework for cases involving the regulation of ballot access that does not always require application of the strict scrutiny standard," and "[t]his approach is in contrast to mandatory application of the strict scrutiny standard in reviewing restrictions on core political speech—or content-based restrictions on speech—that do not regulate ballot access").

### 2. Residency Requirement

#### a. Burden on the Plaintiffs

##### i. Caselaw from Other Courts

While the Supreme Court directly addressed voter registration requirements in *Buckley*, the Court did not reach Colorado's requirement that all petition circulators be residents of the state because the parties did not contest that provision. *Buckley*, 525 U.S. at 197. Justice Rehnquist, in dissent, specifically noted the majority's "sphinx-like silence" as to whether states may limit circulators to state residents. *Id.* at 228 (Rehnquist, J., dissenting).

In the years that have passed, however, a consensus has emerged. A majority of the federal appellate courts that has considered the question has found residency restrictions to be severe burdens and unconstitutional under a strict scrutiny review. *See Wilmoth v. Sec'y of New Jersey*, 731 F. App'x 97, 103 (3d Cir. 2018) (applying strict scrutiny to New Jersey's residency requirement for circulators); *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 317 (4th Cir. 2013) (holding Virginia's "residency restrictions bearing on petition circulators and witnesses burden First Amendment

rights in a sufficiently severe fashion to merit the closest examination"); *Nader v. Blackwell*, 545 F.3d 459, 478 (6th Cir. 2008) (Nelson Moore, J., concurring) (clarifying the majority's holding that Ohio's residency restriction "severely limits political speech and is not justified by a sufficient state interest"); *Krislov v. Rednour*, 226 F.3d 851, 860 (7th Cir. 2000) (finding a severe burden and concluding that "[b]y preventing the candidates from employing millions of potential advocates to carry their political message to the people of Illinois, the statute places a formidable burden on the candidates' right to disseminate their message"); *Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008) (holding Arizona's residency requirement poses a severe burden on plaintiffs' First Amendment rights, noting that "[w]hile the district court correctly observed that there remain millions of potential Arizona circulators, the residency requirement nevertheless excludes from eligibility all persons who support the candidate but who, like Nader himself, live outside the state of Arizona"); *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1028 (10th Cir. 2008) (applying strict scrutiny, despite not using *Anderson-Burdick* test).

In fact, only the Eighth Circuit has found a residency requirement not to be a severe burden. *See Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614 (8th Cir. 2001) (holding that North Dakota's residency requirement was not a severe burden and upholding its constitutionality). *But see Citizens in Charge v. Gale*, 810 F. Supp. 2d 916, 926 (D. Neb. 2011) (reviewing Nebraska's residency requirement and concluding that *Jaeger* did not control and was distinguishable, noting that *Jaeger*

49

specifically stated that there was "no evidence in the record" of the alleged burden associated with the ban).

The Maine Law Court, however, upheld Maine's residency requirement in *Hart v. Secretary of State*, 1998 ME 189, 715 A.3d 165.  The *Hart* Court stated that "[a]lthough technically any restriction limits the 'number of voices who will convey the [proponents'] message,' it does not follow that requiring circulators to be residents will limit the size of the audience the proponents can reach or will make it less likely that proponents 'will garner the number of signatures necessary to place the matter on the ballot.'"  *Id.* ¶ 11 (quoting *Meyer*, 486 U.S. at 422-23) (alteration in original).  The *Hart* Court distinguished its case from *Meyer*, explaining that "[i]n *Meyer*, the petitioners had only six months to gather the necessary signatures and they demonstrated a need to pay circulators in order to obtain the necessary signatures within the allotted time," while the plaintiffs "had three years to gather the necessary signatures and failed to demonstrate any necessity for employing nonresidents in circulating the petitions."  *Id.* ¶ 12.  *See Maine Taxpayers Action Network v. Gwadosky*, No. Civ.A. AP-02-005, 2002 WL 747912, at *2 n.2 (Me. Super. Ct. Mar. 19, 2002) (declining to revisit *Hart* in light of *Buckley*).

The First Circuit has not addressed residency requirements, but Magistrate Judge Cohen in *Initiative & Referendum Institute v. Secretary of State*, No. CIV. 98-104-B-C, 1999 WL 33117172 (D. Me. Apr. 23, 1999), briefly considered the issue.  The Court made quick work of the plaintiffs' challenge, noting that they "adduce[d] no evidence that Maine's residency requirement imposes any particular burden on the

initiative process." *Initiative & Referendum Inst.*, 1999 WL 33117172, at *16.  The Court also emphasized that the "plaintiffs offer[ed] no evidence in support of the basic proposition that any one of them is a non-resident who wishes to work as a circulator in Maine.  For this reason alone the claim founders."  *Id.*

These cases demonstrate that the constitutional analysis here is fact-intensive. In its TRO Order, the Court concluded that there were "too many unresolved and contested facts to issue a TRO."  *TRO Order* at 39.  The parties have since filed dozens of declarations, interrogatory responses, and statements of facts.  Based on this much more substantial factual record, the Court proceeds to analyze the specific burdens in this case.

### ii.    Evidence of Burden

The Court concludes that the Plaintiffs have proven a severe burden of their First Amendment rights.  In *Meyer*, the Supreme Court held that "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"  *Meyer*, 486 U.S. at 421-22. The Court found that a prohibition on paying petition circulators restricted political expression by "limit[ing] the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach," and "mak[ing] it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion."  *Id.* at 422-23.

The residency requirement imposes similar restrictions. By limiting the pool of available petition circulators to Maine residents, the challenged laws reduce the number of voices who can convey the Plaintiffs' message and make it less likely that their ballot will succeed. The record shows that there are out-of-state professional petition circulators, such as Plaintiff Nicholas Kowalski, Mr. Mooney, and Mr. Pool, who are skilled at efficiently collecting signatures and ensuring that the signatures collected are valid. Even Matthew Dunlap, the former Maine Secretary of State, acknowledged that it's difficult to collect signatures and it takes "a particular type of personality to be able to do this," which is why groups seek to hire out-of-state professional circulators. Out of the 38,000 signatures the Plaintiffs collected, 90% were gathered by forty-nine out-of-state professional petition circulators, while only 3,800 signatures were gathered by seventy-two Maine circulators. In other words, each out-of-state professional petition circulator has collected, on average, six hundred ninety-seven signatures, versus, on average, fifty-three signature collected by each Maine resident, including professional, paid, and volunteer residents. This is in spite of the fact that the out-of-state circulators were limited to using Maine residents as witnesses, which slows down the process of signature collection. Despite conversations with other professional petition managers, the Plaintiffs were only able to identify six Maine professional petition circulators.

The Defendants argue that "it is abundantly clear from the record that there are ample in-state circulators, be they paid or volunteer, to enable the collection of sufficient signatures within the 18-month timeframe afforded by Maine's

Constitution." *Defs.' Prelim. Inj. Br.* at 7.  They contend that there are other options available to collect signatures, such as paying Maine residents, hiring volunteers, or pairing out-of-state circulators with Maine resident witnesses.  This argument misses the point.

The Supreme Court has clearly stated that "[t]he First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer*, 486 U.S. at 424.  The *Meyer* Court explained that "Colorado's prohibition on paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication.  That it leaves open 'more burdensome' avenues of communication, does not relieve its burden on First Amendment expression." *Id.  See Nader*, 531 F.3d at 1036 ("While the district court correctly observed that there remain millions of potential Arizona circulators, the residency requirement nevertheless excludes from eligibility all persons who support the candidate but who, like Nader himself, live outside the state of Arizona.  Such a restriction creates a severe burden on Nader and his out-of-state supporters' speech, voting and associational rights"); *Krislov*, 226 F.3d at 862 ("To the extent the Illinois law prevents candidates from using the people they consider to be the best means of carrying their message to the public, it places a substantial burden on the candidates' ability to convey their political ideas, even if it only restricts the candidate from using a few circulators"); *On Our Terms '97 PAC v. Sec'y of State*, 101 F. Supp. 2d 19, 26 (D. Me. 1999) ("The [restriction on payment-per-signature], like the Colorado

payment ban [in *Meyer*], did not completely stifle initiative and referendum activity in Maine, leaving open the possibility of conducting successful signature-gathering campaigns either via volunteers or employing 'more burdensome' forms of paying professional circulators.  That these avenues remained open does not alter the finding that the Statute heavily burdened protected speech").

While the Defendants contend that there are thousands of Maine residents ready and willing to circulate petitions for pay, the record shows the Maine residents the Plaintiffs have hired are not as efficient as professional out-of-state circulators. The fact that in the past five years, there were twelve petition drives using thousands of Maine residents and only one was unsuccessful does not change the conclusion. This evidence merely shows that it is possible to have a successful petition drive, despite the voter registration and residency restrictions.  The fact that some petition drives have been able to overcome the obstacles the state of Maine has imposed against their success hardly justified the imposition of the obstacles in the first place. The record here demonstrates that signature collection efforts that currently require hundreds of Maine circulators can likely be done faster and more efficiently by a smaller number of professional circulators.

The evidence regarding volunteers further proves the point.  The record shows only one successful all-volunteer petition drive from twenty-five years ago.  While one petition drive from five years ago did have enough volunteer-collected signatures to qualify for the ballot, that fact was only apparent in retrospect and the petition drive still employed paid circulators.  Furthermore, former Secretary of State Dunlap

admitted that it is "very difficult to get volunteers to really engage with people and get them to sign petitions." Indeed, the Plaintiffs at first tried employing only Maine volunteers, but were unable to get anywhere close to the required 63,067 signatures.

The availability of in-state witnesses does not reduce the burden on the Plaintiffs. First of all, after the 2015 amendment to 21-A M.R.S. § 903-A, it is unclear to what extent the pairing of in-state witnesses with out-of-state circulators is legal. The Defendants' interrogatory responses suggest that only a Maine voter is authorized to present the petition to the voter, ask the voter to sign the petition, and personally witness the voter signing the petition. This is in line with Ms. Flynn's testimony that the 2015 amendment prohibited out-of-state persons "from handling a petition in any manner." Mr. Dunlap's statements in the SAM interview confirm that from the viewpoint of the then-Secretary of State, the purpose of the 2015 amendment was, in fact, to stop the in-state witness "end around." Thus, while theoretically the in-state witness scheme allows the Plaintiffs to use out-of-state professional circulators, it is legally dubious. Indeed, some out-of-state professional petition circulators are unwilling to come to Maine due to the 2015 amendment.[30]

---

[30]    In 2019, the Maine Legislature amended the violations and penalties section of the law, 21-A M.R.S. § 904, to include a new subsection 6:

A person commits a Class E crime if that person:

**6. Failure to truthfully execute and file circulator affidavit.** Knowingly fails to truthfully execute and timely file a circulator affidavit under section 903-A, subsection 4.

See ME. LEG. 2019, ch. 456, §§ 3, 4, 5 (eff. Sept. 19, 2019). Under 21-A M.R.S. § 903-A, the circulator affidavit requires the circulator to file an affidavit with the Secretary of State that must include:

**B.** That the circulator read the information provided by the Secretary of State pursuant to subsection 3 and understands the laws governing the circulation of petitions in the State;

Second, even if using in-state witnesses is legal—a question this Court need not resolve—the record shows that the scheme more than doubles the cost of collecting signatures and slows the signature collection process down.  This is not simply a "marginal increase in cost." *Defs.' Prelim. Inj. Opp'n* at 11.

The Defendants suggest that out-of-staters can still engage in "recruiting, hiring, training and supervising Maine circulators; hiring notaries to administer the oaths to circulators; collecting the signed petitions from the circulators or notaries and distributing them to the town offices for certifications; and organizing and filing all of the petitions with our office by the deadline." *Suppl. Flynn Decl.* ¶ 8.  These alternatives do not sufficiently alleviate the burden on the Plaintiffs' First Amendment rights.

Two final arguments advanced by the Defendants warrant explanation.  First, the Plaintiffs must submit 63,067 signatures to the Maine Secretary of State by 5:00 p.m. on February 16, 2021.  It is February 16, 2021.  The Defendants argue that it is impossible to make up the gap by using out-of-state circulators. *Defs.' Prelim.*

---

**C.** That the circulator was a resident of the State and a registered voter in the State at the time of circulating the petition;

**D.** That the circulator understands that the circulator can be prosecuted under section 904 for violating the laws governing the circulation of petitions, including that the circulator truthfully executed the affidavit.

These provisions raise the stakes for the out-of-state professional circulator, who undertakes circulation activity and is deemed to have stepped over the legal lines that the Secretary of State has drawn.  If that circulator is considered to have circulated the petition but failed to file the required affidavit, the circulator could be exposed to prosecution for violation of a Class E crime.  21-A M.R.S. § 904.  In Maine, conviction of a Class E crime subjects the person to a term of imprisonment not to exceed six months, 17-A M.R.S. § 1604(1)(E), and a fine not to exceed $1,000.  17-A M.R.S. § 1704(5).

*Inj. Opp'n* at 9.  The Court agrees.  However, the parties have agreed that even if the Plaintiffs do not gather enough signatures by February 16, 2021, they can immediately start gathering signatures to put their initiative on the 2022 ballot. Without a preliminary injunction, the Defendants will still be burdened by the residency requirement.  Thus, whether a preliminary injunction will enable the Plaintiffs to gather enough signatures for the February deadline does not obviate their need for injunctive relief.

Second, the Defendants claim that the Plaintiffs "appear to have made little effort to mount a petition drive using Maine circulators."  *Defs.' Prelim Inj. Opp'n* at 8.  This District addressed a similar argument in *On Our Terms '97 PAC*.  In that case, Magistrate Judge Cohen found that "the plaintiffs made at best a modest effort to collect signatures during the Pledge Drive in 1997, employing thirteen people for a period of at most four weeks, foregoing a chance to collect signatures on Election Day and expanding only a small fraction of their budget for payment to circulators." *On Our Terms '97 PAC*, 101 F. Supp. 2d at 25.  "Had the plaintiffs worked harder and/or more creatively and invested more resources, the Pledge Drive might have succeeded  despite  the  existence  of  the  Statute."  *Id.*  The  Magistrate  Judge nonetheless concluded that the prohibition on paying circulators was a severe burden, noting that plaintiffs had begun the process of collecting signatures when they realized the state regulation posed a significant problem for the campaign.  *Id.*  The plaintiffs "judged that the ban on payment per signature would undermine estimates of collection costs and time frames, threatening the success of the entire Pledge Drive

effort." *Id.*  The Magistrate Judge reasoned that there "was no need . . . for the plaintiffs to press their campaigns to completion to demonstrate the burdensome effect of the applicable state regulation." *Id.*

As explained, the Plaintiffs have tried employing only Maine residents to circulate their petitions.  The Plaintiffs have hired out-of-state circulators to partner with in-state residents.  They have spent thousands of dollars, employed many in-state and out-of-state individuals, and were still only able to gather 38,000 signatures.  This is much more than the "modest effort" the Magistrate Judge found sufficient in *On Our Terms '97 PAC*.  While the Defendants point out ways the Plaintiffs could have collected more signatures, the Court is persuaded that the residency requirement severely burdened the Plaintiffs' attempts to mount its petition drive.

What makes this case more difficult than other cases that have considered residency restrictions is that this District and the Maine Supreme Judicial Court have previously upheld Maine's residency requirement.  However, the Court views these cases as distinguishable.  In *Initiative & Referendum Institute v. Secretary of State*, No. CIV. 98-104-B-C, 1999 WL 33117172 (D. Me. Apr. 23, 1999), Magistrate Judge Cohen quickly dismissed a challenge to the residency requirement because "[t]he plaintiffs adduce[d] no evidence that Maine's residency requirement imposes any particular burden on the initiative process" and they offered "no evidence in support of the basic proposition that any one of them is a non-resident who wishes to work as a circulator in Maine." *Initiative & Referendum Inst.*, 1999 WL 33117172, at

58

*16.  Far from the complete lack of evidence put forth by plaintiffs in *Initiative &*
*Referendum Institute*, the Plaintiffs here have provided a substantial record detailing
the burden on the initiative process and the Plaintiffs specifically identify out-of-state
individuals who would like to work as circulators in Maine.

In *Hart v. Secretary of State*, 1998 ME 189, 715 A.2d 165, the Maine Supreme
Judicial Court upheld Maine's residency requirement and distinguished *Meyer* by
noting that the *Meyer* plaintiffs had only six months to gather the necessary
signatures and demonstrated a need to pay the circulators in order to obtain the
necessary signatures within the allotted time.  *Hart*, 1998 ME 189, ¶ 12.  Meanwhile,
the *Hart* plaintiffs had three years to gather necessary signatures and "failed to
demonstrate any necessity for employing nonresidents in circulating the petitions."
*Id.*

Here, by contrast, the Plaintiffs had eighteen months to gather signatures, but
by law, all the signatures have to be collected within a one-year window.  Moreover,
as already explained, to the extent the *Hart* Court or the Defendants here argue that
the Plaintiffs have failed to show a necessity for employing nonresidents, this misses
the point.  The proper constitutional inquiry is not a "but for" test, where the Plaintiffs
must prove but for the residency requirement they would collect sufficient signatures.
Indeed, it would be difficult to ever prove this counterfactual proposition.  Regardless
whether the Plaintiffs here can collect sufficient signatures by using only Maine
residents, the Plaintiffs have shown the inability to use out-of-state petition
circulators is a severe burden.

On the record before it, the Court is satisfied that the Plaintiffs carried their burden to show the inability to use out-of-state petition circulators is a severe burden on the exercise of their First Amendment Rights.

### b.    The State's Interests

The Court next considers whether the Defendants have shown sufficient interests that justify the severe burden.  Because the Plaintiffs demonstrated Maine's residency requirement severely burdens their First Amendment rights, the Court applies strict scrutiny.  *See Timmons*, 520 U.S. at 358 ("Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest").  Applying a strict scrutiny framework, it is the Defendants' burden to prove the residency requirement is narrowly tailored to serve a compelling interest. *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989).

The Defendants put forth two interests: (1) "procedural integrity" and (2) "protecting the initiative's grassroots nature."  *Defs.' Prelim. Inj. Opp'n* at 9.  The Defendants cite *Hart* for support:

> Residence enhances the integrity of the initiative process by ensuring that citizens initiatives are brought by citizens of Maine.  Because the circulators are the persons who verify that the signature and residence of petitioners are accurate, the residency requirement provides the State with jurisdiction over the circulators and makes the circulators easier to locate if there is a question as to the validity of the signatures collected.  Thus, any interference with proponents' right to unfettered political expression is justified by the State's compelling interest in protecting the integrity of the initiative process, and the residency requirement set forth in the Maine Constitution is narrowly tailored to serve that interest.

*Hart*, 1998 ME 189, ¶ 13.  The Plaintiffs counter, arguing that "a state can more narrowly protect its interest in policing against petition fraud by requirement that out-of-state circulators submit to the state's jurisdiction.  *Pls.' Mem.* at 12.

The Court appreciates the State's strong interest in protecting its elections.  The record shows that instances of fraud do occur, and limiting petition circulators to Maine residents makes it easier to monitor and prosecute petition fraud.  The problem is the restriction is not narrowly tailored to the interest.

In *Libertarian Party of Virginia v. Judd*, the plaintiffs, like the Plaintiffs here, argued that to combat fraud, Virginia "could compel nonresidents, as a condition of witnessing signatures on nominating petitions, to enter into a binding legal agreement with the Commonwealth to comply with any civil or criminal subpoena that may issue."  *Libertarian Party of Virginia*, 718 F.3d at 318.  The defendants made very similar arguments as the Defendants here, claiming that "ostensible consent to the extraterritorial reach of the Commonwealth's subpoena power does not guarantee the requisite access, because nonresident witnesses must yet be located and retrieved, perhaps by extradition or rendition."  *Id.*

The Fourth Circuit agreed with the plaintiffs, noting that the defendants "produced no concrete evidence of persuasive force explaining why the plaintiffs' proposed solution, manifestly less restrictive of their First Amendment rights, would be unworkable or impracticable."  *Id.*  The Court reasoned that "[t]here are few guarantees in life . . . and it is hardly an iron-clad proposition that a similarly situated resident witness will be amenable to service and comply with a lawfully issued

subpoena." *Id.* "Surely nonresidents with a stake in having the signatures they have witnessed duly counted and credited—whether that stake be political, financial, or otherwise—will possess the same incentive as their resident counterparts to appear at the Commonwealth's request and answer any questions concerning the petitioning process." *Id.* Thus, the Court found it had "scant choice but to conclude, as the district court did, that the requirement fails strict scrutiny and is unconstitutional." *Id. See also Yes On Term Limits, Inc.*, 550 F.3d at 1030 ("[R]equiring non-residents to sign agreements providing their contact information and swearing to return in the event of a protest is a more narrowly tailored option that Oklahoma has failed to prove would be ineffective").

The Court similarly finds that the Defendants here have failed to show how a requirement that petition circulators enter into a binding agreement to submit to Maine's jurisdiction and comply with any subpoenas would be inadequate. Simply because a circulator is a Maine resident does not mean they will be less likely to commit fraud or more amenable to service in Maine. This is especially true with out-of-state professional petition circulators, who have an incentive to maintain their professional reputations and get paid for their valid signatures. The Court is not convinced that in-state circulators are "far easier to contact," especially if out-of-staters are required to provide their contact information and sign a legally binding agreement. *Defs.' Prelim. Inj. Br.* at 17. While the Court appreciates the short thirty-day window the Secretary of State has to review petition signatures, the Defendants have not proven how the residency requirement is narrowly tailored.

The State residency requirement is similarly not tailored to the State's grassroots interest. It is clear to the Court that one of the purposes of the residency requirement and the 2015 amendment is to keep out-of-state interest groups out of Maine's political process. The Court understands the State's concerns. Even before its admission to the Union in 1820, the people of the state of Maine have been proud of their independence and the Court acknowledges, as former state senator Trahan suggested, there is a strong view among many Mainers that Maine people ought to decide Maine issues without outside interference. But Maine is also part of the Union and its Constitution and laws must comport with the First Amendment of the United States Constitution as interpreted by the United States Supreme Court and, when in conflict with fundamental rights, state interests must bend to the greater national good.

Moreover, the Court does not see how allowing out-of-state individuals to circulate petitions eliminates the grassroots nature of the direct initiative. Regardless of who circulates the petition, the petitions must be signed by Maine citizens and approved by Maine voters on election day before becoming law. To qualify for the ballot, a petition proponent must submit valid signatures representing 10% of the total vote cast for the Governor in the last gubernatorial election. *See Buckley*, 525 U.S. at 205 ("To ensure grass roots support, Colorado conditions placement of an initiative proposal on the ballot on the proponent's submission of valid signatures representing five percent of the total votes cast for all candidates for Secretary of State at the previous general election"); *Meyer*, 486 U.S. at 426 ("[T]he

[grassroots] interest is adequately protected by the requirement that no initiative proposal may be placed on the ballot unless the required number of signatures has been obtained").

The instant petition drive is illustrative. The Plaintiffs' initiative drive is led by Representative Billy Bob Faulkingham—a state official elected by the people of Maine. To get his initiative on the ballot, Representative Faulkingham needs to collect 63,067 signatures from registered Maine voters. If the initiative is not adopted verbatim by the Maine Legislature, it will be placed on the general election ballot as a referendum to be considered by Maine voters for adoption. The Defendants have not shown how prohibiting out-of-state individuals from circulating petitions is narrowly tailored to the State's interest in maintaining grassroots initiatives.

Nor has the Secretary of State demonstrated that Maine voters are especially vulnerable to blandishments from out-of-state circulators. To the contrary, the circulator "from away" must overcome skepticism of local Mainers approached by a stranger, and the proponents of the petition may have to respond to criticism about the use of out-of-state circulators to drum up support that would not succeed without the intervention of out-of-staters.

Therefore, the Plaintiffs are likely to succeed on the merits of their constitutional challenge to the voter registration requirement.

3.      **Voter Registration Requirement**

a.      **Burden on the Plaintiffs**

i.      **Caselaw from Other Courts**

The Supreme Court considered the constitutionality of voter registration requirements for petition circulators in *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999).  In *Buckley*, the plaintiffs challenged a Colorado law that required initiative petition circulators to be registered voters. *Buckley*, 525 U.S. at 186.  The trial record showed there were approximately 1.9 million registered voters in Colorado, and at least 400,000 persons eligible to vote but unregistered.  *Id.* at 193.  The *Buckley* Court looked to the record and compared the restriction to that in *Meyer*, reasoning that voter registration "decreases the pool of potential circulators as certainly as that pool is decreased by the prohibition of payment to circulators."  *Id.* at 194 (citing *Meyer*, 486 U.S. at 422-23).  The *Buckley* Court rejected Colorado's argument that the voter registration requirement limited speech, but not severely, because "it is exceptionally easy to register to vote."  *Id.* at 195.  The Supreme Court reasoned that "[t]he ease with which qualified voters may register to vote . . . does not lift the burden on speech at petition circulation time," noting that "there are . . . individuals for whom, as the trial record shows, the choice not to register implicates political thought and expression."  *Id.*

Although the parties have not cited a First Circuit case directly on point, other federal courts have applied the *Buckley* Court's determination.  *See Wilmoth*, 731 F. App'x at 102-03 (applying *Anderson-Burdick* analysis and holding a New Jersey voter

registration law was a severe burden on plaintiffs' First Amendment rights); *Nader*, 545 F.3d at 475 (holding Ohio's voter registration and residency requirements for candidate-petition circulators violated plaintiff's First Amendment rights); *id.* at 478 (Nelson Moore, J., concurring) (clarifying the court's holding that "the voter-registration requirement . . . is a severe restriction on political speech which cannot survive strict scrutiny"); *Krislov*, 226 F.3d at 860-62 (holding Illinois' voter registration requirement was a severe burden on the plaintiffs' First Amendment rights); *Nader*, 531 F.3d at 1035-36 (concluding Arizona's residency requirement for petition circulators was less restrictive than *Buckley*'s voter registration requirement, but was still a severe burden on plaintiff's First Amendment rights).[31]

The First Circuit has not weighed in on the issue of voter registration requirements for petition circulators, but the Defendants cite a 1999 case from this Court, *Initiative & Referendum Institute v. Secretary of State*, No. 98-cv-104-B-C, 1999 WL 33117172 (D. Me. Apr. 23, 1999), *aff'd* (D. Me. Sept. 27, 1999), where Magistrate Judge Cohen confronted the voter registration issue on summary judgment. Magistrate Judge Cohen distinguished the plaintiffs' case from *Buckley*, noting that in Colorado less than 65% of the voting-age population was registered to vote, while in Maine, approximately 98.8% of the voter-eligible population was

---

[31]   The Plaintiffs also bring to the Court's attention a Fifth Circuit case, *Pool v. City of Houston*, 978 F.3d 307 (5th Cir. 2020), where the City of Houston appeared to argue that its voter registration law was a "zombie law" in the wake of *Buckley*, comparing it to same-sex marriage laws that remain on the books after *Obergefell v. Hodges*, 576 U.S. 644 (2015), "even though everyone knows they can no longer be enforced." *Id.* at 313.  The voter registration law in *Pool*, however, restricted petition signers and circulators to Houston residents and registered voters, and this city jurisdictional restriction is significantly more restrictive than a state voter registration or residency requirement. *Id.* at 310.

registered.  *Id.* at *15.  Moreover, the plaintiffs failed to "identify the existence of any particular obstacle imposed by the voter-registration requirement, *e.g.*, that as a direct result they were unable to hire sufficient numbers of circulators or a particular initiative campaign was hurt."  *Id.*  Because the evidence demonstrated "at most the imposition of a slight burden, the less stringent standard of review applie[d]."  *Id.*

The Maine Law Court as recently as this past September upheld Maine's voter registration requirement.  In *Jones v. Secretary of State*, 2020 ME 113, 238 A.3d 982, the Maine Secretary of State had rejected the plaintiffs' petition after determining there were an insufficient number of valid signatures because some circulators were not registered voters.  *Id.* ¶¶ 2-5.  The plaintiffs filed a petition for review, and the Maine Superior Court vacated the Secretary of State's determination, concluding that *Buckley* rendered the registration requirement a violation of the First Amendment. *Id.* ¶ 8.  The Secretary of State appealed.  *Id.* ¶ 9.

Using the sliding scale balancing test outlined in *Burdick* and *Anderson*, the *Jones* Court analyzed the First Amendment burdens on the plaintiffs.  The Maine Law Court concluded that the burdens were not severe because less than two percent of people who collected signatures were determined to be unregistered and, unlike *Buckley*, none of the circulators was opposed to registering to vote.  *Id.* ¶ 31.  Thus, "although the *effect* of the signature collectors' failure to timely register in their new municipalities of residence may be severe in this case, we cannot say that the *burden* of the registration requirement on the exercise of petition supporters' First

67

Amendment rights is severe either as applied in this case or more broadly in Maine." *Id.* (emphasis in original).

In reaching its conclusion, the *Jones* Court stressed the importance of a factual record. Before engaging in its constitutional analysis, the *Jones* Court emphasized that unlike *Buckley* and *Initiative & Reform Institute*, "there has been no trial or summary judgment motion to generate evidence for the trial court's—or our—consideration here." *Jones*, 2020 ME 113, ¶ 29. The Maine Law Court stressed that "the determination of the extent of an election regulation's burden on First Amendment rights is fact-intensive and may depend on broad statistical evidence and direct testimony from those eligible to vote." *Id.* ¶ 27. "Such a record is vital, as the briefs of the parties demonstrate, with both the Secretary of State and Jones citing information from various sources concerning voter registration statistics and patterns and speculating about voter behavior given Maine's registration procedures." *Id.* ¶ 29. The *Jones* Court also highlighted that, unlike in *Buckley*, "the individual circulators whose petitions are in dispute here were not opposed to registering to vote and indeed became registered voters in their municipalities, albeit *after* they circulated the disputed petitions." *Id.* ¶ 31. *See also Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 420 (6th Cir. 2014) (noting that the sliding scale test is "fact-intensive" and stating that "[a] determination that a challenged disclosure requirement unconstitutionally burdens speech protected by the First Amendment on one record does not compel us to conclude the same of a different disclosure requirement on another record").

The Court turns to the substantial factual record to determine the severity of the burden.

### ii.     Evidence of Burden

The Court easily determines that the voter registration requirement imposes a severe burden on the Plaintiffs' First Amendment rights.  The voter registration requirement is narrower than the residency requirement—one of the prerequisites to voting in Maine is living in Maine.  The Defendants admit that "Maine's circulator registration requirement exists as a means of enforcing the state's residency requirement." *Defs.' Prelim. Inj. Opp'n* at 13.  The Court has already determined that the residency requirement imposes a severe burden.  If the residency requirement alone imposes a severe burden, a law that requires residency *and* the additional step of registering to vote is also a severe burden.  The Court briefly discusses how the voter registration requirement is more burdensome than the residency requirement.

The Defendants contend that registering to vote imposes "hardly any additional burden beyond that imposed by the residency requirement." *Defs.' Prelim Inj. Opp'n* at 13-14.  The Court agrees with the Defendants that registering to vote in Maine is easy, but the Supreme Court has held that "[t]he ease with which qualified voters may register to vote . . . does not lift the burden on speech at petition circulation time." *Buckley*, 525 U.S. at 195.  The Court accepts the Defendants' calculation that 1,063,383 people, or 97% of Maine's voter-eligible population, are registered to vote in Maine.  However, the Maine Constitution requires more than simply registering. A circulator must be a Maine resident "whose name must appear on the voting list of

the city, town or plantation of the circulator's residence as qualified to vote for Governor." ME. CONST., art. IV, pt. 3, § 20. Thus, to circulate petitions in Maine, a person must be not only be registered, but registered to vote in their town or city of residence. This means if a person moves within the state and fails to update her voter registration, she would be unqualified to circulate petitions and any signatures she collects are subject to invalidation. In a mobile society, the real number of eligible circulators must be lower than the 97% number asserted by the Defendants. Furthermore, while it may be easy for Maine citizens to check their voter registration records, it appears that only they may do so. If someone like Representative Faulkingham wants to hire a Maine resident to circulate petitions, he has no way of knowing whether the Maine resident is registered to vote or whether they are registered to vote in their town or city of residence.

The Court concludes that by requiring circulators to be Maine residents, the voter registration requirement acts as a severe burden on the Plaintiffs and that requiring circulators to be registered voters further burdens the Plaintiffs' First Amendment rights.

### b.   The State's Interests

Having found the voter registration requirement to be a severe burden, the Court applies the strict scrutiny framework, requiring the Defendants to prove the requirement is "narrowly tailored and advance[s] a compelling state interest." *Timmons*, 520 U.S. at 358. The Defendants argue that the voter registration requirement "serves the residency requirement." *Defs.' Prelim. Inj. Opp'n* at 18. They

claim "[i]t is 'a simple and . . . *verifiable* way for the Secretary of State to determine a person's residency in Maine at the time of circulation of a petition—a consideration that was not discussed in *Buckley*.'"  *Id.* (quoting *Jones*, 2020 ME 113, ¶¶ 33-34) (emphasis in original).  The Defendants also assert that the voter registration requirement "directly serves the same grassroots interest that residency does."  *Id.*

The Court has already concluded that the residency requirement is not narrowly tailored to further a compelling state interest, and the Plaintiffs are likely to succeed on the merits of their challenge.  Verification of residency is no longer a valid interest.  To the extent the restriction ensures grassroots support, the Court has already concluded that the residency requirement is not narrowly tailored to serve the grassroots interest, and the Court reaches the same conclusion here.  Thus, the Court concludes that the Defendants have not shown that the voter registration requirement is narrowly tailored to a compelling state interest.  Therefore, the Plaintiffs are likely to succeed on the merits of their constitutional challenge to the voter registration requirement.

### C.    Irreparable Harm

Irreparable injury is "an injury that cannot adequately be compensated for either by a later-issued . . . injunction, after a full adjudication on the merits, or by a later-issued damages remedy."  *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).  Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that it is a possibility.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *see also*

*Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("[P]roof of a mere possibility of injury is insufficient to justify an injunction"). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The Defendants claim that the "Plaintiffs have failed to demonstrate that it is Maine's laws—rather than Plaintiffs' own lack of diligence or simply a lack of support for the campaign—that stand in the way of them gathering sufficient signatures to qualify their petition for the ballot." *Defs.' Prelim. Inj. Opp'n* at 18. They also argue that the "Plaintiffs admit that if they fail to gather enough signatures by the deadline, they can resubmit an application to the Secretary's Office and collect signatures between March 2021 and January 2022, thereby still qualifying for the ballot in the very same election." *Id.* at 18-19.

The Court has concluded that the Plaintiffs are likely to succeed on the merits of their constitutional challenges to Maine's residency and voter registration requirements. As already explained, the Plaintiffs have shown a severe burden and are not required to further prove that it is impossible to gather enough signatures under the current law. The Court also previously discussed that even if the Plaintiffs do not meet the February 16, 2021 deadline, they can renew their signature collection efforts to put their initiative on the 2022 ballot, and so while an injunction might make no real difference for the current petition drive, they will continue to suffer harm in their next petition drive. The Plaintiffs have shown a likely deprivation of

their First Amendment rights and the Court concludes this continuing deprivation acts as an irreparable harm.

### D.   Balance of the Equities and the Public Interest

The Court must also weigh the balance of the hardships on the parties and the public interest.  On the one hand, the public has a strong interest in ensuring the freedom of speech and constitutionality of election laws.  *Pls.' Prelim. Inj. Br.* at 19-20.   On the other hand, the public has a strong interest in the regulation of referendum petitions and in protecting the integrity and grassroots nature of the direct initiative and people's veto power.  *Defs.' Prelim. Inj. Opp'n* at 20.  The Court recognizes that the public has strong competing interests on both sides but concludes the public has a greater interest in upholding its constitutionally protected freedom of speech.

In its TRO Order, the Court emphasized that "[t]here is no constitutional right to procrastinate." *Dobson v. Dunlap*, 576 F. Supp. 2d 181, 183 (D. Me. 2008).  The Court noted that the "Plaintiffs failed to offer any reason for their delay in filing this action," and that delay "has contributed in significant part to Plaintiffs' request for a somewhat urgent preliminary injunction". *League of Women Voters v. Diamond*, 923 F. Supp. 266, 275 (D. Me. 1996).  By filing its action so close to the February 16, 2021 deadline, the Plaintiffs contributed to the urgent nature of the preliminary injunction request.  By their delay, the Plaintiffs put the Court in the undesirable position of considering an important constitutional challenge on an expedited basis.  For example, the record was not complete until the Plaintiffs filed their response to the

Defendants' statement of undisputed facts at 11:59 p.m. on Wednesday, February 10, 2021.

At the same time, the Court finds the Plaintiffs' constitutional challenge both meritorious and important. The residency and voter registration requirements are a severe burden on the Plaintiffs' First Amendment rights. Meanwhile, the Court acknowledges that the effect of the injunction will be to prohibit the Secretary of State from enforcing Maine constitutional and statutory provisions regulating Maine's ballot initiative process. But if the Court is correct, and at this point it does not assume it is wrong, the Maine constitutional and statutory provisions the State would be unable to enforce violate the free speech guarantees of the First Amendment. Thus, the burden on the State depends on its right to enforce unconstitutional provisions and must bend to the Plaintiffs' legitimate First Amendment rights. Given the continuing deprivation of the Plaintiffs' First Amendment rights absent an injunction, the Court concludes the balance of equities weighs in the Plaintiffs' favor.

### E. Summary

The Court concludes that the Plaintiffs have established their entitlement to a preliminary injunction. This is not a conclusion the Court reaches lightly. The Court appreciates the strong interest the State has in protecting the direct initiative process. At the same time, petition circulation is core political speech at the heart of the First Amendment. On the record before the Court, the residency and voter registration requirements act as severe burdens on the Plaintiffs' First Amendment rights and are not justified by the State's interests. Therefore, the Plaintiffs are likely

to succeed on the merits of their constitutional challenge, and because the other preliminary injunction factors also weigh in the Plaintiffs' favor, the Court enjoins the offending laws.

Abraham Lincoln reportedly said that judges are entitled to respect because they have the responsibility to make the "last guess." Here, the Court's last guess is also its best judgment. Fortunately, under the federal judicial system, a trial judge's ruling may not be the last guess and in a case of this significance, and the Court hopes and anticipates that its ruling will be subject to appellate review. The Court will schedule a conference of counsel to discuss what happens next. The Secretary may wish to appeal this preliminary injunction order. *See Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 532 (1st Cir. 2019) (discussing appellate standards of review for an appeal of a preliminary injunction). The parties may agree to freeze this preliminary order into a permanent injunction, or they may elect to proceed with an evidentiary hearing on the pending motion for permanent injunction to create a more fulsome record, to correct any correctable errors the Court has made here, or to present the Court of Appeals with a more complete foundation for appellate review. The Court will discuss the alternatives at the upcoming conference of counsel.

## VI.   CONCLUSION

The Court GRANTS the Plaintiffs' Motion for Preliminary Injunction (ECF No. 3).[32] Accordingly, it is ORDERED that Defendant Shenna Bellows, and any

---

[32]   The Court has already ruled on the TRO portion of this motion and restricts its order to the motion for preliminary injunction.

successor in office, and Defendant Julie Flynn, and any successor in office, are hereby preliminarily enjoined from enforcing the following statutory provisions:

(1) 21-A M.R.S. § 903-A, to the extent it requires that petitions for a direct initiative or people's veto may only be circulated by a registered voter of Maine; and,

(2) 21-A M.R.S. § 903-A, to the extent it requires that petitions for a direct initiative or people's veto may only be circulated by a resident of the state of Maine, as applied to out-of-state circulators who first submit to the jurisdiction of the state of Maine for any investigation and/or prosecution of alleged violations of Maine's election code with respect to Referendum and/or People's Veto petitions filed with Shenna Bellows or Julie Flynn.

The Court OVERRULES the Defendants' Objection to the Plaintiffs' Statement of Undisputed Facts (ECF No. 37).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 16th day of February, 2021