IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
PORTLAND DIVISION

| | |
|---|---|
| WE THE PEOPLE PAC; STATE REPRESENTATIVE BILLY BOB FAULKINGHAM; LIBERTY INITIATIVE FUND AND NICHOLAS KOWALSKI,<br><br>Plaintiffs,<br><br>v.<br><br>MATTHEW DUNLAP, in his official capacity as the Secretary of State of Maine; and JULIE FLYNN, in her official capacity as the Deputy Secretary of State of Maine for the Bureau of Corporations, Elections and Commissioners,<br><br>Defendants. | :<br>:<br>:<br>: No.  1:20-cv-0489-JAW<br>:<br>:<br>:<br>:<br>: Plaintiffs' Answer to Defendants'<br>: First Set of Interrogatories<br>:<br>:<br>:<br>:<br>:            *Filed Electronically*<br>: |

## PLAINTIFFS' AMENDED/CORRECTED ANSWER TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiffs state their answers to Defendants' First Set of Interrogatories as follows:

Interrogatory #1.        Please identify, to the nearest thousand, how many signatures the campaign had gathered as of the following dates:  In Maine, once a initiative proponent is given permission to collect signatures, the proponent has 18 month period to collect, within a 12 month period, to collect the required number of signatures.  In other words, a signature is only good for a 12-month period, so a proponent has the ability to select which 12-month period within the 18-month time frame to collect and file signatures.

ANSWER:

1)      November 6, 2019        2,000

2)      January 1, 2020         2,000

2

| | | |
|---|---|---|
| 3) | March 15, 2020 | 2,000 |
| 4) | July 15, 2020 | 2,000 |
| 5) | November 4, 2020 | 12,000 (2,000 collected by November 6, 2019 not included in this total because signatures are only good for 1 year time period). |
| 6) | December 31, 2020 | 25,000 (2,000 collected by November 6, 2019 not included in this total because signatures are only good for 1 year time period). |
| 7) | Today | 38,000 (2,000 collected by November 6, 2019 not included in this total because signatures are only good for 1 year time period).  The turn in day for petition signatures in Monday, do this total reflects the signatures turned in as of Monday, January 25, 2021.  Signatures collected from January 25 through January 29 are still in the field and the campaign as no way of reporting on those increased numbers. |

Interrogatory #2.        As of each of the dates identified in Interrogatory No. 1, please separately identify how many volunteer and paid circulators were actively gathering petition signatures for the campaign, and how many of those circulators were resident, registered Maine voters.

ANSWER:

1)        November 6, 2019 – There were 50 volunteers who collected 2,000 signatures. All 50 represented to the campaign they were Maine residents.  The campaign also paid a Maine professional petition company, 4DC Augusta LLC, to manage a paid petition effort.  Though the company reported to the campaign that they engaged six Maine residents in the effort, no petition signatures were ever provided by 4DC Augusta LLC to the campaign.  This lack of production by a Maine petition company caused the campaign research other option for the campaign's petition drive for future efforts, and to look beyond the boarders of the State of Maine.

2)        January 1, 2020 – Not Applicable

3)        March 15, 2020 – Not Applicable

4)        July 15, 2020 – Not Applicable

5)        November 4, 2020 – On November 3, 2020, Plaintiffs' records show that there were 42 paid circulators and 24 volunteer circulators working the polls on Election Day.  After

Election Day, on November 4, 2020 there were 6 paid circulators and 12 volunteers.  All reported they were Maine residents.

6)     December 31, 2020 – 9 paid circulators, 2 reported to be Maine residents, 7 out-of-state circulators; 12 volunteers, all Maine residents.  The out-of-state professional petition circulators were brought in by the campaign late in this time period because the Maine residents (both professional and volunteer were not generating sufficient signatures to advance to the targeted collection totals).

7)     Today – 55 professional circulators, 6 Maine residents and 49 professional circulators. 12 volunteer circulators, all report to be Maine residents.  Most of the additional out-of-state circulators arrived in the State of Maine after January 5, 2021 (after the conclusion of the Georgia run-off election).  The high volume, most productive out-of-state professional petition circulators are waiting for a preliminary injunction so that they do not have to work with in-state resident witnesses, who slow them down and reduce their ability to collect signatures and generate income.  The professional petition circulators who can generate several hundred to a thousand signatures per week are not willing to work in the State of Maine if they have to work with an "anchor" in-state witness.

90% of the signatures collected were collected by out-of-state professional circulators.

Among the circulators contracted and currently working to collect signatures for Plaintiffs are several of circulators of African-American descent.  The campaign (Rep. Faulkingham) has been contacted by people voicing suspicion that these circulators may not be legitimate.  This gives rise two disturbing issues that the challenged provisions cause. First, Maine has the highest Caucasian population in the nation and one of the smallest African-American populations in the nation.  This gives rise to the suspicion that any African-American circulators must be non-resident and therefore unlawfully circulating petitions in Maine – even if they are Maine residents.  Second, the restrictions impose a severe handicap to issues which the African-American community may want to advance as there is a limited population of African-Americans within the Maine population from which proponents of an initiative can draw upon as a base of support.

Interrogatory #3: Please describe any efforts, between August 2019 and the present, that

Plaintiffs have made to recruit resident, registered Maine voters to act as paid or volunteer

circulators in connection with the campaign.

ANSWER:     In 2019, the campaign hired Curtis Ayotte to mobilize, organize and manage volunteers. Representatives of the campaign met with every Republican Party county committee in the state to publicize the issue and ask for volunteers to circulate the petition. Through those efforts and others, 50 volunteer circulators were recruited.  The campaign also paid a petition company located in Maine, 4DC Augusta LC, to manage a Maine resident paid petition effort.  Though the 4DC Augusta reportedly engaged 6 Maine paid residents for the effort, no petition signatures were ever produced by 4DC Augusta to the campaign.

2

Beginning in October 2020, Ballot Access LC and James Tracey have advertised for petition circulators on Craigslist and Facebook, advertising efforts which have cost the campaign about $40,000.00.  In addition, James Tracey caused flyers to be printed and distributed in Portland, Lewiston and Auburn seeking paid Maine petition circulators.  The campaign lost Maine circulators to the CMP petition effort who were reportedly paying circulators $25.00 per hour. James Tracey contacted a number of those working for the CMP petition drive to return to Plaintiffs' campaign after the CMP petition drive ended.  Plaintiff Faulkingham has promoted the campaign's effort and called for volunteers on the We The People PAC Facebook page, which has 1,474 followers, as well as on his own Representative Faulkingham Facebook page, which has 2,450 followers.  Representatives of the campaign have again met with every Republican Party county committee in Maine requesting they help recruit volunteer help in circulating Plaintiffs' petition.

The results of these extensive advertising, social media posts and word-of-mouth recruitment efforts have resulted in minimal and uneven results.  Most of the volunteers have limited their willingness to collect signatures at more comfortable locations such as at the polls on Election Day in 2020, which was, itself was severely impaired owing to Maine's decision to prohibit circulators from collecting signatures in polling location on Election Day 2020 as a result of the4 COVID-19 pandemic and because of the severe weather on Election Day 2020, most of the volunteer circulators were not willing to work in the snow to collect signatures outside the polls on Election  Day 2020.

Further, because of the many people who are registered to vote in Maine, but who reside either at an address other than the address at which they are registered to vote, or even outside the State of Maine, it is not possible for Plaintiffs to be certain that the people recruited through their advertising and word-of-mouth campaigns in Maine qualify as the "resident, registered Maine voters" contemplated by this interrogatory. For instance, Plaintiffs are aware that the following individuals are registered voters of Maine, but received a Maine absentee ballot at an address outside the State of Maine for the 2020 general election:

- Olivia Pearson 8/22/94. Graduated Colby 2016. 2017 to present, University of Colorado cancer center research coordinator. Appears to be registered to vote there but Clerk instructs her records may fall under identity protection law an must be obtained by Waterville Clerk. Clerk Marie Albert's contact is malbert@bouldercounty.org.
- Maxwell R Abramson 2/13/98. Graduated Colby 2020. Linkedin states he is a software developer for CGI and resides in the greater Lewiston, Maine area. Exact address cannot be determined but as a graduate, it is not 4000 Mayflower Hill.
- David Berle Carman 2/23/98. Graduated Colby 2020. Registered in Glendale, MA since July 2016. Status is Active. Glendale Clerk Terri Iemolini contact is (413)298-4170.
- Anna Louise Gildea 6/27/98. Graduated Colby 2020. Registered to 22 Church St. Weston, MA on 10/19/20. Requested absentee ballot from that address same day which was sent to 343 East 21st St NY, NY. Possible this individual intends to vote twice. Weston Clerk Deborah Davenport's contact is (781)893-7320.
- Anna West Van Dreser 4/3/98. Graduated Colby 2020. FB states she currently resides in Boulder, CO where she was previously registered from 5/7/2015 to 10/25/2016. No further info available, but clearly no longer has an address in Waterville.
- Ezekiel Bond Edwards Mizel 3/13/99. Listed as an Active voter at 939 Tower Rd. Winnetka, IL 60093. This is the same address to which his absentee ballot was sent. I am unable to access his voting history.

2

- Oliver Lloyd Lawrence 7/6/99. Listed as an Active voter at 18 Range Rd. Norwalk, CT. This is the same address to which his absentee ballot was sent. Contact Clerk Kim at (203)854-7746.
- William A Terzi 6/26/99. Voted in primary election on 8/14/18 from address 23 High Hill Rd. Wallingford, CT. This is the same address to which his absentee ballot was sent.
- Tyler John Veilleux 4/3/99. Maine resident that appears to be distance learning from his parent's home in Yarmouth and no longer possesses a residence address in Waterville. Apparently has not re-registered in Maine or the CVR would have caught it.
- Cameron Brian Walker 10/22/99. Listed as an Active voter at 1727 Mustang Crossing Missouri City, TX 77459. This is the same address to which his absentee ballot was sent. I am unable to obtain his voting history.
- Gabriel Lewis Tigay 11/30/98. Linkedin indicates he is interning in NY, NY for a Real Estate Development Co. and is from New York City metro area originally. I am unable to obtain his initial home address online and given the size and scope of NY City, am unable to determine if this individual is or is not registered currently in New York. Individual currently has no residential address in Waterville that can be identified.
- Carissa Hu-Wen Yang 1/25/99. Listed as an active voter at 3501 Walnut Ave Wilmette, IL 60091. This is the same address to which her absentee ballot was sent. I am unable to obtain her voting history.
- Jesse Kase 5/10/2000. Registered 10/16/2020 and active at 179 Hope St. Providence, RI 02906. This is the same address to which his absentee ballot was sent. Voter ID# 28001467994.
- Jared Wood 1/21/2000. Listed as an Active voter at 138 Argilla Rd. Ipswich, MA 01938. This is the same address to which his absentee ballot was sent.

Accordingly, Plaintiffs cannot certify for purposes of this interrogatory that those who responded to Plaintiffs' recruitment efforts are, in fact, resident registered voters who currently reside at the address indicated on their voter registration record, and therefore qualified under the challenged Maine statutory provisions to circulate initiative petitions in the State of Maine.

Interrogatory #4.      Please describe the rate paid to circulators who are – or have been – employed to work on the campaign. If that pay rate has differed between Maine resident and non-resident circulators or between individual circulators, or if it has changed over time, please separately describe those rates.

ANSWER:      Prior to and on Election Day 2020, professional circulators were paid $2.00 per signature. After November 3, 2020, the rate per signature was increased to $2.50 per signature to reflect the more difficult collection environment where voters are not congregated in one place. In December, 2020, the rate was increased to $3.00 per signature. Out-of-state professional petition circulators, who first came to work with Maine resident in-state witnesses in December 2020 were, and still are, paid $3.00 per signature. In addition to the $3.00 per signature compensate, out-of-state professional petition circulators have their accommodation reimbursed if they collect at least 300 signatures per week, in lieu of the $.50 per signature bonus paid to Maine resident professional circulators who do not have accommodation costs.

2

Interrogatory #5.       Please describe the rate paid to witnesses who are – or have been – employed to work on the campaign.  If that pay rate has differed between witnesses or changed over time, please separately describe those rates.

ANSWER:     Maine in-state witnesses are paid $100.00 per day for an expected 8-hour day.  If they provide transportation, they are paid an additional $50.00 per day for an 8-hour work day.  Most of the in-state resident witnesses are more elderly and not willing to work more than an 8-hour day.

Interrogatory #6.       Please describe the responsibilities assigned to witnesses who are – or have been – employed to work on the campaign.

ANSWER:     In-state resident witnesses must establish to the campaign that they are residents of the State of Maine and registered to vote at the address at which they currently reside.  They are required to work with out-of-state professional circulators, usually limited to an 8-hour work day.  Their sole duty that they are required to complete which they are working to directly observe the entire process employed by the out-of-state professional circulator in securing every signature on Plaintiffs' petitions.  They are also further tasked with truthfully executing the circulator affidavit or oath for those (and only those) petition pages for which they observed, on a first-hand basis, the collection of signatures.  Accordingly, the out-of-state petition circulators are required to use different petition pages when they work with different in-state witnesses on different days, so that the signatures observed by an in-state witnesses are segregated onto individual petition pages.

Interrogatory #7.       Please define the term "professional petition circulator," as used in several of the declarations that Plaintiffs have filed, and in so doing please describe how, if at all, a "professional petition circulators" differs from any other person hired and paid to collect signatures on a petition.

ANSWER:     A professional petition circulator is an individual who earns a significant portion of their annual income from the circulation of election petitions, such as candidate nominating petitions, initiative and referendum petitions, recall petitions and legislative veto petitions.  In addition, professional petition circulators will sometime be hired to collect signatures on issue-based petitions used to lobby elected officials to advance a particular policy agenda, such as the "Petition to Stop the Slaughter of Harp Seals" or some such other issue advocacy petition.  A professional petition circulator is someone who is routinely engaged in the circulation of election petitions and, as a result of their experience, have acquired the skills necessary to engage a stranger on the street or at an event and quickly communicate the purpose of the petition, ascertain if the targeted stranger is legally qualified to provide a valid signature and to instruct the stranger on how to properly execute his/her signature on the petition.

2

Professional petition circulators, through experience, understand, in general that there are rules which govern the circulation of petitions and that they must familiarize themselves of the rules which govern the circulation of election petition in the jurisdiction in which they are collecting signatures. Typically, the best professional petition circulators can routinely collect several hundred and up to a thousand signatures per week (subject to many variables). Accordingly, a professional petition circulator is not merely an individual who is paid on a few occasions to collect petition signatures on an itinerate basis.

The best professional petition circulators (i.e., professional petition circulators who are known to routinely collect a high volume of valid petition signatures) are well known and have a good reputation within the industry of petition management firms.

Interrogatory #8.    Please identify how many "professional petition circulators" reside in Maine and the basis for that figure.

ANSWER:    James Tracey, who has significant experience in Maine petition efforts, both in terms of initiative and people's veto petitions but also candidate nominating petitions, has identified 6 active professional petition circulators who reside in the State of Maine. In conversations with Tim Mooney and other prominent professional petition managers, no additional professional petition circulators were identified as residents of the State of Maine. Discussions with Edee Baggett, CEO and president of National Ballot Access, also one of the largest petition management firms in the United States (they managed President Trumps 2016 ballot access campaign), also confirmed that she was not aware of any other professional petition circulator who was a resident of the State of Maine other than those on the list of 6 professional petition circulators identified by James Tracey.   Of the six known Maine professional petition circulators, none of them are considered by Edee Baggett or Tim Money as being on a list of those considered to be among the best in the industry.

Interrogatory #9.    Please identify the number of "professional petition circulators," whether based on Maine or outside of Maine, that Plaintiffs or their contractors have contacted to date – and intend to hire or retain – in connection with the campaign should Plaintiffs secure a preliminary injunction. And the pay rate that has been agreed upon with those circulators.

ANSWER:    In addition to the 55 professional petition circulators now working on Plaintiffs' campaign, Plaintiffs and Plaintiffs' contractors have identified 135 additional professional petition circulators who are available to circulate Plaintiffs' petition in Maine under the current pay structure and are willing to do so if they do not have to work with an in-state resident witness. Within this group of 135 additional petition circulators, are some of the best professional petition circulators in the nation, able to collect a large number of valid petition signatures in a short period of time. Even at the current 300 per-week minimum signature threshold Plaintiffs have established for the reimbursement of accommodations to out-of-state circulators by the campaign, that translates into an anticipated 30,000-40,000 additional valid

2

signatures by February 15th (assuming the Court provides a full week of relief under the requested preliminary injunctive relief).

Interrogatory #10.     For out-of-state circulators who are – or have been – employed to

work on the campaign, please indicate whether they have paid (or are paying) for their travel,

meals, and lodging and, if not, who has covered these expenses.

ANSWER:     Initially, travel expenses are paid by the campaign for out-of-state circulators.  Travel expenses are advanced based on the requirement that the out-of-state circulator collects at least 500 signatures.  Otherwise, any travel expenses advanced are deducted out of any signature payment owed to the circulator.  Accordingly, as travel costs are advanced, the campaign only contracts with known professional petition circulators who have a reliable reputation for being able to collect signatures in difficult situations.  The 500 signature requirement, in turn, is acceptable to professional out-of-state circulators only if they do not have to work with an in-state resident witness who may directly impair their ability to collect the 500 signatures required for them to retain their travel payment advance.

Interrogatory #11.     For any out-of-state circulators employed to work on the

campaign, or who Plaintiffs intend to employ to work on the campaign should they secure a

preliminary injunction, please indicate whether – and for how long – Plaintiffs will require those

circulators to remain in Maine following delivery of their petitions to local town offices and, if

so, who will pay their expenses during that period.

ANSWER:     First, just like resident Maine circulators, no initiative campaign can hold their circulators hostage within the State of Maine.  Resident Maine circulators are free to leave the State of Maine at their own determination.  However, Plaintiffs have agreed with their out-of-state professional petition circulators to pay for their travel back to the State of Maine and their accommodation within the State of Maine in response to any request by Maine officials to answer any questions necessary to validate petition signatures filed by them on behalf of Plaintiffs' initiative effort.  Furthermore, out-of-state petition circulators are required to provide the campaign easy contact information, typically their cell phone number, so that the campaign can communicate with them as necessary after the petitions have been filed.

Interrogatory #12.     Please identify where Plaintiffs intend to have – or have had – circulators gather signatures in order to "saturat[e]" Maine, as described in Paragraph 15 of Timothy F. Mooney's declaration, or "move through crowds," as identified in Paragraph 12(e) of Paul Jacob's first declaration.

ANSWER:     Professional petition circulators are independent contractors and free to choose their own locations to petition.  In fact, this is one of the administrative advantages of hiring experienced professional circulators – they know how to, and prefer, to locate their own spots to collect signatures and secure the necessary permission, when necessary, to do so, thereby relieving the campaign the burden of locating petition sites and tracking down the person(s) who can grant the necessary permission to set up shop at that location – a person, often best located by someone on the ground, engaging in a one-on-one discussion as to where the person may circulate a petition, rather than on the phone by someone located in an office who may be unfamiliar with the location and unable to fully comprehend the extent and limitations placed on the permission granted.  Furthermore, the freedom to select and change petition locations is one of the reasons why many professional petition circulators refuse to work with an in-state witness as experience has shown they are often unwilling or unable to change their geographical location as conditions warrant thereby impairing a professional petition circulator from being able to freely move from location to location following where crowds may be found at certain times of the day (i.e., mass transportation hubs on weekday mornings and evenings, cities centers during weekday lunch hours, school events in the evening and farmers and flea markets, festivals, sporting events and concerts on the weekends).

The locations that professional petition circulators tend to select are those with the most crowds, which during the COVID-19 pandemic are fewer in number than in normal times.  Despite the reduced number of opportunities to work crowded locations to collect signatures in Maine during the COVID-19 pandemic, professional petition circulators working for the campaign have worked the few events held in Augusta and other population centers within the Maine.  One of the more reliable locations to collect signatures, even during the COVID-19 pandemic is in parking lots of shopping centers.  In order to collect the maximum number of signatures at a location, a professional petition circulator requires the willingness to move through the parking lot, or crown, or pedestrian flow to make direct eye-contact, which is the best position to initiate a conversation with a stranger.  This technique, learned from experience, requires constant movement, speed and perseverance – a level of mobility with which a professional petition circulator is accustomed and which is foreign to most in-state witnesses who are often elderly individuals (normal working aged individuals are not available or willing to serve as an in-state witness during the week as they have their normal jobs and are not willing to work at what is essentially minimum wage on their days off on the weekends).  The 135 additional out-of-state professional petition circulators that the campaign has identified as willing to travel to work in Maine once the limitation of having to work with an in-state witness is removed, is a sufficient number to man most of the preferable locations in Maine's population centers.  Further, if the campaign runs out of location to petition, the out-of-state professional circulators are willing to go door-to-door to collect signatures.

2

Interrogatory #13.      On October 16, 2019, the Bangor Daily News reported that the

campaign has been suspended for failure to raise sufficient money, citing a Facebook post

written by Plaintiff Faulkingham (link address omitted). Please describe to what extent this

report is accurate and the actions taken to effectuate the suspension described therein.

ANSWER:     It is an accurate report, as the campaign took a pause after the
failure of 4DC Augusta to collect any of the signatures promised in October 2019.  The pause
permitted the campaign to reevaluate what was necessary to successfully collect the required
number of signatures within the 1-year period permitted and gave the campaign time to secure
sufficient funds necessary to collect the required number of signatures within the required 1-year
time frame.  Donors will not send promised contributions until they are sure their contributions
will go to an effort with a reasonable chance of success.  Accordingly, there is a critical mass of
funding necessary to trigger the launch of a petition drive.  The campaign's reevaluation resulted
in the understanding that the campaign needed to hire better and more experienced professional
circulators who were largely resident in states other than Maine and the need to amass
contributions or have access to reliable funding in excess of $300,000 before the deadline to file
petitions in February, 2021.

Interrogatory #14.     Please identify the date on which the campaign was restarted and

describe why and how the campaign was restarted at that time.

ANSWER:

In September 2020, Paul Jacob with Liberty Initiative Fund contacted Rep. Faulkingham
about the Pledge to Protect Our Vote then being launched by Americans for Citizen Voting to
highlight the issue of Citizen Voting and put candidates on the record. During a discussion after
an October 7, 2020, news conference in Augusta to publicize the pledge, Faulkingham and Jacob
discussed the idea of starting the petition drive again as part of a door-to-door canvass to build
awareness among the public of where the issue stood and where candidates stood on it. The
effort would amplify the issue when the public is most interested in politics, during an election,
while also gathering signatures and building a manpower team able to cover more polling places
on Election Day to gather more signatures. On October 13, Rep. Faulkingham announced that
the petition drive was re-starting.

Interrogatory #15.    Please identify the "research" and "advice" behind Plaintiff

Faulkingham's assertion in Paragraph 10 of his declaration that "the best professional petition

circulators reside outside the State of Maine."

ANSWER:    After the campaign had contracted with the resident Maine petition
management 4DC Augusta LLC to collect signatures on Election Day 2019 and failed to receive
any of the promised signatures, Plaintiff Faulkingham engaged in general conversations with
legislative colleagues and other individuals familiar with the most efficient way to collect the
signatures necessary to secure ballot access for the citizen only voting initiative and was directed
to the names of certain out-of-state petition management firms who used professional petition
circulators who were more experienced and routinely collected several hundred signatures on a
weekly basis as the best way to collect signatures for the campaign.  In more detailed discussions
with Paul Jacob, who, in turn, had conversations with Tim Mooney and Edee Baggett, the
substance of which were related to Representative Faulkingham, it was discovered that there
were several hundred professional circulators who were not residents of Maine who could each
collect several hundred signatures each week with a validity rate in excess of 70%, who could
collect the necessary 90,000 signatures to secure ballot access in a few weeks.  Those reported
numbers are an objective, rather than a mere subjective assessment, that the best professional
petition circulators reside outside of the State of Maine.  In addition, of the six known
professional circulators who do reside in the State of Maine, none of them are considered to be
among the best petition circulators known to the major petition management firms headed by
Tim Mooney and Edee Baggett.

Interrogatory #16.    Please describe Plaintiff Kowalski's efforts to date, if any, to

participate in the campaign, whether by assisting the campaign directly or by voicing his support

for the subject matter of the campaign.

ANSWER:    Plaintiff Kowalski and the campaign now have an agreement for
him to travel to the State of Maine if non-residents are permitted to work without in-state
resident witnesses.  Plaintiff Kowalski is willing to submit to the jurisdiction of the State of
Maine to be able to freely circulate Plaintiffs' petition in Maine.  Plaintiff Kowalski has also
identified 20 professional petition circulators who have expressed an interest and willingness to
travel to Maine, based on the compensation, travel and accommodation plan set forth in
interrogatories above, so long as they do not have to work with an in-state resident witness, and
are also willing to submit to the jurisdiction of Maine to be able to freely circulate Plaintiffs'
petition in Maine.

2

Interrogatory #17.      Please explain why We The People PAC did not file a lawsuit challenging the laws at issue [in] this case until December 31, 2020, less than two months before the end of the circulation period for this petition under Maine law.

ANSWER:      Our hope was that a lawsuit would not be necessary, because filing a lawsuit in federal court is not a simple proposition, but rather an enormously time-consuming and expensive one. It was not until after the November 2020 election and after the COVID-19 Election Day restrictions impaired the campaign's ability to collect a sufficient number of signatures to rely thereafter solely on Maine resident circulators to secure ballot access that Plaintiffs assessed the need to contract with out-of-state professional petition circulators and that the instant lawsuit was necessary.  Key people working on the campaign, managing the petition effort and raising the necessary funding for the effort have had to divert an estimated 60 to 100 hours of time to gather information, communicate with attorneys, make declarations and respond to interrogatories.

Furthermore, the cost of litigation to Liberty Initiative Fund is considerable.  Past involvement and knowledge of such cases suggest litigation costs in excess of $100,000 was likely and could cost three times that much, depending on potential appeals.  Initially, Liberty Initiative Fund lacked sufficient funds segregated for the purpose of initiating this litigation which we believed necessary to obtain effective legal representation.  Accordingly, Plaintiffs were not able to immediately engage local and experienced litigation counsel until compensation for counsel and litigation costs could be secured, which did not occur until after the Christmas Holiday.

In addition, the decision to initiate this lawsuit in December was with the knowledge that if out-of-state professional petition circulators were permitted to enter Maine, the number and quality of the professional circulators was such that in a short period of time the campaign would be able to collect a sufficient number of signatures to meet the current February deadline for the 2022 election.

In addition, Plaintiffs are also aware that if they do not collect the required number of signatures to meet the current February, 2021 deadline, Plaintiff can immediately refile the initiative petition and still make the 2022 ballot if they file signatures from a new petition drive with signatures collected from March 2021 to January 2022.  Accordingly, when funds became available in December, 2020 for this litigation, filing the action within a week, at the end of December, would permit Plaintiffs a meaningful remedy for both options to make the 2022 general election ballot.

Dated: January 30, 2021

Reviewed & Submitted by Counsel:          **/s/ Paul A. Rossi**
                                          Paul A. Rossi
                                          *Counsel to Plaintiffs*
                                          Admission *Pro Hac Vice*
                                          IMPG Advocates, Suite 1020
                                          316 Hill Street, Mountville, PA  17554
                                          717.961.8978   Paul-Rossi@comcast.net

2

## VERIFICATION OF INTERROGATORY ANSWERS

I, Billy Bob Faulkingham, as both Plaintiff in the above captioned action and as the authorized agent and officer of Plaintiff We The People PAC, believe based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed by my hand on February 17, 2021:

_Billy Bob Faulkingham_

Billy Bob Faulkingham
Plaintiff

_Billy Bob Faulkingham_

Billy Bob Faulkingham
For:  Plaintiff, We The People PAC

I, Paul Jacob, as the authorized officer and agent of Liberty Initiative Fund, believe based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed by my hand on February 17, 2021:

Paul Jacob
For Plaintiff
Liberty
Initiative
Fund

13

I, Nicholas Kowalski, believe based on reasonable inquiry, that the foregoing answer to Interrogatory #16, the only interrogatory response which requires my verification, is true and correct to the best of my knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed by my hand on February 19, 2021:


_Nicholas Kowalski_
_____
Nicholas Kowalski
Plaintiff